UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

**FILED**

NOV 08 2019

U.S. DISTRICT COURT
INDIANAPOLIS, INDIANA

JURIJUS KADAMOVAS

        PETITIONER,

T. J. WATSON
WARDEN UNITED STATES
PENITENTIARY, TERRE HAUTE
(USP),

        RESPONDENT.

CAUSE NO:

2:19-cv-0540-JPH-MJD

PETITION FOR WRIT OF HABEAS CORPUS
PERSUANT TO 28 U.S.C § 2241

<u>THIS IS A DEATH PENALTY CASE</u>

COMES THE PETITIONER JURIJUS KADAMOVAS,
PRO SE, AND FOR HIS CAUSE OF ACTION STATES
AS FOLLOW:

PRO SE PLEADINGS MUST BE CONSTRUED LIBERALLY.

1. ALLEN v. CALDERON, 408 F. 3d 1150, 1153 (9TH Cir. 2005) (WE MUST CONSTRUE PRO SE HABEAS FILINGS LIBERALLY.")

PRO SE PLEADINGS, ALLEGED FACTS ACCEPTED AS TRUE.

2. EARP v STOKES 423 F. 3d 1024 (9TH Cir. 2005) P.1032 WHERE THE PETITIONER ESTABLISHES A COLORABLE CLAIM FOR RELIEF AND HAS NEVER BEEN AFFORDED A STATE OR FEDERAL HEARING ON THIS CLAIM, WE MUST REMAND TO THE DISTRICT COURT FOR AN EVIDENTIARY HEARING. (CITING STANDEVITZ v. WOODFORD, 365 F. 3d 706, 708 (9TH Cir. 2004) IN SHOWING A COLORABLE CLAIM, A PETITIONER IS REQUIRED TO ALLEGE SPECIFIC FACTS WHICH, IF TRUE, WOULD ENTITLE HIM TO RELIEF." ORTIZ v. STEWART, 149 F. 3d 923, 934 (9TH Cir. 1998)

## INTRODUCTION
### A LITHUANIAN CITIZEN

3. JULIUS KADAMOVAS IS A PRISONER ON FEDERAL DEATH ROW IN THE SPECIAL CONFINEMENT UNIT (HEREAFTER SCU) AT THE UNITED STATES PENITENTE-

2.

ARY AT TERRE HAUTE, INDIANA (HEREAFTER USP-TH);

4. THE FEDERAL OFFICIALS, AGENTS AND EMPLOYEES OF THE FEDERAL BUREAU OF PRISONS (HEREAFTER BOP), WHO HAVE BEEN NEGLIGENT IN THEIR DUTIES AND WHO HAVE DENIED AND CONTINUE TO DENY PETITIONER KADAMOVAS'S RIGHTS PURSUANT TO THE SIXTH AND FIRST AMENDMENTS OF THE U.S. CONSTITUTION, AS WELL AS THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT OF THE UNITED STATES CONSTITUTION, BY FAILING TO ADHERE TO THEIR OBLIGA-TIONS TO ALLOW KADAMOVAS TO BE PRESENT WHEN LEGAL MATERIALS, BOTH CONFIDENTIAL AND NON-CON-FIDENTIAL, ARE OPENED AND REVIEWED, AS WELL AS KADAMOVAS'S RIGHT TO ACCESS TO THE COURTS, AND HAVE FAILED TO ADDRESS, IN ANY FASHION, THE LOSS, OVER THE YEARS OF KADAMOVAS'S LEGAL MATERIALS PERTINET TO HIS DEATH PENALTY APPEAL, INCLUDING THOSE PROTECTED BY THE ATTORNEY- CLIENT PRIVILEGE, WHEN THE BOP OFFICIALS HAVE NOT IMPLEMENTED REASONABLE POLICIES AND PROCEDURES TO KEEP HIS LEGAL MATERIALS SAFE AND SECURE AND, IN FACT, HAVE CREATED AND ENFORCED POLICIES WHICH HAVE LED TO THE LOSS OF LEGAL MATERIALS RELATED TO KADAMOVAS'S DEATH PENALTY APPEAL, AS WELL AS IN KADAMOVAS'S VIEW, READING AND COPYING KADAMOVAS'S ATTORNEY-CLIENT PRIVILEGED LEGAL

3.

MATERIALS AND THEN PROVIDING COPIES OF DOCUMENTS AND WORK PRODUCT ESSENTIAL FOR HIS CHALLENGE TO HIS CONVICTION TO THE PROSECUTORS IN LOS ANGELES. THE BOP OFFICIALS ACTIONS ALSO VIOLATE THE EIGHTH AMMENDMENT OF THE U.S. CONSTITUTION BY KEEPING HIM IN SOLITARY CONFINEMENT FOR MORE THEN 17 CONSECUTIVE YEARS AS THEIR ACTIONS HAVE INFLICTED UNNECESSARY AND WANTON MENTAL EMOTIONAL AND PHYSICAL PAIN UPON KARAMOURS THAT CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT.

5. ALSO THE BOP OFFICIALS VIOLATE THE UNITED NATION'S STANDARD MINIMUM RULES OF THE TREATMENT OF PRISONERS, RULE NUMBER 53 "PRISONERS SHALL HAVE ACCESS TO OR BE ALLOWED TO KEEP IN THEIR POSSESSION WITHOUT ACCESS BY THE PRISON ADMINISTRATION, DOCUMENTS RELATING TO THEIR LEGAL PROCEEDINGS." AS WELL RULES 42, 43, 44, 45, RULE 42 "IN NO CIRCUMSTANCES MAY RESTRICTIONS OR DISCIPLINARY SANCTIONS AMOUNT TO TORTURE OR OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT. THE FOLLOWING PRACTICES, IN PARTICULAR, SHALL BE PROHIBITED:
   A) INDEFINITE SOLITARY CONFINEMENT;
   B) PROLONGED SOLITARY CONFINEMENT;

6. SEE ALSO CONVENTION AGAINST TORTURE AND OTHER CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT

4.

PART I, ARTICLE 1, PROVIDES, "FOR THE PURPOSES OF THIS CONVENTION, THE TERM "TORTURE" MEANS ANY ACT BY WHICH SEVERE PAIN OR SUFFERING, WHETHER PHISICAL OR MENTAL..." SEE ALSO ARTICLES 4, 9, 10, 14, AND ARTICLE 16 PROVIDES, "EACH STATE PARTY SHALL UNDERTAKE TO PREVENT IN ANY TERRITORY UNDER ITS JURISDICTION OTHER ACT OF CRUEL INHUMAN OR DEGRADING TREATMEN OR PUNISHMENT."

7. IT IS ALSO DIRECT VIOLATION THE INTERNATIONAL COVENANT ON CIVIL AND POLITICAL RIGHTS, WHICH THE U.S. ALSO HAS RATIFIED, PROVIDES UNDER ARTICLE 7, THAT "NO ONE SHALL BE SUBJECT TO TORTURE OR TO CRUEL INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT."

8. AS WELL, THE BOP OFFICIALS VIOLATING ARTICLES 3, AND 36 OF THE VIENNA CONVENTION ON CONSULAR RELATIONS BY OPENING UADAHOVAS'S MAIL FROM HIS LITHUANIAN EMBASSY, CLEARLY MARKED AS CONSULAR CORRESPONDENCE, WITHOUT HIS PRESNCE.

9. PETITIONER SEEKS TO VACATE HIS SENTENCE AND GRANT A NEW TRIAL, AS WELL AS VACATE HIS SOLITARY CONFINEMENT STATUS.

## JURISDICTION AND VENUE

10. FEDERAL HABEAS CORPUS RELIEF UNDER 28 U.S.C § 2241

is available to anyone held "in custody in violation of the Constitution, laws or treaties of the United States." In order to invoke jurisdiction under 28 USC §2241, Kadamovas must show that 28 USC §2255 is inadequate for providing redress. Adequacy is determined by considering whether, in the circumstances of the case, the "essential function" served by habeas corpus is impaired "by the limitations on the use of the remedy provided in Section 2255."

11. Kadamovas's, direct appeal petition for a writ of certiorarry to the U.S. Supreme court No 18-7489 was deny on October 8, 2019 and his one year of time limitation for file 2255 relife started, but because of the BOP officials misconduct, it will be "literally impossible" for Kadamovas to present his case for 2255 relife. Among the reasons;

A) The loss over the years, significant part of the legal materials and work products.

B) Will be not be able to have an attorney to help, because not possible to have attorney client privilege.

C) No miningful access to discovery and other legal materials,

D) Torturous conditions in solitary confine-

6.

MENT, PREVENTING TO WORK.

12. VENUE IS PROPER IN THIS COURT BECAUSE A SUBSTANTIAL PART OF THE EVENTS AND OMMISSIONS GIVING RISE TO PETITIONER'S CLAWS OCCURRED IN THIS DISTRICT AND DIVISION. 28 U.S.C § 1391 (B)(2)

13. THIS COURT MUST FIND JURISDICTION AND ALLOW HIM TO PROCEED WITH HIS PETITION; THERE IS NO OTHER REMEDY FOR THE FUNDAMENTAL AND UNCONSTITUTIONAL DEFECT AND ERROR IN THIS CASE WHEN HARM IS IRREPARABLE AND KADAMOVAS WILL BE NOT BE ABLE TO WORK AND PRESENT HIS CASE FOR 28 U.S.C. 2255 REMEDY.

14. PETITIONER KADAMOVAS HAS EXHAUSTED HIS ADMINISTRATIVE REMEDIES TO EXTENT POSSIBLE, HE HAS NO FURTHER ADMINISTRATIVE RECOURSE. PETITIONER WAS VERY DILIGENT IN ATTEMPTS TO RESOLVE ALL ISSUES RELATED TO HIS ACCESS TO LEGAL MATERIALS, PRIVILEGE COMMUNICATION WITH HIS ATTORNEYS AND ISSUES RELATED TO SOLITARY CONFINEMENT. HE FILED MORE THEN 200 GRIEVANCES TO THE BOP, WITH NO REDRESS, HE WAS ON FIVE HUNGER STRIKES, TO BRING ATTENTION TO HIS ISSUES AND FILE FIVE LAWSUITS IN THIS COURT. SEE;

NO: 2:02 - cv- 259 - WTC - JMS
NO: 2:11 - cv- 0015 - WTL - DKL
NO: 2:14 - cv- 179 - WTL - WGH

7.

No: 2:11-cv-258 WTL-WGH

No: 2:17-cv-00050 WTL-DML

WITHOUT ANY SUCCESS AS YET.

# FACTUAL ALLEGATIONS

## ON-GOING LOSS OF LEGAL MATERIALS RELATED TO DEATH PENALTY APPEALS[1]

[1] PETITIONER ATTACH A PRINTED ACTUAL ABLIGATIONS THAT WAS FILED FOR AMENDED COMPLAIN CAUSE NO: 2:18-CV-00490 JRS-MJD BECAUSE THEY ARE IDENTICAL TO THIS PETITION AND EASIER TO READ THAN PLAINTIF'S HANDWRITING.

8.

15. After Plaintiff's conviction, all his files, including discovery, as well as all his personal and confidential notes (on CD's and DVD's – more than 300 of them!) were confiscated when his trial lawyer sent them to USP Terre Haute, where he has been since April of 2007. Not only were his files confiscated, but prison officials reviewed the contents outside his presence and without his permission and then claimed months later than 19 of the CD's of materials would not open. This makes no sense to Plaintiff because when he had last worked on his laptop computer in the Metropolitan Detention Center in Los Angeles, he had been able to open every CD/DVD and had made digital notes based upon his review of the discovery, court transcripts and other documents. Plaintiff's request to be present and watch the CD's being opened and to make an inventory was denied by BOP officials. A letter to his attorney confirms that his electronic media was confiscated and, as such, could not be viewed in the prison visiting room and that 19 compact discs were unable to be viewed.

16. E-mail communications between Plaintiff's appeal attorney and a prison attorney in which the prison attorney informed his counsel that Case Manager `English scanned the discovery several months back for contraband and he did not have any issue opening any of this discovery! This proves that Plaintiff's files were, at some point in time, erased or otherwise destroyed.

17. Starting in 2008, concerned about his ability to work on his death penalty appeal case as well as the security of his legal materials related to his conviction and death sentence, some of which is attorney/client privileged, Plaintiff KADAMOVAS requested to keep his digital legal materials in his cell where he was allowed to keep hard copies of his case-related materials. Plaintiff KADAMOVAS'S requests were denied.

18. Plaintiff KADAMOVAS, in 2009, sought informal and administrative relief related to the unfettered access by other prisoners and destruction of his digital discovery for death penalty appeal case-related materials and an electronic translation device that had not been maintained in a secure location, but rather in an unoccupied cell utilized to temporarily hold SCU prisoners during cell rotations.

19. Plaintiff requested, at that point, to do a full inventory of his case files, which was only partially allowed. Plaintiff was allowed to count the disks and learned that 22 were missing, and at least 3 of the 22 missing disks contained attorney/client privileged materials. These three disks contained dozens of gigabytes of important information (8.5 GB each) so this was no small loss. Plaintiff was not, however, allowed to have an inventory by checking them with a computer, and was not able to know if all other disks could be opened and reviewed.

10.

20. On April 24, 2010, Plaintiff KADAMOVAS, who was housed in the cell across from where his digital case materials were stored, watched as a prisoner rummaged through the boxes of the legal materials. Plaintiff KADAMOVAS, on April 26, 2010, submitted to Warden Helen Marberry, a BP-9 in which Plaintiff KADAMOVAS requested 1) that other prisoners not be allowed access to his discovery, 2) to have another inventory undertaken of his discovery to determine what might be missing, and 3) to store his discovery in a safe and secure location. On May 24, 2010, Warden Marberry responded that there was "no evidence to indicate other inmates had access to (Plaintiff KADAMOVAS'S) electronic discovery material in the SCU." She further responded that SCU staff had "encouraged (Plaintiff KADAMOVAS) to purchase a combination lock to secure the boxes containing the electronic media." Warden Marberry also stated that Plaintiff KADAMOVAS'S electronic discovery would be moved to the Unit Team complex. Plaintiff KADAMOVAS'S BP-10 appeal to North Central Regional Director Michael Nalley was denied on June 20, 2010, with Nalley specifically finding "no evidence of another inmate having access to (Plaintiff KADAMOVAS'S) electronic discovery material."

21. In his BP-11, Plaintiff KADAMOVAS alleged that it was "a farce for the warden and the regional director to find that no prisoners had access to (his) legal materials" when three prisoners came forward to say that they were in the cell with

11.

Kadamovas's legal materials and were also witness to other prisoners having easy access to Plaintiff KADAMOVAS'S legal materials. Plaintiff KADAMOVAS also advised that he believed that BOP staff would "continue to do whatever they want, intentionally or negligently, with (his) important case materials, because there will be no consequences." Plaintiff KADAMOVAS requested that he be allowed with his lawyer to conduct an inventory of all his digital materials so that he could determine what might be missing and then, if warranted, duplicate or replace, and, that after the inventory was completed, that his case-related materials be removed from the Unit Team complex and given to him to keep in his cell because there was no place else in the Unit that they are guaranteed to be secure. There was no reason to not allow Kadamovas to have the requested legal materials on CDs in his cell when other prisoners were allowed to have case related CDs as well as music CDs in their cells.

22. Despite evidence to the contrary, on April 13, 2010, Harrell Watts, National Inmate Appeals Administrator, found "there is no evidence or information…which suggests (Plaintiff KADAMOVAS'S) stored materials were compromised."

23. In the meantime, on or about May 22, 2010, Plaintiff KADAMOVAS subsequently learned that a SCU orderly found two of his death penalty case-related CD's in the cell of a mentally ill death row prisoner who, at some point, had also been locked in the cell where Plaintiff KADAMOVAS'S digital legal

12,

materials were being stored. Plaintiff KADAMOVAS, on May 23, 2010, filed an informal grievance so that, among other things, he could provide evidence, by way of a declaration from this prisoner/orderly, that other prisoners did have access to Plaintiff KADAMOVAS'S digital discovery material, and that staff were not securing his digital materials. His formal grievances and appeals were all denied. Also, his legal mail from Margaret O'Donnell on June 11, 2010 was opened outside his presence. Grievances did not resolve this issue.

24. On September 7, 2010, Plaintiff KADAMOVAS began a 24-day hunger strike to protest his conditions of confinement, including that his death penalty appeal legal materials were not safe-guarded or protected by the unit team and BOP administration, which had resulted in damage to and loss of his digital legal materials. Plaintiff undertook a second hunger strike in May of 2011, which lasted 38 days, to again protest, in part, the loss of his legal materials. Nothing, however, changed regarding the manner in which Plaintiff KADAMOVAS'S legal materials were maintained. On July 5, 2011, legal mail from his attorney Barbara O'Connor was opened outside his presence. Grievances did not resolve the issue.

25. In 2010, Plaintiff's appeal attorney, Margaret O'Donnell, made efforts to help Plaintiff KADAMOVAS with his on-going loss of legal materials by contacting and meeting with Defendant SIEREVELD on many occasions. In her declaration dated December 22, 2010, Margaret O'Donnell declares:

13.

My efforts, which began in earnest on July 26, 2010, have met with no success. Those efforts include:

a.    July 26, 2010

I spoke by telephone with Mary Ellen Doucette-Lunstrum, FCC Terre Haute attorney, who advised that the BOP would accommodate my request to see Mr. Kadamovas's BOP assigned computer as well as his digital discovery and case materials. We agreed that I would make the request to the unit staff to see the computer and the digital materials during a future legal visit with Mr. Kadamovas.

                                        ***

b.    August 26-27, 2010

i.    When I arrived in the visiting room on August 26, 2010, the computer and Mr. Kadamovas's digital materials were present in the visiting room.  The prison Information Technology Manager, Trey Adams, was present to provide an overview about the computer's operations, including a description of the installed software programs, which he explained provided only the capacity to open and read the documents. After Mr. Adams left the visiting room, Mr. Kadamovas and I began an inventory of Mr. Kadamovas's digital case materials, only, in short order, to discover that a majority of Mr. Kadamovas's discovery and case material CDs would not open.  When the legal visit ended, I requested that Unit Counselor John Edwards ask Mr. Adams if he could return the following day so that we could determine the reason the computer would not open Mr. Kadamovas's digital files.

ii.    I then proceeded to a meeting with new prison attorney Katherine Siereveld.  Among the matters we discussed, were my request to meet again the next day with Mr. Adams and my request, for the purposes of conducting an inventory of Mr. Kadamovas's legal materials, that unit staff copy,  at my expense, the CD covers of all Mr. Kadamovas's legal materials….Ms. Siereveld advised that she would plan to come up to the death row unit the next day to inform me of the status of my requests….

14.

iii.    I returned, the next day, August 27, 2010, to the prison for another legal visit with Mr. Kadamovas. The computer and the discovery materials were still in the visiting room, but neither Mr. Adams nor Ms. Siereveld came to the visiting room during the 6 hours I was meeting with Mr. Kadamovas.

c.    September 3, 2010

I sent an e-mail to attorney Katherine Siereveld inquiring about the status of the Kadamovas computer and the copying of the covers of Mr. Kadamovas's case related CDs. Ms. Siereveld advised that she had spoken with Trey Adams, who had been off all week, and was certain he would advise what needed to be done to make the computer operational. Ms. Siereveld also indicated that the unit staff was working on the logistics for copying the CDs and that I would be advised of the cost of copying....

d.    September 17, 2010

I e-mailed both Ms. Siereveld and Ms. Doucette-Lunstrum requesting that they ask Trey Adams to contact me so we could move forward in making Mr. Kadamovas's computer functional. I explained that since August 26th, my efforts to speak with Mr. Adams had been unsuccessful. In a September 20, 2010 e-mail reply, Ms. Doucette-Lunstrum advised she would have Mr. Adams call me.

Margaret O'Donnell was also at the prison on September 30, 2010 and November 1, 2010 and no prison officials sought to address the computer problems or the progress of copying the CD covers.

Margaret O'Donnell concluded the declaration by stating that Mr. Kadamovas still does not have access to an operational computer that will allow him to access all his discovery and case related materials. As a consequence, there is no ability to undertake an inventory of his discovery files or to move forward with the purchase and installation of translation software so that Mr. Kadamovas can read in Russian his discovery and trial transcripts.

For more information, please see attached Declaration of Margaret O'Donnell, Exhibit 1.

26. Defendant SIEREVELD sabotaged any effort at conducting an inventory and Plaintiff KADAMOVAS still cannot conduct inventory and the BOP still keeps Plaintiff KADAMOVAS'S 200 plus CD's/DVD's in their possession! And can do what they like! This was done in violation of United Nation's Standard Minimum Rules of the Treatment of Prisoners, Rule Number 53 "Prisoners shall have access to or be allowed to keep in their possession without access by the prison administration, documents relating to their legal proceedings." This rule was attached to Remedy ID 925231-F-1 (See exhibit No. 4 in original complaint).

27. On February 24, 2017, Case Manager Cory Shepherd allowed Plaintiff KADAMOVAS to have 5 DVD's with his attorney-privileged work product. One of the DVD's, "Data N1" has Margaret O'Donnell's handwriting on it. "MOD could not open 5/24/11." Now this disc in her possession and she cannot open it on her computer. It is other proof that this disc was erased and another 8.5 GB info is gone!

28. Up to Fall 2012, through a series of e-mails from SCU Unit Manager Michael Stephens, death row prisoners were advised they were authorized to have in their possession "up to three (3) cubic foot (sic) of legal material with the stipulation that it is to prepare for or respond to an active case." The memos advised that prisoners were to prioritize and determine what needed to be mailed out.

1. EXHIBITS TO ORIGINAL COMPLAINT TO CAUSE NO. 2:18-CV-0049 JRS-MJK ATTACHED TO THIS PETITION AS ATTACHMENT "A"

16.

Prisoners, including Plaintiff KADAMOVAS, were informed that any legal materials beyond 3 cubic feet that were not mailed out would be destroyed.

29. In order to prevent his important legal materials from being destroyed, Plaintiff KADAMOVAS, on September 11, 2012, shipped three bankers boxes of legal materials (all related to his death penalty case), including some documents protected by the attorney/client privilege, to his attorneys. This was not what Plaintiff KADAMOVAS wanted to do, but felt he had no choice. His attorneys, however, only ever received two of the boxes, and one of the boxes that arrived was clearly not in the original box in which it had been packed by Plaintiff KADAMOVAS.

30. Oddly, on September 20, 2012, Plaintiff KADAMOVAS started receiving individual pieces of old mail, that he knew were contained in one of the boxes he had sent to his attorney. He received additional old mail from the boxes on September 21, 2012. His attorney, Margaret O'Donnell, received a call from a SCU official asking whether she had received all three boxes. This official later confirmed that one of Plaintiff KADAMOVAS'S boxes had clearly been compromised in transit. On October 11, 2012, Plaintiff KADAMOVAS received a pack of materials that had also been in the missing box, but, in between his folders were six folders that belonged to persons other than him and whose paperwork seemed to have nothing to do with criminal or prison related matters. Kadamovas

17.

still cannot establish what is missing and may never be able to do so because 12 years after his trial, he has forgotten much of what happened, and he can never have those boxes back because of the prison limit on the size of boxes allowed in the cell.

31. Plaintiff Kadamovas filed an informal grievance seeking an explanation from BOP staff. No prison officials, however, seemed to be able to offer much of an explanation, except that it happened when in the hands of the postal service and that any complaint should be made to the postmaster. Two other prisoners had similar problems and their attorneys asked for an investigation and learned that the loss had nothing to do with the U.S. Post Office. See Exhibit No. 2, Investigation Request from Jennifer Merrigan, Assistant Federal Defender, Capital Habeas Unit, July 15, 2013; Exhibit No. 3, OIG Complaint-Investigation Request, July 18, 2013; Exhibit No. 4, Letter from Margaret O'Donnell, dated July 24, 2015, requesting update on status of OIG investigation. No response was received and no investigation was, apparently, undertaken.

32. Plaintiff KADAMOVAS'S BP-9 was rejected as untimely even though he submitted it within the required 20 days of learning his old legal mail was trickling back into the USP-TH mailroom and, even though he had not yet even heard back from his required informal BP-8 grievance.

18.

33. On October 31, 2012, Plaintiff KADAMOVAS'S lawyer wrote to Warden Caraway expressing her concerns about the ongoing difficulties in maintaining the safety and security of Plaintiff KADAMOVAS'S legal files and materials, and asking Warden Caraway to explore options that would allow death row prisoners, who want to work on their cases, to maintain their legal files on site in a manner that best allows them to meaningfully work on their cases. Warden Caraway claimed never to have received the letter. Margaret O'Donnell contacted Defendant Siereveld several times by e-mail on March 19 and 27, 2013. See Exhibit No. 5. But on April 5, 2013, Warden Caraway finally responded, again blaming the postal service, but offering no solutions for the ongoing dilemma of storing and securing Plaintiff KADAMOVAS'S and other prisoners' important legal materials. See Exhibit No. 6.

34. But defendants' failure to address problems that continue to arise with legal materials in the SCU, and to implement policies that take into consideration that the prisoners at issue are under death sentences is unconscionable. Access to and safety of death row prisoners' legal materials, both paper and digital, is of vital importance to them as well as their legal teams.

35. The ongoing loss of Plaintiff KADAMOVAS'S legal files pertaining to his death penalty case is documented. The failure of defendant to fashion any remedy to halt the loss of Plaintiff KADAMOVAS'S legal files is also documented.

36. Defendant SIEREVELD and other BOP officials have long known of Plaintiff KADAMOVAS'S concerns about the security of his legal files.

35. Defendants SIEREVELD and other BOP officials, as a direct and proximate result of their acts and omissions and abuse of process, have already caused Plaintiff KADAMOVAS to lose significant portions of his legal files pertaining to his death penalty case and resulting worry and concern about defendants' ongoing failure to protect his legal files.

3 7. Defendant, as a direct and proximate result of her acts and omissions, has failed and continues to fail to take reasonable steps to remedy the ongoing loss of Plaintiff KADAMOVAS'S legal files, electronically and on paper.

### RECENTLY OCCURRED  FACTUAL ALLEGATIONS ABOUT LEGAL MAIL RELATING TO A PENDING CRIMINAL MATTER, A "DEATH PENALTY CASE" MARKED "SPECIAL MAIL" WHICH HAS BEEN OPENED AND REVIEWED OUTSIDE PLAINTIFF KADAMOVAS'S PRESENCE, AS REQUIRED BY LAW AND BOP REGULATION

38. The first hard drive (with a capacity of 2 terabytes) sent by my attorneys and containing important privileged information from Plaintiff's laptop hard drive that he was allowed by MDC Los Angeles officials to keep in his cell and do work product, included:

> Vast (95,000 pages) discovery materials with Plaintiff's notes and highlights, like differences in interviews and testimony of government witnesses;  Plaintiff's notes about his memories of events to his attorneys; financial charts, with bank records with prove that Plaintiff did not receive any money for crime, because he did not participate in any; sensitive

information about government's cooperators that must be investigated and other requests for investigation; work on Plaintiff's past life as a musician, mitigation; list of Plaintiff's alibis and exculpatory evidence with details and exhibits, and other hundreds of files actually marked as attorney client privileged, with a breakdown by category into the folders, with many containing more than 1000 confidential information and communications if they were to be printed out on the paper and sent separately in packages and letters!

39. This first hard drive arrived on April 14, 2017. Counselor Mr. Sutton brought the special mail to me in the attorney-client visiting room where I was visiting with three of my attorneys. Mr. Sutton opened the box in my presence but then took it away for inspection to Ms. Defendant SIEREVELD. I did not receive the hard drive for 8 days and it was NOT scanned in my presence.

40. My attorneys filed a motion to the United States Court of Appeals for the Ninth Circuit, where I appealed my criminal cases and they advised the Court that the hard drive should have been inspected in my presence pursuant to 28 CFR §540.18 (*See* attached as Exhibit 1 and 1B to original complaint, Regional Administrative Remedy Appeal No. 925231-R3). On June 12, 2017, the Ninth Circuit issued an order which required government counsel, the United States Attorney, to remind prison officials at USP-TH to open properly designated "special mail" sent to Plaintiff KADAMOVAS by his counsel in Plaintiff KADAMOVAS'S presence. (*See* 28 CFR §540.18, attached as Exhibits 2 and 2B to original complaint to Regional Administrative Remedy Appeal No. 925231-R3).

41. The second hard drive (with a 1 terabyte capacity) sent by my attorneys contained all the attorney files from one of my trial attorneys, including our communications, my requests for investigation, financial charts, and my work on government exhibits including telephone records and other hundreds of files that break down in categories, and the folders which contain more than a thousand documents if printed out and mailed separately. It arrived on November 27, 2017. Mr. Sutton brought the box, marked "special mail," to me. When I told Mr. Sutton that the hard drive must be scanned by officials in my presence, he took the unopened box and left. The next day in the recreation room, Defendant SIEREVELD came with the legal mail and opened the box in my presence. The box contained the June 12, 2017 order from the Ninth Circuit Court of Appeals directing Government Appellee counsel to remind prison officials at USP-TH to open "special mail" in my presence. I told Defendant SIEREVELD that this meant that the contents of the hard drive had to be scanned in my presence, as well as simply the box being opened. Otherwise, the order is meaningless. Defendant SIEREVELD told me she had to consult with the trial prosecutors in the Central District of California and left. And I have no doubt that she did it! I protested but Defendant SIEREVELD asked me what I was going to do about it since I already lost my lawsuit (referring to Case. No. 2:11-cv-258-WTL-MJD regarding my fight for meaningful access to my discovery). It is not her job to deliver legal mail to

22.

inmates, if she does not have request or order from my prosecutor!!! These hard drives with information mentioned above are vital for Kadamovas's 2255 or retrial. Having a copy and reading it, the prosecutors will have an unfair advantage.

Approximately 12 days later, I was brought to the room with the discovery computer in the law library. Present were Defendant SIEREVELD, the Unit Manager and one correction officer. Defendant SIEREVELD opened only one file on the hard drive and then gave it to me. See Exhibit #3 for original complaint, e-mails between Margaret O'Donnell and Defendant SIEREVELD. "I hand over to scan it here in a bit," which is proof that by her ORDER someone "scanned" it and she is responsible for it. It proves that someone else had access to my legal mail and I don't know if he-she was SUPERVISOR! I have no doubt that Defendant SIEREVELD and/or by her order UNKNOWN DEFENDANTS and prison staff had already checked the entire hard drive outside my presence or sent it out for the prosecution in the Central District of California to check. That would explain why it took 12 days to deliver the hard drive to me.

42. On December 14, 2017, I filed a grievance seeking to ensure that my digital materials are scanned in my presence, if the BOP is going to san them at all. Warden Krueger responded, but what he stated in the response is not true. (*See* attached grievance and response, Exhibit 4 to original complaint.) First, Warden Krueger confused the November 27, 2017 incident with the discovery with my

January 10, 2018 oral argument on DVD. This DVD was sent to me after January 10, 2018, and I was allowed to keep it without it being scanned at all. I believe that USP-TH knew that the DVD had no information that would interest them or the prosecution team in Los Angeles so it was just given to me.

43. Warden Krueger is also wrong in that the date Defendant SIEREVELD told me she had to consult with the prosecution team in Los Angeles, there was no one using the discovery computer in the law library and, in any event, even if the computer was in use, she did not have to open the package and could have returned when the computer was available. Also, it is unacceptable that anyone in the BOP would keep my legal materials from me for initially 8 days, and the second hard drive 12 days!

44. In the beginning of 2011, one of the attorneys for another death row inmate, Mr. Paul Enzinna, expressed attorney concerns among the others, on-going opening of legal mail, not in the presence of inmates to Warden Lockett and to legal staff office, Defendant Katherine SIEREVELD.

45. Warden Lockett responded, in part with the following, "I encourage you to schedule a meeting with our legal department and the unit manager. In the event that you feel these issues still require further attention, I will contact the U.S. Attorney's Office and the victims' families and arrange for them to meet with us as

24.

they are also interested parties in the treatment of inmates and their conditions of confinement." (emphasis added)

46. At the time the attorney adviser for Warden Lockett was Defendant SIEREVELD and a copy of this letter was sent to her as well. (*See* attached as Exhibit 7.) This incident even attracted attention from ACLU. *See* attached letter from Gabriel B. Eber dated March 1, 2011 as Exhibit 8.

47. There is no doubt that Defendant SIEREVELD and other BOP officials have this unlawful habit to provide to prosecutors, inmates, attorney/client privileged information from legal mail! It has happened in the past and continues today! More recently, on March 27, 2019, mail from the Lithuanian Embassy, clearly marked as consular correspondence, sent in accordance with Articles 3 and 36-(1)(a) of the Vienna Convention on Consular Relations, done at Vienna, Austria on April 24, 1963, which for last three years was been opened in my presence as legal mail. See Exhibits 9 and 10. See also Exhibits 2-4 for original complaint. Mail from Kadamovas's Embassy was rejected because he was on Special Administrative Measures. Also see Exhibit 11 which shows that other mail from the Lithuanian Embassy and European Court of Human Rights was rejected, as well as the letter from the Lithuanian Embassy to the BOP asking the prison administration to clarify the grounds for rejection of official correspondence/package. See Exhibit 12 which shows that legal mail from Barnes

25.

and Thornburg, the Indianapolis law firm, representing him in another civil matter, and which was marked as special mail was not opened in his presence.

48. Defendant SIEREVELD and UNKNOWN DEFENDANTS, as a direct and proximate result of their acts and omissions, have failed and continue to fail to take reasonable steps to remedy the on-going violations of policy, regulations and the United States Constitution causing harm to Plaintiff KADAMOVAS. Defendants are liable for negligence and deliberate indifference when they know or knew Plaintiff KADAMOVAS faces substantial risk of serious harm and disregard that harm by failing to take reasonable steps to abate the risk. Defendants, however, continue to fail to address violations of policy, regulations and the United States Constitution by failing to ensure Plaintiff KADAMOVAS'S confidential attorney-client materials are secure and reviewed in his presence.

49. Plaintiff KADAMOVAS will continue to experience mental anguish and substantial risk of on-going loss of his legal materials related to his death penalty case unless immediate injunctive relief is granted.

## COUNT ONE

## VIOLATION OF THE FIRST AMENDMENT – RIGHT TO FREE AND CONFIDENTIAL EXPRESSION

50. Plaintiff KADAMOVAS incorporates paragraphs 1 through 49 by reference as if restated fully herein.

26.

51. Plaintiff KADAMOVAS'S complaints regarding his mail are objectively and sufficiently serious and defendants continue to ignore the risk of harm.

## COUNT TWO

## VIOLATION OF THE SIXTH AMENDMENT – RIGHT

## TO ADEQUATE REPRESENTATION

52. Plaintiff KADAMOVAS incorporates paragraphs 1 through 51 by reference as if restated fully herein.

53. Plaintiff KADAMOVAS'S right to effective assistance of counsel has been and continues to be violated by defendants' failure to ensure the confidentiality of his legal materials in violation of their own regulations and demands of the United States Constitution.

## COUNT THREE

## VIOLATION OF THE DUE PROCESS CLAUSE

## OF THE FIFTH AMENDMENT – RIGHT TO

## PARTICIPATE IN ONE'S DEFENSE

54. Plaintiff KADAMOVAS incorporates paragraphs 1 through 53 by reference as if restated fully herein.

55. Plaintiff KADAMOVAS'S right to due process of law has been and continues to be violated by defendants' failure to ensure the confidentiality of his legal

27.

materials in violation of their own regulations and the demands of the United States Constitution.

## COUNT IV

## VIOLATION OF THE CONSTITUTIONAL TO ACCESS TO THE COURT AS GUARANTEED BY THE FIRST AND FIFTH AMENDMENTS

56. Plaintiff KADAMOVAS incorporates paragraphs 1 through 55 by reference as if restated fully herein.

57. Kadamovas has been deprived of legal materials critical to his post-conviction direct appeal which he lost and will not be able to pursue 28 U.S.C. 2255 remedies.

## COUNT V

## VIOLATION OF THE EIGHTH AMENDMENT BY INFLICTION OF UNNECESSARY AND WANTON PSYCHOLOGICAL AND EMOTIONAL PAIN

58. Plaintiff KADAMOVAS incorporates paragraphs 1 through 58 by reference as if restated fully herein.

59. Plaintiff KADAMOVAS rights to be free from cruel and unusual punishment were violated as a result of the loss and compromise of his legal documents related to his death penalty case and he experienced mental anguish, fear, stress, anxiety, depression and emotional impairment. FROM PROLONGED SOLITARY CONFINEMENT.

28.

# SOLITARY CONFINEMENT ISSUES

## FACTUAL ALLEGATIONS

60. PETITIONERS STATUS OF SOLITARY CONFINEMENT MORE THEN 17 YEARS ADVERSELY AFFECTS HIS ABILITY TO PREPARE LEGAL WORK THE BOP PREVENTING HIM FROM OBTAIN A LEGAL HELP FROM "JAIL HOUSE LAWYER" BECAUSE HERE ON FEDERAL DEATH ROW, NO ANY "JAIL HOUSE LAWYERS"

61. MEDICAL DEPARTMENT OFTEN IGNORS PETITIONERS MEDICAL NEEDS.

62. PETITIONER KADAMOVAS HAVE BEEN DENIAL A MENTAL HEALTH TREATMENT, OR PROVIDED NOT ADEQUATE TREATMENT.

63. THE BOP OFFICIALS HAVE FAIL TO PROTECT PETITIONER'S RIGHTS TO A SAFE, CLEAN AND HEALTHY ENVIROMENT, INCLUDING SMOKE FREE LIVING AREAS. KADAMOVAS HAVE DEVELOPED VERY BAD ASTHMA, AND THE BOP OFFICIALS CONTINUE TO TORTURE HEM BY USE A GAS AROUND HEM AND NOT PREVENTING INMATES FROM SMOKING AND SETING FIRES IN THIS BUILDING.

64. AFTER PETITIONER ARIVEL TO TERRE HAUTE "DEATH ROW" IN APRIL 2007, COMMERTIAL NOISY FAN AS A TORTURE DEVICE WAS PLACED OUTSIDE HIS CELL, FOR PRIVENT HEM COMMUNICATE WITH OTHEL INMATES, WITH ALSO PRIVENTED HIM FROM SLEEPING OR THINKING.

65. Since June 24, 2003 up to January 28, 2008 Petitioner have been placed on Spetial Administrative Measures which prevented his communications with no one but his Attorneys only.

66. For about 17 years Petitioner have been given only 15-20 minutes to eat his meals, and required to eat all meals alone in his cell just few feet from steel toilet, with is not only humiliating but also unsanitary.

67. For about 17 years Petitioner have been served different food that the prisoners in the General Prison Population, as well was not allowed to have boiled watter for tea or sup.

68. Petitioner's food trays was often filled with humiliating profanities etched on the cover. As well his meals was often rotten and not edible, and with expired data.

69. Plaintif's English Language is not proficiant and he was not allowed to write a Grievances on his native language, and the BOP's Education Department refuse to help me in Lerning English Language.

70. Petitioner have been not permited to have a books, Magazines, Music or TV-channel on his native Language, The BOP officials have been denied my rights to enjoy of his own coul-

TURE AND LANGUAGE.

71. PETITIONER HAVE BEEN PROHIBITED TO WRITE TO HIS SPIRITUAL ADVISOR IN HIS NATIVE LANGUAGE.

72. PETITIONER HAVE BEEN PLACED ON GENERAL CORRESPONDENCE RESTRICTION

73. CONDITIONS IMPOSED ON PETITIONER FOR PAST 17 YEARS ARE SIGNIFICANTLY HARSHER THEM THOSE IMPOSED ON PRISONERS IN GENERAL POPULATION. THE CONDITIONS IN SOLITARY CONFINEMANT ALMOST TOTALY DEPRIVE KADAMOVAS FROM HUMAN CONTACT, PHYSICAL ACTIVITY, PERSONAL PROPERTY AND MENTAL STIMULATION.

74. THE CONTINUOUS EXPOSURE TO THE CONDITIONS OF SOLITARY CONFINEMENT FOR 17 YEARS HAS EXPOSED ME TO AN UNDULY HIGH RISK OF PSYCHOLOGICAL HARM AND, IN FACT CAUSED ME ACTUAL MENTAL ANGUISH AND SUFFERING, INCLUDING INCREASED STRESS, HEIGHTENED ANXIETY, SEVERE DIFFICULTY CONCENTRATING, SHORT-TERM MEMORY PROBLEMS, CHRONIC DEPRESSION, AGORAPHOBIA, AND UNFATHOMABLE EMOTION PAIN AND SUFFERING. PETITIONER GOT ARTHRITIS, HIGH BLOOD PRESSURE, ANEMIA, CROHN'S DISEAS, ASTHMA, SIGHT PROBLEM AND SLEEP APNEA.

75. CONTINUING TO KEEP ME IN SOLITARY CONFINEMENT IS IN VIOLATION OF CONTEMPORARY STANDERDS OF HUMAN DICENCY AND CONSTITUTES CRUEL AND UNUSUAL PUNISHMENT AND TORTURE.

31.

## CONSTITUTIONAL LAW

## OPENING, READING OR INSPECTION

76. Inmate is not required to show any actual injury beyond free speech violation itself to state a civil rights claim for violation of his First Amendment rights as a result of prison officials' conduct in opening his or her legal mail outside inmate's presence; chilling of inmate's right to confer privately with counsel as a result of a First Amendment violation is itself sufficient injury. United States Constitution, Amendment 1; 42 USCA §1983.

## LEGAL ARGUMENT

77. "Opening legal mail outside the presence of the addressee inmate interferes with protected communications, strips those protected communications of their confidentiality, and accordingly impinges upon the inmate's right to freedom of speech. The practice deprives the expression of confidentiality and chills the inmates' protected expression, regardless of the state's good-faith protestations that it does not, and will not, read the content of the communications. This is so because the only way to ensure that mail is not read when opened is to require that it be done in the presence of the inmate to whom it is addressed." *Jones v. Brown,* 461 F.3d 353, 359 (3d Cir. 2006) (internal quotation marks and alterations omitted)

78. The Eleventh Circuit has observed that, "...given their incarceration and often distance from their attorneys, prisoners' use of the mail to communicate with their

32.

attorneys about their criminal cases may frequently be a more important free speech right than the use of their tongues." *Al-Amin v. Smith*, 511 F.3d 1317, 1333-34 (11th Cir. 2008) (*Kaufman v. McCaughty*, 419 F.3d 678, 685-86 (7th Cir. 2005) Properly marked mail from an identified attorney must be opened only in the prisoner's presence.)

79. In addition to the Third and Eleventh Circuits, the Second, Sixth, Ninth and Tenth Circuits have recognized that the opening of legal mail outside of a prisoner's presence implicates First Amendment rights.

80. Kadamovas believes that opening and taking and destroying his mail and privileged legal materials has harmed him. *Cody v. Weber*, 256 F.3d 764, 768 (8th Circuit 2001) (holding that the advantage defendants obtained by reading the plaintiff's private legal papers constituted actual injury); *Purkey CCA Detention Center*, 339 F.Supp.2d 1145, 1152 (D.KS 2004) (holding that defendants' alleged discarding of notes of interrogation essential for plaintiff's challenge to his conviction sufficient to plead actual injury.

81. SEE ALSO LAKIN v. STINE, 44 F. SUPP. 2D 897 (E.D. Mich 1999) "THE FACT THAT Mr. LAKIN WAS DENIED THE OPPORTUNITY TO SPEAK FREELY AND CONFIDENTIALLY WITH HIS ATTORNEY DENIED HIM CONSEL. (SAID CIRCUMSTANCE REQUIRES HABEAS RELIEF.)

82. The U.S. Supreme Court Cases.

A defendant's communication with counsel is critical to the attorney's representation. Gebers v. United States, 425 U.S. 80, 91, 96 S. Ct. 1339, 47 L. Ed 2d 592 (1976)

83. Denial of this opportunity is constitutional error requiring reversal. The importance of communication between attorney and client is shown by the great lengths the legal system goes to in order to protect attorney-client privilege. Swidler & Berlin, et al., v. United States, 524 U.S. 399, 118 S. Ct. 2081 (1998)

84. Weatherford v. Bursey, 429 U.S. 545, 552 (1977) Recognizing that state interference with confidential attorney-client communications implicates a defendant's Sixth Amendment right to effective assistance of counsel and may in some circumstances require the reversal of a conviction.

85. The attorney-client privilege is one of the oldest recognized privileges for confidential communications. Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S. Ct. 677, 682, 66 L. Ed 2d 584 (1981); (omitted) The privilege is intended to encourage "full and frank communication between attorneys and their clients and thereby promote borrier

34.

PUBLIC INTEREST IN THE OBSERVANCE OF LAW AND THE ADMINISTRATION OF JUSTICE" UPJOHN, SUPRA AT 389.

86. _Swidler & Berlin v. US, 524 U.S. 399, 141 L.Ed 2d. 379, 118 S. Ct. 2081 (1998) p. 2083_ "WE HOLD THAT THE NOTES ARE PROTECTED BY THE ATTORNEY-CLIENT PRIVILEGE. (ATTORNEY-CLIENT PRIVILEGE SURVIVES THE DEATH OF THE CLIENT)

87. U.S CONSTITUTION VI AMENDMENT. THE RIGHT TO COUNSEL IS SO BASIC TO OUR SYSTEM THAT THE ACTUAL OR CONSTRUCTIVE DENIAL OF COUNSEL IS NEVER HARMLESS ERROR _HOLLOWAY v. ARKANSAS, 435 U.S. 575, 489, 55 L.Ed. 2d 426, 98 S. Ct. 1173 (1978)_ (QUOTING FROM _CHAPMAN v. STATE OF CALIFORNIA, 386 U.S. 18, 25 17 L. Ed 2d 705, 87S CT. 824 (1967)._

# CONCLUSION

88. PETITIONER KADAMOVAS WAS NOT PROVIDED FULL ACCESS TO HIS DISCOVERY MATERIALS BEFORE OR AFTER HIS TRIAL. GOVERNMENT WAS ABLE TO PREVAIL ON DIRECT APPEAL BECAUSE KADAMOVAS WAS DEPRIVED OF ACCESS TO HIS LEGAL MATERIALS, PARTICULARLY HIS TRIAL TRANSCRIPTS TRANSLATED INTO A LANGUAGE HE CAN UNDERSTAND, AND HE IS NOT ALLOWED TO HAVE HIS DISCOVERY (≈ 95000 PAGES) ON PAPER

35.

AND CANNOT COMPARE TO THE ELECTRONIC MATERIAL SO THAT HE CAN COMPARE AND DETERMINE WHETHER CHANGES WERE MADE, AND, HE STILL NEEDS TO WORK ON PREPARING FOR HIS RETRIAL OR HIS 28 U.S.C. § 2255 PROCEEDINGS AND, WITHOUT MEANINGFUL AND COMPLETE ACCESS TO ALL LEGAL MATERIALS AND WITHOUT ADEQUATE PROTECTION OF HIS ATTORNEY-CLIENT COMMUNICATIONS, HE WILL SIMPLY BE UNABLE TO DO SO. TO HAVE AN ATTORNEY, BUT NOT HAVING MEANINGFUL ACCESS TO ALL LEGAL MATERIALS WILL PROVIDE A **FALSE SENSE OF SECURITY** AND INEVITABLY WILL LEAD TO CONSTITUTIONALLY DEFECTIVE REPRESENTATION THAT KADAMOVAS CAN NOT AFFORD

89. KADAMOVAS BELIEVES THAT THE ON-GOING LOSS OF HIS LEGAL MATERIALS AND NEFARIOUS ACTS OF THE GOVERNMENT AND THE BOP OFFICIALS ARE INTENTIONAL ACTS INTENDED TO STOP HIM FROM CHALLENGING HIS CONVICTION AND DEATH SENTENCE AND EXPOSING PROSECUTORIAL MISCONDUCT. KADAMOVAS BELIEVES HIS TRIAL WAS NOT CONDUCTED IN A FAIR MANNER AND WAS FILLED WITH FALSE TESTIMONY, MISLEADING ARGUMENTS AND FALSE EXHIBITS. AS A RESULT HE WAS WRONGFULLY CONVICTED FOR CRIMES HE DID NOT COMMIT.

90. THE EVIDENCE OF PROSECUTORIAL MISCONDUCT, IN

PART, HAS BEEN CONTAINED IN DISCOVERY MATERIALS AS WELL IN HIS ATTORNEY-CLIENT PRIVILEGED WORK PRODUCT ON CD's - DVD's, HARD DRIVES AND IN PAPERS, WHICH IS THE REASON HE DID NOT KNOW WHAT REMINS ON IT BECAUSE KADAMOVAS STILL DOES NOT HAVE MEANINGFUL ACCESS TO HIS LAPTOP COMPUTER WITH ALL NECESSARY SOFTWARE TO OPEN AND READ THE FILES AND ALL HIS LEGAL DOCUMENTS

91. ELECTRONIC MATERIALS ARE NO LESS ATTORNEY-CLIENT PRIVILEGED THAN THE CONTENTS OF PAPER SENT BY ATTORNETS, BECAUSE THEY ARE WAS SCANED AND PUT IN ELECTRONIC FORMAT. IN FACT, THE CONTENTS OF HARD DRIVES CAN INCLUDE THOUSANDS OF GIGABYTES OF MATERIALS WHICH MAKES THESE CONTENTS THE EQUIVALENT OF THOUSANDS OF PECES OF SPECIFICALLY MARKED LEGAL CORRESPONDENCE. THIS REVIEW OF HARD DRIVES IS NO DIFFERENT FROM REVIEW OF THE CONTENTS OF LETTERS OR DOCUMENTS SENT TO A PRISONER AND SHOULD BE CONDUCTED IN HIS OR HER PRESENCE.

92 REVIEW OF THE HARD DRIVE CONTENTS IS EVEN MORE IMPORTANT BECAUSE, IN FACT, HARD DRIVES CAN BE COPIED IN MINUTES AND THEN READ, OR WORSE, DELETED, EXTRACTING OR EVEN MODIFYING OR CORRECTING THE CONTENTS OF DISCOVERY MATERIALS. THE INMATE (HERE IT IS KADAROVAS) WOULD NEVER KNOW OF THE

CHANGE MADE. Kadamouas is at risk to be executed without any chance to prove that he did not commit the crimes he was convicted for.

93. As a result of miserable Solitary Confinement conditions and ongoing loss and compromise of Petitioners Kadamouas legal materials related to his death penalty case, Kadamouas is under constant stress and fear that he will not be able to work on his appeal. He also believes that this physical and psychological torture involve or contribute to his many health issues that he got in 17 years of solitary confinement.

# RELIEF

94. Therefore, for all the foregoing reasons Petitioner Kadamouas asks this Court to:

1) Hold that Petitioner Kadamouas has satisfied the jurisdictional requirements for proceeding under 28 U.S.C. §2241.

2) Following any evidentiary hearing that this Court deems necessary, vacate his sentence and grant a new trial, as well as vacate his solitary confinement status.

Dated 31 October 2019

38.

RESPECTFULLY SUBMITTED

BY. _Kotocouos_

JURIJUS KADAMOUAS

#21050-112

USP TERRE HAUTE

P.O. Box 33

TERRE HAUTE, IN 47808

39.