# Exhibit 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:   CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| JURIJUS KADAMOVAS, | ) | Monday, March 12, 2007 |
| | ) | (8:49 a.m. to 10:16 a.m.) |
| Defendant. | ) | |

SENTENCING
ON JURY VERDICT

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

EXCEPTIONAL REPORTING SERVICES, INC
14493 SOUTH PADRE ISLAND DRIVE
SUITE A-400
CORPUS CHRISTI, TX 78418-5940
361 949-2988

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO:  CR-02-220(B)-DT |
| | ) | |
| Plaintiff, | ) | CRIMINAL |
| | ) | |
| vs. | ) | Los Angeles, California |
| | ) | |
| JURIJUS KADAMOVAS, | ) | Monday, March 12, 2007 |
| | ) | (8:49 a.m. to 10:16 a.m.) |
| Defendant. | ) | |

SENTENCING
ON JURY VERDICT

BEFORE THE HONORABLE DICKRAN TEVRIZIAN,
UNITED STATES DISTRICT JUDGE

Appearances:            See next page

Courtroom Deputy:       Debra L. O'Neill

Court Recorder:         Tanya Durant

Transcribed by:         Exceptional Reporting Services, Inc.
                        14493 S. Padre Island Drive
                        Suite A-400
                        Corpus Christi, TX 78418-5940
                        361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

EXCEPTIONAL REPORTING SERVICES, INC

2

APPEARANCES FOR:


The Government:              GEORGE S. CARDONA, ESQ
                            Acting United States Attorney
                            THOMAS P. O'BRIEN, ESQ
                            Assistant United States Attorney
                            Chief, Criminal Division
                            SUSAN DeWITT, ESQ
                            KIM MEYER, ESQ
                            ROBERT DUGDALE, ESQ
                            Assistant United States Attorney
                            312 North Spring Street
                            Los Angeles, CA 90012


Jurijus Kadamovas:          SONIA E. CHAHIN, ESQ
                            2222 Foothill Blvd., Suite E-278
                            La Canada, CA 91011

                            RICHARD P. LASTING, ESQ
                            1717 Fourth Street, Third Floor
                            Santa Monica, CA 90401


Russian Interpreter:        Alex Levoff

3

**Los Angeles, CA; Monday, March 12, 2007; 8:49 a.m.**

**(Interpreter Utilized for Translation)**

**(Call to Order)**

**THE CLERK:** Please remain seated and come to order.

**THE COURT:** All right, once again, it appears that we've got the technical problems solved.

Record should indicate that defendant Kadamovas is present; all counsel are present.

All right, with regard to today's date. This is the time set for the Motion for New Trial as well as sentencing in this matter.

Ms. Chahin, Mr. Lasting, do you know of any legal cause or reason why the Court should not proceed at this point?

**MR. LASTING:** No, your Honor.

**THE COURT:** All right. Mr. Kadamovas filed two motions for new trial; one that was filed on the 30th of January, 2007, dealing with the guilt phase; and then there was another filing made on February the 20th, 2007, which was entitled, 'A Supplemental Filing in Support of a New Trial and/or Alternatively Requesting a New Penalty Trial and Joinder in Motion of Co-Defendant Mikhel for a New Penalty Phase Trial Pursuant to Federal Rule of Criminal Procedure, Rule 33.

Let's take up the motions that were filed by Mr. Kadamovas.

In addition, for the record, Mr. Kadamovas did in

EXCEPTIONAL REPORTING SERVICES, INC

4

fact file as of today a reply to the Government's Opposition to Supplemental Motion for New Trial, so I'll instruct the Clerk to process that document.

With regard to Mr. Kadamovas's Motion for New Trial, he claims that he was denied a fair trial based upon a prejudicial joinder with defendant Mikhel.  Specifically, Mr. Mikhel rested and was later permitted to testify after defendant Kadamovas had completed presentation of his, that is Kadamovas's, case.

Defendant Mikhel, according to Mr. Kadamovas, made numerous, highly prejudicial statements allegedly implicating defendant Kadamovas during Mikhel's testimony even though the testimony was struck and the jury admonished to disregard the testimony based upon Mr. Mikhel's refusal to be cross examined.

The defendant also indicates that he was denied a fair trial because the Court did not order sequential trials for each defendant in the penalty phase.

Mr. Kadamovas also indicates that he was denied a continuance to obtain visas for his family members residing in Lithuania so that they could testify in his penalty phase of the trial.

Mr. Kadamovas also asserts that the jury allegedly failed to follow the Court's Jury Instructions, and, again, the Court failed to order sequential trials for each defendant in the penalty phase.

5

Now, in looking at the law that was cited, the Court is of the opinion that Mr. Kadamovas has failed to meet a heavy burden that he be granted a new trial on extraordinary circumstances.

The Government has filed a brief in which they cite several cases. *United States versus Pimentel*, 654 Fed.2d 538; *U.S. versus Rush*, 749 Fed.2d 1369; *U.S. versus Graner*, 520 Fed.2d 962; *U.S. versus Marabellis*, 724 Fed.2d 1374, for the proposition that defendant Kadamovas has failed to meet the heavy burden that he must meet in order to be granted the extraordinary remedy of a new trial.

Also, the Government cites additional cases: *U.S. versus Angurin*, 271 Fed.3d 786; *U.S. versus Sherlock*, 962 Fed.2d 1349; *U.S. versus Tootick*, 952 Fed.2d 1078; *U.S. versus Throckmorton*, 87 Fed.3d 1069; *Zaphiro versus U.S.*, 506 U.S. 534, for the proposition that the testimony of Mikhel was not antagonistic to defendant Kadamovas; there was no evidence that the purported statements of Mikhel were irreconcilable and mutually exclusive to defendant Kadamovas; and in any event, all of Mikhel's testimony was struck and the Court admonished the jury accordingly.

Now, in essence, the Government argues that the Court acted well within its discretion in denying defendant Kadamovas's request for a new trial, citing *Morris versus Slappy*, 461 U.S. at 1; *U.S. versus Garrett*, 179 Fed.3d, 1143;

6

*Ungar versus Sarafite*, 376 U.S. 575; *U.S. versus Zamora Hernandez*, 222 Fed.3d 1046.

The Government argues that the jury was not obligated to find any of the mitigating factors defendant Kadamovas presented at the penalty phase to warrant a sentence of life without the possibility of release.  The Government cites there *U.S. versus Higgs*, 353 Fed.3d 281; *U.S. versus Paul*, 217 Fed.3d 989.

The Government also argues that the jury considered but rejected all of Mr. Kadamovas's arguments, and that's all that is required, citing *Boyde versus California*, 493 U.S. 277; *Raulerson versus Wainwright*, 732 Fed.2d 803; *Eddings versus Oklahoma*, 455 U.S. 104, which only requires a jury to consider but not necessarily find the mitigating circumstances.

The Government argues that there is a broad discretion for the jury to determine whether a proffered fact is a mitigating factor and that the jury did not commit any misconduct.

The Government also argues that defendant Kadamovas was not denied due process by the Court's refusal to grant his request for sequential penalty phase trials.  There's no error; there's no prejudice.  The defendants were jointly charged and tried during the guilt phase.  No authority mandating separate penalty phase trials is required, and in fact, the contrary is true, according to the Government citing *U.S. versus Mariscal*,

939 Fed.2d 884; *Richardson versus Marsh*, 481 U.S. 200; and *U.S. versus Gaines*, 563 Fed.2d 1352.

The Government argues when defendants have been properly joined under Rule 8(b), a District Court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants or prevent the jury from making a reliable judgment about guilt or innocence.

And here, taking the case as a whole, all of the evidence that was introduced during this trial really was joint evidence.  There was no way that this case could have been severed at the guilt phase and/or the penalty phase.

Having said that, Mr. Lasting or Ms. Chahin, which one is going to argue?

**MR. LASTING:**  I am, your Honor.

**THE COURT:**  All right.

**MR. LASTING:**  Your Honor, our positions are set out in the papers that we filed and the reply, so I'm not going to belabor this at any length.

But, initially, I think what confronted Mr. Kadamovas in this trial in terms of the joint trial were the actions of Mr. Mikhel.  I think they're somewhat unprecedented, at least in my experience.

We're talking about a situation that occurred here where Mr. Mikhel testified over a period of days.  I think he

8

was on the witness stand on his direct examination for three days.  It was testimony that in some sense was marked by disbelief of his own counsel in his examination of Mr. Mikhel. He made comments such as, 'I'm just trying to get through this', and a series of comments in response to either inquiries from the Court or just prefacing questions to Mr. Mikhel which indicated that his counsel didn't want Mr. Mikhel to testify and suggested to the jurors that the testimony was unworthy of belief.

In that regard, Mr. Mikhel did testify in a fashion which completely undercut the defense of Mr. Kadamovas.  He involved Mr. Kadamovas in every crime that was charged in this case while at the same time extricating himself, purportedly, in his testimony.  He brought up crimes that were never ruled to be admissible by this Court, and presented information regarding other murders to this jury and involved Mr. Kadamovas in those crimes.  And then, after his lengthy direct testimony, all of it or a substantial portion of it negative to Mr. Kadamovas, refused to answer a single question of Ms. Chahin so that what he said with regard to Mr. Kadamovas was never tested by cross examination.

It's true that the Court granted our motion to strike his testimony, but the reality is that three days of testimony and the various incriminating statements he made about Mr. Kadamovas were not going to be erased from the jurors'

9

minds.  And I think that became very clear, both in the speed with which the jury returned a verdict of guilt and the speed with which the jury returned the penalty verdict.

Among the things that Mr. Mikhel did in his testimony, in addition to disparaging Mr. Kadamovas and undercutting his defense was, he disparaged the victims in the case.  I think at one point he referred to Nick Kharabadze as a 'leech', and he made other comments which, in the context of these proceedings, could only have infuriated the jury and inflamed them.  And the jurors' ability, any human being's ability to disregard that and wipe it out of their minds is an impossibility.  It's a legal fiction to think that the Court's instructions are going to be followed.

This is not a case where there was an answer or there was a particular response of a witness which the jury was instructed to disregard and which, hopefully, they would be able to disregard.  We're talking about days of testimony here.  And I think as a result of that, that it did infect the proceedings with regard to Mr. Kadamovas, and the reality of what happened here is he was denied due process, he was denied a fair trial, and he was denied individual consideration, both in terms of the trial itself to determine whether he's guilty or not guilty and in the penalty trial.

THE COURT:  Well, one thing that you're forgetting, and that is that the evidence in this case was very, very

10

compelling.  I've never seen a case in which the evidence on the issue of guilt was as thorough a presentation by the Government as I've ever seen.

MR. LASTING:  Your Honor, the Government marshaled a lot of evidence and called a lot of witnesses.  And in terms of Mr. Mikhel, I would agree with the Court that the case was overwhelming.

I think that there is a distinction with Mr. Kadamovas, though, and I don't think there is that overwhelming nature of the case.  It's not a case in which there was a confession.  It's not a case in which there were admissions.  It's a case as to Mr. Kadamovas, particularly in terms of who was involved in the actual murders, in which the Government relies exclusively on the testimony of cooperating witnesses, as they refer to them.

And you have to believe the testimony of Altmanis and Solovyeva and Markovskis to determine that Mr. Kadamovas was involved in killing anybody.

THE COURT:  But all of that testimony was corroborated by physical evidence; physical and scientific evidence.

MR. LASTING:  There is not one piece of physical evidence; there is not one piece of scientific evidence that ties Mr. Kadamovas to the killing of anyone.  There is not any DNA evidence; there is not any evidence which implicates him in

11

physically committing a murder.  There is only the testimony of those individuals; either by Mr. Altmanis's claims as to what he observed or the statements and claims of Mr. Markovskis and Solovyeva as to what they were told.

THE COURT:  What about the photographs and video of Mr. Kadamovas and Mr. Krylov purchasing the cell phones that were used in the tracing that took place up and down the state of California showing the movement up to the New Melonis dam and then back from the New Melonis dam?

MR. LASTING:  Your Honor, I would disagree that the evidence was at all compelling in terms of that video as an argument that was made to the jury, apparently unsuccessfully, but I would dispute that there's any compelling evidence that Mr. Kadamovas bought any telephones.

And even assuming that he did, and I don't mean to accept that by this statement, but even assuming that he did, that doesn't mean that he is physically involved in killing someone.

Mr. Kadamovas, the evidence in this case clearly showed that Mr. Kadamovas was a hard-working individual prior to the time that he met Iouri Mikhel, and that Mr. Mikhel set up a business; Mr. Mikhel financed that business; and Mr. Kadamovas undoubtedly did things at Mr. Mikhel's request and assisted him in various matters that are unrelated to killing people.  And if Mr. Mikhel had asked Mr. Kadamovas, 'Go

12

get me a phone', or 'Go get me a phone card', he's going to do it. He's not going to interrogate him or ask him questions or make Mr. Mikhel explain to him what that's all about.

I would totally disagree with the Court's analysis that, as to Mr. Kadamovas, that the facts of this case were overwhelming. And I think that given what happened, which as I say, in my experience, and I've been doing this a long time, extremely unique to have a witness get on the witness stand and testify, or a co-defendant testify for three days to implicate someone else that he's jointly charged with and then just walk off the stand and refuse to answer any questions, the jury can't forget that. It's impossible.

THE COURT: All right, Mr. Dugdale, you going to argue?

MR. DUGDALE: Yes, your Honor.

MR. LASTING: Excuse me, your Honor, I don't mean -

THE COURT: Okay. I thought you had finished.

MR. LASTING: I was just going to - Do you want to do this sequentially in terms of the trial and then the penalty?

THE COURT: No, do the whole thing.

MR. LASTING: Okay, that's -

THE COURT: That's what I did when I made my analysis.

MR. LASTING: Thank you, your Honor.

With regard to the penalty trial, I think our

13

positions are set forth, again, but just briefly with regard to these issues of the failure to obtain visas for Mr. Kadamovas's family to attend these proceedings and to testify.

It turns out that the visas were denied, and I find that to be something that, in my view, is unconscionable; that the Government, in wanting to obtain a death penalty against someone, then denies visas for critical witnesses for the defense at the penalty trial to come to this country and testify. And the reason they give is the basest of reasons: that their financial situation precludes them getting a visa to enter the United States. And I think that that alone should concern the Court, and it should concern the Court to the extent that the Court should order a new trial, a new penalty trial, so that evidence can be fully presented and that it can be properly considered by the jury.

And that's the other aspect of what happened in this penalty trial is, the jury never considered the mitigation evidence. And I don't disagree that the jurors can reject it and that the jurors can weigh it and, in the balance, the jurors can determine that the aggravating factors sufficiently outweigh the mitigating evidence and then go about reaching their penalty decision. But what the jurors can't do, what they are precluded from doing is what they did in this case, and that is they never even determined whether or not the mitigating factors that were presented by Mr. Kadamovas had

14

been proved to be true by a preponderance of the evidence, and that's what the Court's instructions require them to do.

First you determine 'has this evidence been proved', and then those jurors who find that the evidence has been established by a preponderance of the evidence, weigh it and consider it.

Here, the jurors never got into part two of weighing and considering because they rejected the proof, and that is something which I think bears upon whether or not the jurors properly fulfilled their duties in reaching the very serious decision as to whether somebody was going to be sentenced to death or not.

There is no doubt that Mr. Kadamovas, and I'll just select this one example and not go through every mitigating factor that was selected and presented to this jury, because, unlike Mr. Mikhel, we didn't present a laundry list of 20 factors, and we didn't take one factor and try to break it into four different parts.

But, every single fact that we presented to this jury as mitigation was one, true, and two, proved, I would contend, beyond a reasonable doubt, but it was certainly proved by a preponderance of the evidence. And the simplest example of all is the issue of Mr. Kadamovas not having a prior criminal record. We presented to the jury a document from the government of Lithuania, a certified copy that specified that

15

he had no prior record in Lithuania, and clearly, he has no record in the United States.  So, prior to his arrest here, he had no criminal history.  That is a statutory mitigating factor which, if established, must be considered by the jury.

This jury did not consider it because nobody found it to be proved by a preponderance of the evidence, and that to me is the jury abdicated their responsibilities, their fundamental responsibilities to look at the evidence, decide what is true here, and then what are we going to weigh against the aggravating factors.  They didn't do that.

The penalty proceedings, in terms of the way the jury conducted themselves was completely improper, and for those reasons Mr. Kadamovas is entitled to a new penalty trial.

I appreciate the Court's consideration.  Thank you, your Honor.

**THE COURT:**  Mr. Dugdale?

**MR. LASTING:**  Oh, just one other thing, your Honor.

**THE COURT:**  Yes.

**MR. LASTING:**  The way the proceedings, the sentencing is being done, if the Court denies our motion for new trial or for a new penalty trial, I understand that Mr. Mikhel's attorneys will be arguing this afternoon, and there are some aspects of their motion that we just joined in, and I'd like to also join in whatever arguments they present on the issues that are jointly available.

**MR. DUGDALE:**  Thank you, your Honor.

I'll address all three arguments very briefly, because I think the Government filed very thorough papers on this, and I did not want to repeat our argument.

Starting with the severance, counsel is wrong both as a matter of law and his recitation of some of the facts here, too.  Severance is obviously the exception rather than the rule, and the cases that the Government cites show that even in a case where parties take an adverse position to each other, that doesn't necessarily require severance.  It's only in a case where the conviction of one defendant would necessarily - I'm sorry, the acquittal of one defendant would necessarily lead to the conviction of another defendant that severance is even required or really should even be considered.

In this case here, I think there's been a mischaracterization of what Mr. Mikhel's testimony was about to begin with, but the most important aspect of his testimony is the fact that it was struck by this Court, and this Court instructed the jury on numerous occasions how to deal with that testimony and in fact, really how not to deal with that testimony by not considering it at all.

First about the testimony itself, there were not instances where defendant Mikhel at all directly implicated defendant Kadamovas in the crimes that have been charged in this case.  In fact, his testimony exculpated both himself and

Mr. Kadamovas from those crimes. He did not blame him for the murder of Meyer Muscatel; he blamed Ainar Altmanis exclusively for that. He did not blame him for the murder of Ms. Pekler; he claimed that Ms. Pekler was left alive when he and the defendant departed that day. He didn't blame defendant Kadamovas for Umansky's murder; he said he had nothing to do with it, and neither had anything to do with it. He didn't blame him for Ms. Safiev and Mr. Kharabadze's murder either; they were both alive when Mikhel says they were last seen by either him or the defendant. So, there was nothing here as far as finger pointing and blaming defendant Kadamovas exclusively for these crimes and trying to exculpate himself. That's not what the testimony was.

But more importantly is the fact that the Court struck the testimony and instructed the jury when it struck the testimony that it wasn't to consider it at all; repeated that instruction several times; and repeated it again when the jury was finally charged in the case. And it's clear, as the law in the cases cited in the Government's brief, that the jury is presumed to have followed those instructions.

And not only were they given those instructions, but then when they made their guilt determination and their penalty phase determination, they were given separate special jury verdict forms, meaning that the jury had to separately consider both guilt and penalty as to both of these defendants.

18

And when it comes to the penalty phase, it's difficult to see how defendant Mikhel's antics could have possibly prejudiced defendant Kadamovas's rights here.  If anything, one would think that defendant Kadamovas would have benefited from how defendant Mikhel acted in several respects, because the jury would be able to distinguish him from defendant Mikhel and how he was acting here.

And defendant Kadamovas, of course, didn't take the stand and not refuse to answer questions.  He showed up for trial every day; he showed up for trial every day well dressed in his street clothes.  So, if anything, this probably benefited defendant Kadamovas, but it didn't benefit him in the long run because both defendant Kadamovas and defendant Mikhel were equally culpable in this offense, or practically equally culpable, and they were worthy of the same punishment.

And in fact, defendant Kadamovas in many aspects was probably even more worthy of the death penalty for some reasons, including the fact that he brought more of the co-conspirators into the operation than defendant Mikhel did, having recruited Altmanis, having recruited his own wife to participate in this.  There are aspects of this that make defendant Kadamovas even worse than defendant Mikhel.

And the Court's analysis about the overwhelming nature of the evidence in this case is dead on right.  And I'm not going to repeat it because I don't have two days here; I

have 20 minutes according to Judge Otero, basically.

The evidence against the defendant, the tape recording of the victim's voice that was found at defendant Kadamovas's apartment with defendant Kadamovas talking to Mr. Safiev. The footprint found on the Parrot's Ferry Bridge that was defendant's footprint from his gym shoes. I mean, all these things, and the testimony of numerous witnesses that implicate him directly in the hostage-takings and the murders here, it was simply overwhelming, and that, of course, continued with the penalty phase.

The aggravating evidence in this case not only sufficiently outweighed the mitigating evidence, it completely overwhelmed it to such an extent that the jury properly found that none of the mitigating evidence presented by the defense was worthy of any weight at all when related to the weight of the evidence presented by the Government. So, as far as severance is concerned, neither the law nor the facts in this case favored granting the severance.

On the continuance motion, I just want to make one point clear. The defense has not disputed the timeline that the Government put together in its papers, and what that timeline shows is a complete lack of diligence on the part of these witnesses to get here to be here for this trial. They showed up at the American Embassy, your Honor, the day before the defendant was supposed to put together his penalty phase

evidence.  The day before.  They showed up, I believe it was on February 5th of 2007, with the expectation that they would be here the next day.  I mean, this is such a lack of diligence it's almost invited error here by the defense.

THE COURT:  There's also the Government's position that Mr. Kadamovas lost touch with his family for many, many years, even before calling them at the last minute for this trial.

MR. DUGDALE:  That is correct, your Honor.  At the end of the day, what the Court has to consider is this four-part test for a continuance that the Government laid out in its papers.

First of all, the diligence exercised.  There was none.  When you show up at the Embassy the day before expecting to travel to the United States from a country like Lithuania, you can't possibly expect that you're going to be given that permission.

And Special Agent Perez went out of his way here, and the Government went out of its way to try to facilitate any arrangements it could make for these witnesses, but when given information at the last minute, when people show up at the last day, it's not going to happen.

And the other thing to make very clear here is that nobody associated with this case had any role at all in the decision to deny the visas for these people.  That decision was

21

made by the U.S. Consulate in Lithuania without any prompting or influence at all by the Government. We had nothing to do with that.

And the decision to deny a person to travel from Lithuania to here because they don't have financial resources in that country is not an uncommon thing it's my understanding. They do that because they want to make sure that the people leaving are going to come back. And if you have some sort of way to show that; one of the ways to show that is that you have financial ties to that country; that you're just not abandoning it; that you have some reason to come back, and that was the decision that was made. But again, there was nothing that could be done about this at that point in time.

I mean, this is a case where capital charges were pending against this defendant for four and a half years. They had four and a half years to figure out a way to get these people over here if they wanted to have them here, if they really wanted to have them here. Even after all that time passed, they had other options, like the video conferencing option discussed by the Court, or having their mitigation expert who, I don't know how much money they spent on, Dr. Toller (phonetic), who interviewed these family members, testify about those interviews.

They had a way to put this evidence in front of the jury even if these people never stepped foot in the United

22

States, and they chose not to do it.  That was a tactical decision, and for the reasons that we point out in our papers, it seems obvious to us why that tactical decision was made in the way it was.

If these people did show up, your Honor, the Government was prepared to meet that testimony about, if it was that he was a good father or good husband, with testimony that would have shown to the contrary.  At the end of the day, it's the Government's position, this would have made the defendant look worse than better at the end of the day, because the facts are that he abandoned these people in Lithuania.  He had contact with them; that is for sure.  He still did have contact with them, but he came here, he got a new girlfriend; he had a child with the girlfriend.  In fact, he had other children or another child outside of his marriage as well.

So, if the goal was to make the defendant look like a philanderer, there were other aspects of his personality which would have been brought out as a result of this, such as his drinking, his temper, his anti-Semitism.  There were a number of other things about the defendant that are not particularly attractive about his personality that I'm sure the defense considered and did not want this jury to hear.  And that, at the end of the day, could explain why these people showed up at the Embassy the day before they were supposed to come here and testify at trial.

23

So, as far as the first factor is concerned, there was no reasonable diligence to get these people here.

Second, there's no showing that, even had they shown up weeks beforehand, that they ultimately would have been granted this visa, and that's why these other alternatives should have been explored in the four and a half years that the trial was pending.

We had a case, as the Court will know, with Mr. Tezhik, where Mr. Tezhik was refusing to come to the United States, and we didn't want to sit here during the trial and look during the guilt phase at the door all the time wondering if Mr. Tezhik was going to decide to change his mind and show up, so we went overseas and took a deposition, at great expense to the Government. We videotaped that deposition so it could be used at trial. We did video conference it back here so the defendants could watch it with their counsel here. We took these steps because we anticipated these problems with our overseas witnesses. The same standard should have been held to the defense here if they really were interested in getting these people here.

And there's no showing that any continuance granted by the Court would have helped the situation.

As far as the inconvenience to the parties, the third factor, and to the Court and to the jury, how long a continuance were we talking about here? We had a jury that had

already been sitting for over six months here; a jury that showed up every single day and, despite the disparaging comments that have been made about this jury by defense counsel, showed up on time every day, paid attention to the evidence every day. To expect them to take three weeks off, four weeks off, in the middle, really near the conclusion of the death penalty case, would have been unfair to the jury; it would have been unfair to the Court; would have been unfair to the Government to space its case so far away from the ultimate verdict in this case, especially considering now we're in another trial right now. I don't know how we could have done both things simultaneously had this case been continued as recommended by the defense.

And lastly, there was no showing at the time that this continuance motion was made as to how it even harmed the defense. They didn't submit any proffer to show what these people would say. They still haven't submitted any proffer as to what these people would say, not that it would make any difference now. But, as the Court has indicated before, the Court's not a mind reader. What was the harm that was shown? There was nothing shown to justify the continuance request at the time it was made.

So, the continuance, obviously this is a matter that the Court has really an overwhelming sense of discretion on as to how to conduct its trial and the timing of its trial. Judge

25

Otero reminds us of that constantly, telling us we have to be at his court at 10:00 o'clock.  But, in any event, for those reasons, that should be denied.

And the last issue, the issue with the jury.  The jury wasn't obligated to find any -

THE COURT:  You've got two issues; one is the sequential trials -

MR. DUGDALE:  Correct, your Honor.

THE COURT:  - in the penalty phase, and second would be the jury issue.

MR. DUGDALE:  Again, insofar as the sequential penalty trials, *United States versus Tipton* is a death penalty case which talks about the fact that this is not required in a death penalty case, by any means.  It really is another matter that's within the discretion of the Court here.

And in this case, we have two equally culpable defendants, basically; that's what the evidence showed here. They were involved in the same crimes together; they really both assumed the same kind of leadership role in the case; and again, for the reasons I cited, defendant Kadamovas actually had some things that were against him.

Defendant Mikhel obviously had other aspects of the crimes that he was more involved with than defendant Kadamovas, but they both were really, basically, equally culpable defendants who assumed a leadership role in this crime, so

trying them together was appropriate.

And the jury, despite the fact that they were tried jointly, again, the Court did what it had to do and what it was supposed to do to make sure that they got the individualized consideration that was required in a death penalty trial. The jury was instructed on several occasions in the final charge.

THE COURT: There were two separate verdict forms.

MR. DUGDALE: Correct.

THE COURT: One for the guilt phase, and two separate verdict forms for the penalty phase as well.

MR. DUGDALE: Correct. As far as the instructions itself, the Court explicitly instructed the jury that they had to give individual consideration as to both of these defendants. The Court instructed them separately as to the mitigation that was presented as to each and the aggravation presented as to each. The aggravating factors obviously overlap, but even though they overlap, the Court instructed separately as to aggravating factors for both defendants.

And then, as the Court noted, ultimately what the Court did to ensure that there would be this separate consideration is, they had separate jury verdict forms. So, this jury was required to sit back there and fill out the verdict form for each defendant separately and to give that separate consideration.

THE COURT: In the penalty phase aspect of the trial,

27

the verdict forms that were used by the Court set forth in detail each defendant's proposed mitigating factors.

MR. DUGDALE: Correct, your Honor.

The verdict forms did and also the instructions set out what each mitigating factors were for the defense, so they were repeated.

And the fact the jury came back after a couple hours of deliberation really doesn't show anything other than the fact that this was an overwhelming case, both for guilt and for death in this case.

It just so happened, your Honor, on the same exact day of this trial, there was a trial in Virginia, the one that Dr. Cunningham testified in ultimately, and that verdict was delivered on the same day. Now, it's a different case; that jury came back in less than an hour. So, fast decisions in penalty cases are not anything that's unusual.

There was a case two weeks ago the District Attorney's office tried; jury came back in less than an hour.

This jury had six months to consider the evidence in this case and weeks to consider the penalty phase evidence; an entire weekend after the arguments in this case, and then time to deliberate amongst themselves about this evidence. The fact they came back quick, again, only shows that it was an overwhelming case, as the Court has pointed out, both for guilt and for penalty as well.

28

And as far as the consideration of the fact -

**THE COURT:** I don't think you can ignore the fact that the jury heard compelling evidence as to five deaths and the manner in which the deaths occurred. They were brutal murders.

**MR. DUGDALE:** That's absolutely the case. And again, this was a uniquely brutal crime involving uniquely brutal defendants which warranted a unique penalty, and that's why they came back in the manner that they did, your Honor.

And it also reflects their special findings as well. Again, the law is not on the defendant's side on this issue either. The law is clear that even in a case where there's uncontradicted evidence concerning a mitigating factor, that does not obligate the jury to make any findings in their favor. Not at all.

So, what the jury's verdict ultimately reflects is, they found zero weight for the mitigation that was presented for the defense. And really, they didn't consider these facts to be mitigating at all when compared to - well, they weren't mitigating at all, and particularly when you compare it to the aggravating evidence that you have in the case.

Again, as the Court noted, the five murders; they didn't even hear about the other two murders, but they heard about these five murders. They heard about the manner that they were committed in; they heard about the motivation for

these murders, the fact it was done for the shameful reasons that it was done for, just so they could buy mink coats and nice houses and things like that, and just the brutal nature of the killings here. Again, the jury wasn't obligated to find anything in either party's favor. That's exclusively something that was within the provenance of the jury and their discretion here.

And what their verdict really just reflects is nothing more than they engaged in the two-step process they were supposed to; first of all seeing if there were facts supporting mitigating factors, and second, to determine whether in fact that was mitigating or not. And what their bottom line result was, and it's something that's supported by the overwhelming nature of the evidence here, is that the mitigation evidence really amounted to nothing when you compared it to the aggravating evidence.

And unless the Court has any questions, I'll submit. Thank you.

THE COURT: I'm going to deny defendant Kadamovas's motion for new trial on both the guilt phase and the penalty phase. There's no evidence before the Court that the jury did not follow the instructions of the Court in arriving at verdicts in both phases of the trial.

Now, with regard to sentencing in this matter, Mr. Lasting, Ms. Chahin, is there anything you wish to say on

behalf of your client?

MR. LASTING:  Your Honor, the Court having denied our motions for new trial, I don't believe there's anything to be said in terms of the sentencing.

THE COURT:  Does Mr. Kadamovas wish to address the Court prior to sentencing?

**(The Interpreter conveys the Court's request to defendant Kadamovas)**

THE COURT:  We can move you up to the front seat if you wish, or the lectern, or you can take one of the microphones and put it in front of you.  I think the one on this end of the table can be moved over there.

**(Pause)**

**(Mr. Kadamovas addresses the Court through the Interpreter)**

DEFENDANT KADAMOVAS:  First of all, I want to say that I was given an opportunity to speak here.

First of all, I would like to say that the trial wasn't fair.  It wasn't fair for at least two reasons.  The first reason is that one of my attorneys, Ms. Chahin, wasn't ready for the trial.  She joined the case only half a year before the proceedings started, and she admitted herself that she cannot defend me because she wasn't familiar with the case enough.

And the second reason, and maybe the most important

EXCEPTIONAL REPORTING SERVICES, INC

reason for me, is that I wasn't given an opportunity to prepare myself for the trial. I didn't have an opportunity to familiarize myself with the facts of the case. At this moment, I know only about 15 percent of the discovery that was introduced in this case. If I'm not mistaken, the discovery contains somewhere between 85 and 90,000 pages, and there are also a lot of other video, audio, and computer materials with information stored on computer disks.

The fact that I didn't have an opportunity to familiarize myself with those materials caused the fact that I wasn't able to discuss those facts with my defense attorneys.

I would like to show one example of the fact that I wasn't - of the fact of the influence that I wasn't given an opportunity to familiarize myself with the materials of the case, and there are three things. First of all, that I wasn't able to read the materials in time. I wasn't able to discuss it with my attorneys.

The second is that the attorneys didn't notice those facts in the materials of the case.

And the third fact is that the Government and FBI were involved in direct counterfeiting of the materials and changing the facts to feed their case.

I have five pages that I would like to show and explain my points.

THE COURT: Go ahead.

32

THE INTERPRETER:  It's working.

MS. DeWITT:  I think it's on, Sonia.

MS. CHAHIN:  Your Honor, does this appear on the Court's monitor?

THE COURT:  It will.

DEFENDANT KADAMOVAS:  You can't see very well on this monitor, but on this single page there are at least three big mistakes.  Today I would like to speak only of one example.

Please pay attention to the call that was made at 10:15 a.m.  I can't see clear on this monitor.

Maybe Ms. Chahin will help me.

MS. CHAHIN:  You're referring to page 2 or on this page here?

DEFENDANT KADAMOVAS:  This page.

THE COURT:  No.  Go to the other side.  That's it.

It's right underneath the blue.  It says 10:14 a.m., and then there's a 10:15 a.m.

No.  You're going the wrong way.  Move to the other side.

MS. CHAHIN:  Which way, your Honor?  This way?

THE COURT:  That's it.  Perfect.  You've got it, 10:15.

DEFENDANT KADAMOVAS:  Could you move a little bit on the other side.  There's something said 9:15, over there.

MS. CHAHIN:  This way?

33

DEFENDANT KADAMOVAS:  Yeah, where the mark on the page.

Could you expand it a little bit, magnify?

MS. CHAHIN:  Smaller?  Larger?

DEFENDANT KADAMOVAS:  Bigger, magnify.

No.  Other way.

MS. CHAHIN:  That's it.

THE COURT:  There's a focus over there on your ...

Tell me what you're trying to explain.  I think it's easier that way.

DEFENDANT KADAMOVAS:  The Government contends that at 10:15 a.m. I was in Bakersfield.  And this table was shown to the jury.  I started --

THE COURT:  Let me interrupt you a minute.

They don't claim that you were in Bakersfield.  Their claim that the call was picked up on a device in Bakersfield at 10:15.

DEFENDANT KADAMOVAS:  It doesn't really matter at this point whether I was there or my telephone was there.  On the other hand, you are right.  You can't say exactly in whose possession my telephone was.

When I started checking telephone calls -- I would like to ask Ms. Chahin to put the second page on the screen.

THE COURT:  Now, these items that you're giving to me are all exhibits in the trial of the case that were introduced

34

during the guilt phase of the trial.

**DEFENDANT KADAMOVAS:**  Unfortunately, I don't have a computer right here.  The computer was taken away two weeks ago.  And I can't tell the numbers.

This is a page from my telephone bill.  Where the mark is between those two telephone calls there should be either incoming or outgoing call.  But there is no incoming or outgoing calls between those two calls.

I started checking and started to -- tried to find out why my phone is showing as being in that area.

I would like to show the next page.

There was a table in the evidence.  The table was compiled by the FBI agents showing where I was at this point. Please look at the call number 173.  It shows the telephone was made from Altmanis' telephone to my telephone.

And I would like to show next page.

This is a detailed printout used by the FBI agents to pinpoint times and the location of telephones.  This shows that Altmanis' phone with a number 818-209-3555 was making a call to my phone 323-428-1630.

I would like to show the next page.

**THE COURT:**  You're just re-arguing all of the evidence in this case.  You haven't addressed the issue that I asked you to speak to, and that is on sentencing.

**DEFENDANT KADAMOVAS:**  This is the telephone bill of

35

Altmanis.  And the call number 21 shows that in reality the call made in 10:15 in the morning -- but it shows that Altmanis made a call not to my cell phone but to somebody else's.  I don't even know whose phone it is.

MR. DUGDALE:  Your Honor, I'm sorry.  I have to excuse myself.  But Ms. DeWitt will handle the remainder of the sentencing.

THE COURT:  That's fine.

MR. DUGDALE:  I will just add, however, that this point that he's making here he's totally wrong about this.  And the reason that the phone calls don't show up on bills is because this was a zero duration call.  So he wouldn't be billed for it.  So I don't know.  This exercise seems to be a waste in time in large part.  But the analysis is totally wrong.

Thank you, your Honor.

DEFENDANT KADAMOVAS:  What the prosecutor just said is not quite correct.  Because if we look at the previous page, you will see that Altmanis was waiting for about 14 seconds when he was trying to connect to my phone.

And it shows that Altmanis wasn't dialing my phone at that time.  He was dialing somebody else's phone.  But for some reason, the Government shows in their colored table that Altmanis was calling to me, and I was in Bakersfield at that time.

This is only one example out of a large number of examples that I could have shown.  But I don't believe it's an appropriate time now to go into that.

The more I go into the details of the case, the more I find cases which should have been mentioned during the case.  But I couldn't have done that, because I simply didn't know about it.

But the attorneys even if they looked through the whole evidence of the case, which I doubt, they couldn't find a lot of things.  Because they didn't know what it relayed to.  It was my job to find those things and point it to them.

Another thing is the management of MDC.  A person who represents MDC is present here.  I would like to say how I was prevented from accessing the computer and why it had happened.

Starting from 2003 I kept asking that the materials of the case were either translated to me or I was given an electronic means of translation so I could have done it myself.  At some point my attorney convinced the management of MDC that my having a computer with a interpreting or translating program would be very helpful for the case.

At some point in 2005 my attorney purchased a computer for me, installed a necessary, all necessary software, and sent it to MDC.  From that point on I was starting keeping track of all occasions when I was given access to the computer and how much time I spent working on the computer.

From May 2005 to the beginning of the trial, I spent on the computer approximately 209 hours.  It takes me about five, six minutes to read a single page.  Because the computer program has to transform the page into a different format and translate it into Russian.  And only after that, I can read the page.

During those 209 hours, I was able to familiarize myself only with 3 to 5,000 pages of the entire discovery.  In addition to that, 234 pages were translated by the court interpreter.

Starting from August 2005, I was given less and less access to the computer.  I was explained that the rooms where I could do that were occupied by the meetings of other inmates with their attorneys.  I started complaining to my attorney.

At that time I had a different attorney.  A woman named Marcia Brewer.  At one of these meetings with her, she told me that she had been told by MDC that I myself don't wish to work with the computer.

I told her that this wasn't true.  And I gave her about 25 pages and asked her to write in her own hand a request for each day of the month for me to access the computer.  Marcia did what I asked her.  I signed every page.  And she herself gave that stack of paper to one of the wardens on the eighth floor.

That month I wasn't given a single chance to work on

38

the computer.  My situation was so desperate that I couldn't find another solution than to go on hunger strike.  That was my second hunger strike.  The first one lasted for 29 days; the second one for 14.

I have a piece of paper, and I would like to show it to you, a piece of paper that I would put against the glass on my door with three demands regarding my hunger strike.

THE COURT:  Ms. Chahin, you're going to put it on the overhead projector so I can see it?

MS. CHAHIN:  Yes, your Honor.

DEFENDANT KADAMOVAS:  On the first day of my hunger strike --

THE COURT:  Well, let me read what he's put on.

"Protest hunger strike.  Let me working on my case and let me learn English.  Give me a medical care."

That was the sign.

DEFENDANT KADAMOVAS:  On the second day of my hunger strike, one of the lieutenants walked into my camera and turned over the water and took away all drinking water.  They told me that if I'm not going to eat I wouldn't be able to drink either.

In the first hunger strike, they wouldn't give me any liquid for four days.  During this hunger strike, they didn't give me any drink for 24 hours.  They checked my blood pressure, and they weighed me.

39

Next day after 24 hours, they took me again to measure my blood pressure and to weigh me. When they weighed me, the doctor was surprised that I am losing weight so fast. I think it was three pounds during the 24 hours.

In my broken English, I explained to the doctor that I am not given any liquids. The doctor said that I was supposed to be given as much water as I need to. And the doctor said it in the presence of the lieutenant. And the lieutenant promised that I would be given water.

Later they started giving me one liter of water a day, one bottle of water. And that lasted for 10 days.

At some moment I was visited by 10 people from MDC management, including Ben-Schmul (phonetic) who is present here. And my attorney Marcia Brewer was also present. We discussed the situation. They asked me to stop the hunger strike. And I asked them to give me an opportunity to use the computer.

Ben-Schmul showed me a separate room. It was a small room designed for special visits. And he said that I would be given an opportunity to work on the computer in that room every day. I knew I would be deceived.

But next day my attorney Richard Lasting came to me. He personally spoke to Mr. Taylor, the counsel. And he promised that I would be given the computer every day for the whole day, and I would be given an opportunity to work.

40

I believed them and stopped hunger strike.  But I have never been given that room and an opportunity to work there.  Later, right before the trial was supposed to start, when they brought me here to MDC, they started giving me an opportunity to work in this particular room.  Because Mikhel was in other wing of the building, and we couldn't meet.

But the fact that they gave me an opportunity to work in that room shows that they could have given it to me half a year earlier.  Then they came up with different explanations why they couldn't give me a computer.  One of them was that they didn't have electricity.

THE COURT:  I'm going to have to ask you to wrap up here.  Because you're just wandering and complaining and not addressing what I asked you.  And that is do you have anything to say on behalf of yourself with regard to sentencing in this matter.

DEFENDANT KADAMOVAS:  I understand.

In short I want to remind again that I wasn't given an opportunity to prepare for the trial and to get familiar with the discovery of the case.  I would like to say couple of words about the second phase of the trial and regarding my family from Lithuania, which wasn't present here.

THE COURT:  All right.

DEFENDANT KADAMOVAS:  The Government wants to show me as some kind of villain who abandoned the family in Lithuania,

and they didn't really want to come here.

First of all, it's not true that I abandoned my family.  Every month as long as I was free, I was sending them money and packages.  And they didn't have -- they had everything that they needed.  During the last four years, they wouldn't let me make calls to Lithuania.  And I didn't have any connection to my family.

I just want to give one example.  Three and a half years ago, through my attorney, I sent to my wife all papers necessary for the divorce.  She still has not divorced me.

Let's make it simple.  Let's dial the number in Lithuania and let them tell us what kind of relations I had with my family and what they think about me.

That's about it; I want to tell at this point.  I was not prepared for it, because only yesterday I was told that I would be given an opportunity to speak.

Thank you.

**THE COURT:**  All right.

With regard to the Second Superseding Indictment, Count One charges a violation of 18, United States Code, Section 1203, conspiracy to take hostages resulting in death. Counts Two, Three, and Four allege a violation of 18, United States Code, Section 1203, hostage taking resulting in death. Count Five is the violation of 18, United States Code, Section 1956(h), conspiracy to launder monetary instruments.  Count Six

is a violation of 18, United States Code, Section 371, conspiracy to escape from custody.  Count Seven is a violation of 18, United States Code, Section 981(a)(1)(C); 21, United States Code, Section 853; and 28, United States Code, Section 2461(c), criminal forfeiture.

This is a death penalty case under 18, United States Code, Section 3591, et seq.  Under Section 3593(d), there was a return of special findings unanimously by the jury under Section d, e, and f of 3593.

Under Section 3594, that requires a sentence.  3595 is the appeal process.  And 3596 is implementation.

Now, in Count One of the Second Superseding Indictment the victims were Myer Muscatel, Rita Pekler, Alexander Umansky, Nick Kharabadze, and George Safiev.  In Count Two the victim was Alexander Umansky.  In Count Three the victim was Nick Kharabadze.  And in Count Four the victim was George Safiev.

The guilt phase verdicts as to Defendants Iouri Mikhel and Jurijus Kadamovas were unanimously delivered by the jury and published, filed, and recorded by the Court on January 17th, 2007.  The penalty phase verdicts as to Defendants Iouri Mikhel and Jurijus Kadamovas were unanimously delivered by the jury and published, filed, and recorded by the Court on February 13th, 2007.  The forfeiture phase verdicts as to Defendants Iouri Mikhel and Jurijus Kadamovas were unanimously

43

delivered by the jury and published, filed, and recorded by the Court on February 21st, 2007.

Pursuant to 28, United States Code, Section 3593(c), which states "not withstanding Rule 32 of the Federal Rules of Criminal Procedure, when a defendant is found guilty or pleads to an offense under Section 3592, no presentence report shall be prepared."

The Court therefore pronounces sentence as follows:

It is ordered that the Defendant Jurijus Kadamovas shall pay to the United States a special assessment of $700. That's a hundred dollars per count, which is due immediately pursuant to statute. Pursuant to Section 5e1.2 of the Guidelines, all fines are waived as it is found that the Defendant does not have the ability to pay a fine since all of his assets have been forfeited to the United States. And the Court is concurrently entering a monetary judgment of forfeiture against Mr. Kadamovas.

Pursuant to 18, United States Code, Section 3591, et seq. and the *Sentencing Reform Act of 1984*, it is the judgment of the Court that Defendant Jurijus Kadamovas is hereby committed on Count Five and Count Six of the Second Superseding Indictment to the custody of the Bureau of Prisons to be imprisoned for a term of 240 months.

This term consist of 240 months on Count Five and 60 months on Count Six to be served concurrently with each other

44

and concurrently to any other sentence imposed by this Court on the remaining counts, specifically Counts One, Two, Three, and Four. In effect the sentences imposed on Counts Five and Six are merged by operation of law with the sentences imposed on Counts One, Two, Three, and Four hereunder.

With regard to Counts One, Two, three, and Four; the Court finds that the jury has unanimously made the requisite special findings required by law with respect to 18, United States Code, Section 3592, 3593(d), 3593(e), and 3593(f).

Therefore, the Court imposes the following sentence pursuant to 18, United States Code, Section 3594, upon a unanimous recommendation under 28, United States Code, Section 3593(e) that the Defendant Jurijus Kadamovas should be sentenced to death. The Court hereby sentences you to the ultimate penalty of death.

Specifically, pursuant to the *Federal Death Penalty Act of 1994*; 18, United States Code, Section 3591 through 3596; and the special findings of the jury returned on February 13th, 2007; and the jury's unanimous vote recommending that you, Jurijus Kadamovas, shall be sentenced to death on Counts One, Two, Three, and Four of the Second Superseding Indictment; it is the judgment of the Court that Mr. Kadamovas is sentenced to death separately on Counts One, Two, Three, and Four of the Second Superseding Indictment.

You shall, pursuant to 28, United States Code,

45

Section 3593, be committed to the custody of the Attorney General of the United States until exhaustion of the procedures for appeal of the judgment of conviction and for review of the sentence in accordance with 28, United States Code, Section 3595.

When the sentence is to be implemented, the Attorney General shall release you to the custody of the United States Marshal who shall supervise implementation of the sentence in the manner prescribed by the law of the state -- that is California -- in which the sentence is imposed.

If the state of California does not provide for the implementation of a sentence of death, the Court shall designate another state, the law of which does provide for the implementation of a sentence of death.  And the sentence shall be implemented in the latter state in the manner prescribed by such law.

Pursuant to Title 18, United States Code, Section 981(a)(1)(C); Title 21, United States Code, Section 853; and Title 28, United States Code, Section 2461(C); and Count Seven of the Second Superseding Indictment, Defendant shall forfeit to the United States all right, title, and interest in any and all property, real or personal, which constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1203.  That is Counts One through Four for which Defendant has been convicted.

46

Moreover, the jury by special verdict has found that the total of $1,203,628 constitutes or is derived from proceeds traceable to the violations of Title 18, United States Code, Section 1203.  That's Counts One through Four for which Defendant has been convicted.

Pursuant to that special verdict as reduced by the net amount already forfeited in related civil and administrative forfeiture proceedings, a personal money judgment in the amount of $1,039,716.46 has been contemporaneously entered against Defendant.

With regard to Count Seven, the criminal forfeiture count, the Court enters judgment against you as stated herein individually, jointly, and severally in the total sum of $1,203,628.

Finally, the Defendant is to cooperate with the Bureau of Prisons' authorities and personnel in the collection of a DNA sample from Defendant's person.

I'm going to order the court recorder to prepare a transcript of the sentencing proceedings, which is incorporated herein by reference.  A copy of the transcript and the statement of the Court as set forth herein shall be included in the commitment order and judgment.

Now, Mr. Kadamovas, you have the statutory right to appeal your sentence and your judgment of conviction.  With few exceptions, any notice of appeal must be filed within 10 days

of judgment being entered in your case.

If you're unable to pay the cost of an appeal or filing fee, you may apply for leave to appeal in forma pauperis. If you do not have counsel to act on your behalf if you so request, the Clerk of the Court will prepare and file a notice of appeal on your behalf.

I'm going to also instruct the attorneys in this case to file a notice of appeal on behalf of Mr. Kadamovas.

**MS. DeWITT:** Your Honor, just one thing. We had initially proposed in the language for the J and C that you also include that the sentence be implemented pursuant to the laws of the state of Indiana as a specific alternative. And the reason for that is because that is where it is most likely that, at least based upon our current information, that any sentence will be carried out. And it might avoid having to go back and --

**THE COURT:** Well, a lot of things can change by the time this appeal is finally final. And that's why I did not utilize Indiana. I just said in a state that the death penalty is still valid.

**MS. DeWITT:** Thank you, your Honor.

**THE COURT:** All right. The Defendant then is committed for execution of sentence and judgment in this case.

I have in fact signed the personal money judgment of forfeiture against Jurijus Kadamovas in open court this date.

48

Thank you.

THE CLERK:  The Court's in recess?

THE COURT:  No.  We have another case.

(Off the record discussion)

MS. DeWITT:  Your Honor, this isn't intended for us?

THE COURT:  Yes -- oh, wait.

Before you leave, I brought to the table those jury questionnaires.  The ones at the counsel table for the Government are to be taken by the Government.  There are two boxes on defense counsel table.  One box is for Defendant Kadamovas.  And one box is for Defendant Mikhel.

Mr. Rubin is here.  So he'll take one of the boxes. Ms. Chahin or Mr. Lasting will take the other box.

It's a complete set.

(This procedure was adjourned at 10:16 a.m.)

CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    March 13, 2007

          Signed                                         Dated

TONI HUDSON

FEDERALLY-CERTIFIED TRANSCRIBER

# EXHIBIT 1

5 PAGES FROM JK.

1) GOVERNMENT EXHIBIT, SHOW WHAT KADAMOVAS ON DECEMBER 6, 2001 WAS IN BAKERSFIELD AT 10:15 AM.

2) KADAMOVAS ORIGINAL BILL FROM CINGULAR WIRELES REVELS NO INCOMING OR OUT COMING CALLS AT 10:15 AM ON DECEMBER 6, 2001.

3) FBI CREATURE CHART CALL # 173 SHOWS WHAT (818) 209-35? ALTMANIS, CALL TO (323) 428-1630 KADAMOVAS PHONE AT 10:15:02

4) ONE MORE "DETAILED" FBI CHART SHOWS WHAT IT WAS TRUTHFUL CALL FROM ALTMANIS TO KADAMOVAS AT 10:15 AM

5) ALTMANIS ORIGINAL BILL FROM SPRINT PCS REVILS WHAT ALTMANIS WAS MAKE PHONE CALL AT 10:15 AM BUT NOT TO KADAMOVAS - (323) 428-1630 BUT SOME ONE ELSE WHOSE PHONE W (818) 765-5559

## THE LOCATION OF DEFENDANT JURIJUS KADAMOVAS' CELL PHONE USAGE BETWEEN 12/5/01 AT 11:37 P.M. AND 12/6/01 AT 11:44 A.M.

### (FROM CELL SITE DATA FOR PHONE NUMBER (323) 428-1630)

| CALL | DATE | TIME | CALLING NUMBER | CALLED NUMBER | CELL SITE WHERE KADAMOVAS' CELL PHONE WAS USED |
|---|---|---|---|---|---|
| 1 | 12/05/01 | 11:37 PM | (323) 428-1630 | (818) 996-3147 | 5229 Lindley Avenue, Tarzana, CA |
| 2 | 12/06/01 | 9:28 AM | (818) 996-3147 | (323) 428-1630 | 526 Burnett Road, Tipton, CA |
| 3 | 12/06/01 | 10:15 AM | (818) 209-3555 | (323) 428-1630 | 1260 Shafter Road, Bakersfield, CA |
| 4 | 12/06/01 | 10:41 AM | (818) 209-3555 | (323) 428-1630 | 49723 Gorman School Road, Gorman, CA |
| 5 | 12/06/01 | 11:44 AM | (818) 996-3147 | (323) 428-1630 | 15430 Ventura Boulevard, Encino, CA |





Rita Pekler

Mikhel    Kadamovas

December 5, 2001

December 6, 2001





GOVERNMENT
EXHIBIT
741

KADAMOVAS | ORIGINAL BILL | 323 - 428 - 16 - 30

| | Date/Time | | | Location | Destination | Code | Number | Min | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| H | 12/05/2001 07:36 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 3-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 07:51 PM | PK | | LOS ANGELES (GSM) C | VAN NUYS | CA | 818-907-7427 | 1.00 | 0.00 | 0.00 | 0.00 |
| | 12/05/2001 07:52 PM | PK | | LOS ANGELES (GSM) C | BURBANK | CA | 818-209-3555 | 1.00 | 0.00 | 0.00 | 0.00 |
| | 12/05/2001 07:54 PM | PK | 0333 | LOS ANGELES (GSM) C | Call Forwarded | CF | 323-428-6789 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 07:55 PM | PK | | LOS ANGELES (GSM) C | Voicemail | VM | 323-428-1234 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 08:35 PM | OP | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 08:37 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 08:19 PM | OP | | LOS ANGELES (GSM) C | Voicemail | VM | 323-428-1234 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 08:21 PM | OP | | LOS ANGELES (GSM) C | VAN NUYS | CA | 818-730-7403 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 09:28 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 10:39 PM | OP | | LOS ANGELES (GSM) C | BEVERLYHLS | CA | 310-993-6748 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 11:34 PM | OP | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 11:37 PM | OP | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/05/2001 11:37 PM | OP | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 09:28 AM | PK | | FRESNO CA | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 10:40 AM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 11:44 AM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 03:32 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 06:03 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 06:13 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 07:18 PM | PK | | LOS ANGELES (GSM) C | MONTEBELLO | CA | 323-270-5115 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/06/2001 08:01 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/07/2001 08:49 AM | PK | | LOS ANGELES (GSM) C | Voicemail | VM | 323-428-1234 | 1.00 | 0.00 | 0.00 | 0.00 |
| | 12/07/2001 08:39 AM | PK | | LOS ANGELES (GSM) C | MONTEBELLO | CA | 323-270-5115 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/07/2001 08:43 AM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| | 12/07/2001 12:18 PM | PK | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 2.00 | 0.00 | 0.00 | 0.00 |
| H | 12/07/2001 12:43 PM | PK | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/07/2001 12:44 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/07/2001 12:50 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/07/2001 03:00 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 12:19 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 3.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 01:31 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 01:53 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 04:19 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 5.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 04:26 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 12:57 PM | OP | | LOS ANGELES (GSM) C | Voicemail | VM | 323-428-1234 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 01:05 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 01:08 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 2.00 | 0.00 | 0.00 | 0.00 |
| H | 12/08/2001 01:23 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/09/2001 02:39 PM | OP | | LOS ANGELES (GSM) C | BEVERLYHLS | CA | 310-993-6748 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/09/2001 07:38 PM | OP | 0333 | LOS ANGELES (GSM) C | Call Forwarded | CF | 323-428-6789 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/09/2001 08:01 PM | OP | 0333 | LOS ANGELES (GSM) C | Call Forwarded | CF | 323-428-6789 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/09/2001 09:06 PM | OP | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | -0.00 |
| H | 12/10/2001 12:16 PM | PK | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/10/2001 12:20 PM | PK | | LOS ANGELES (GSM) C | Voicemail | VM | 323-428-1234 | 1.00 | 0.00 | 0.00 | 0.00 |
| | 12/10/2001 12:24 PM | PK | | LOS ANGELES (GSM) C | MONTEBELLO | CA | 323-270-5115 | 2.00 | 0.00 | 0.00 | 0.00 |
| | 12/10/2001 02:17 PM | PK | | LOS ANGELES (GSM) C | RESEDA | CA | 818-896-3147 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/10/2001 02:24 PM | PK | | LOS ANGELES (GSM) C | VAN NUYS | CA | 818-730-7403 | 1.00 | 0.00 | 0.00 | 0.00 |
| H | 12/10/2001 02:51 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 5.00 | 0.00 |
| H | 12/10/2001 04:05 PM | PK | | LOS ANGELES (GSM) C | INCOMING | CL | 323-428-1630 | 1.00 | 0.00 | 0.00 | 0.00 |

| | | | |
|---|---|---|---|
| $16.00 | $0.00 | $0.00 | $3.00 |

*(handwritten notes in left margin: "INCOMING" "OUTCOMING" "15AM" "TO M" "NYONE!")*

17846

KADAMOVAS  **FBI CREATURE CHART.**

| # | Date | | | | | | | Notes | | |
|---|---|---|---|---|---|---|---|---|---|---|
| #156 | 12/5/01 | 19:55:36 | 19:55:36 | 0:00:17 | 19:55:53 | (323) 428-1630 | (323) 428-1234 | | LA698C | LA134B |
| #157 | 12/5/01 | N/R | 19:56:02 | N/R | N/R | N/R | (323) 428-1630 | | LA698C | LA698C |
| #158 | 12/5/01 | 20:35:58 | 20:36:09 | 0:00:46 | 20:36:55 | (323) 428-1630 | (818) 996-3147 | | LA130C | LA134B |
| #159 | 12/5/01 | 20:37:08 | 20:37:15 | 0:00:14 | 20:37:29 | (818) 996-3147 | (323) 428-1630 | | LA699C | LA699C |
| #160 | 12/5/01 | N/R | 20:37:58 | N/R | N/R | N/R | (323) 428-1630 | | LA699C | LA699C |
| #161 | 12/5/01 | 21:19:01 | 21:19:01 | 0:00:23 | 21:19:24 | (323) 428-1630 | (323) 428-1234 | | LA699C | LA699C |
| #162 | 12/5/01 | N/R | 21:19:29 | N/R | N/R | N/R | (323) 428-1630 | | LA699C | LA699C |
| #163 | 12/5/01 | 21:21:47 | 21:22:09 | 0:00:38 | 21:22:47 | (323) 428-1630 | (818) 730-7403 | | LA699C | LA699C |
| #164 | 12/5/01 | 21:27:44 | 21:27:51 | 0:00:00 | 21:27:51 | (818) 730-7403 | (323) 428-1630 | | LA548B | LA548B |
| #165 | 12/5/01 | N/R | 21:27:51 | 0:00:00 | 21:27:51 | (818) 730-7403 | (323) 428-1630 | | N/R | N/R |
| #166 | 12/5/01 | 21:28:10 | 21:28:13 | 0:00:25 | 21:28:38 | (818) 730-7403 | (323) 428-1630 | | LA548B | LA548B |
| #167 | 12/5/01 | N/R | 21:28:13 | 0:00:25 | 21:28:38 | (818) 730-7403 | (323) 428-1630 | | N/R | N/R |
| #168 | 12/5/01 | 22:39:24 | 22:39:32 | 0:00:14 | 22:39:46 | (323) 428-1630 | (310) 993-6748 | | LA078C | LA078C |
| #169 | 12/5/01 | 23:34:59 | 23:35:13 | 0:00:07 | 23:35:21 | (323) 428-1630 | (818) 996-3147 | | LA064B | LA064A |
| #170 | 12/5/01 | 23:37:20 | 23:37:21 | 0:00:06 | 23:37:27 | (323) 428-1630 | (818) 996-3147 | | LA064A | LA064A |
| #171 | 12/5/01 | 23:37:48 | 23:37:59 | 0:00:05 | 23:38:04 | (323) 428-1630 | (818) 996-3147 | | LA064A | LA064A |
| #172 | 12/6/01 | 9:28:30 | 9:28:49 | 0:00:10 | 9:28:59 | (818) 996-3147 | (323) 428-1630 | | PL886B | PL886B |
| #173 | 12/6/01 | 10:14:42 | 10:15:02 | 0:00:00 | 10:15:02 | (818) 209-3555 ALT | (323) 428-1630 JK | | LA460A | LA460C |
| #174 | 12/6/01 | 10:40:52 | 10:41:08 | 0:00:17 | 10:41:25 | (818) 209-3555 | (323) 428-1630 | REVEAL WHAT ALTMANIS | LA291C | LA291B |
| #175 | 12/6/01 | N/R | 10:41:09 | 0:00:17 | 10:41:26 | (818) 209-3555 | (323) 428-1630 | WAS CALL TO KADAMOVAS. | N/R | N/R |
| #176 | 12/6/01 | 11:44:42 | 11:44:57 | 0:00:13 | 11:45:10 | (818) 996-3147 | (323) 428-1630 | IT IS DETAILED FALSELY! | LA091C | LA091C |
| #177 | 12/6/01 | 12:56:08 | 12:56:29 | 0:00:00 | 12:56:29 | (818) 996-3147 | (323) 428-1630 | JK. ORIGINAL PHONE BILL | LA076C | LA035B |
| #178 | 12/6/01 | 15:32:18 | 15:32:32 | 0:00:14 | 15:32:46 | (818) 209-3555 | (323) 428-1630 | REVEAL, NO ANY INCOMING | LA064A | LA036B |
| #179 | 12/6/01 | 18:03:39 | 18:03:52 | 0:00:27 | 18:04:19 | (818) 209-3555 | (323) 428-1630 | OR OUTCOMING CALS | LA968B | LA064A |
| #180 | 12/6/01 | N/R | 18:03:53 | 0:00:27 | 18:04:20 | (818) 209-3555 | (323) 428-1630 | BETWEEN 9:28 AM AND 10:40 AM | N/R | N/R |
| #181 | 12/6/01 | 18:13:17 | 18:13:33 | 0:00:11 | 18:13:44 | (818) 730-7403 | (323) 428-1630 | BUT MORE IMPORTANT | LA036B | LA036B |
| #182 | 12/6/01 | N/R | 18:13:33 | 0:00:11 | 18:13:44 | (818) 730-7403 | (323) 428-1630 | ALTMANIS ORIGINAL PHONE | N/R | N/R |
| #183 | 12/6/01 | N/R | 18:27:04 | N/R | N/R | N/R | (323) 428-1630 | BILL REVEAL WHAT HE CALL | LA958C | LA958C |
| #184 | 12/6/01 | 19:18:39 | 19:19:03 | 0:00:35 | 19:19:38 | (323) 428-1630 | (323) 270-5115 | AT 10:15 AM NOT TO JK PHON | LA126B | LA126B |

3 of 5

*FBI CHART - #e191 FROM.....?*   *67*

```
CMS40R8MSCber.CallDataRecord.pCSPLMNCallDataRecord
{
     mSTerminating
     {
          callIdentificationNumber: 'B39E17'H
          relatedCallNumber: 'B39DCB'H
          recordSequenceNumber: '25946B'H
          exchangeIdentity: "BRBOBM1 E011Q00"
          mSCIdentification: '112190090433F0'H
          cellIDForFirstCell: '13007100788729'H              34601        LA460A
          incomingRoute: "ST1T1RI"
          outgoingRoute: "MA1R0MO"
          callingPartyNumber: '411828905355'H               (818) 209-3555  ALTMANIS
          calledPartyNumber: '113132241836F0'H              (323) 428-1630  I KAVAMOVA!
          iMSI: '310170207654320F'H
          iMEI: '520392710590410F'H
          mobileStationRoamingNumber: '116116020550F5'H
          redirectionCounter: '00'H
          dateForStartOfCharge: '14010C06'H                 12-06-2001
          timeForTCSeizure: '0A0E2A'H                       10:14:42
          timeForStartOfCharge: '0A0F02'H                   10:15:02  >  20 SECONDS
          chargeableDuration: '000000'H                     00:00:00
          trafficActivityCode: '0B020E'H
          teleServiceCode: '11'H
          internalCauseAndLoc: '023D'H
          timeFromRegisterSeizureToStartOfCharging: '000017'H
          timeForStopOfCharge: '0A0F02'H                    10:15:02
          interruptionTime: '000000'H
          typeOfCallingSubscriber: '01'H
          disconnectingParty: 'networkRelease (2)'
          chargedParty: 'chargingOfCallingSubscriber (0)'
          eosInfo: '00'H
          callPosition: ' (2)'
          originForCharging: '00'H
          cellIDForLastCell: '1300710078872B'H              34603        LA460C
          tariffClass: '0001'H
          tariffSwitchInd: 'noTariffSwitch (0)'
          firstAssignedSpeechCoderVersion: 'fullRateVersion2 (1)'
          speechCoderPreferenceList: '0100'H
          firstRadioChannelUsed: 'fullRateChannel (0)'
          presentationAndScreeningIndicator: '10'H
          switchIdentity: '0019'H
          networkCallReference: 'F09B6B000E'H
          subscriptionType: '00'H
          jurisdictionInformationParameter: '909640'H
          outgoingAssignedRoute: "MA1R0MO"
     }

}
```

*4 of 5*

**Preced.**                                                                                                    System   Options   Windows   Help

## Customer/Account search

Enter search criteria.

**Select search method.**

- ○ Access number
- ○ Account number
- ● Name
- ○ ESN
- ○ Customer ID

[ Search ]

**Select record type.**

- ● Account
- ○ Subscription
- ○ Customer

**Enter search value(s).**

Last name:  ALTMANIS                    ☑ Exact match

First name:  AINAR

Contact phone number:  [   ]

**Select customer type.**

- ● Individual
- ○ Business

**Select matching item(s).**

| | Customer | Address | Customer ID | Access number | Account |
|---|---|---|---|---|---|
| 👤 💲 | ALTMANIS, AINAR | 4320 MAMOUTH AVE... | 073807994 | (818)209-3555 | 0054771547 |
| 👤 | ALTMANIS, AINAR | 4320 MAMOUTH AVE... | 073807994 | (818)679-2317 | 4101494047 |

PENGAD-Bayonne, N. J.
GOVERNMENT EXHIBIT 306

[ Add account... ]   [ View/Change... ]   [ Billing activities ▼ ]   [ Options ▼ ]   Delete

[ Add customer... ]   [ Streamlined activation ▼ ]   [ Clear ]   Done

06:01:25 PM       Feb. 12, 2002

 **Sprint.**          Individual Phone Charges          **Sprint PCS**
www.sprintpcs.com

| Customer | | Account Number | Billing Period Ending | Invoice Date | Page |
|---|---|---|---|---|---|
| AJNAR ALTMANIS | | 0054771547-1 | Jan. 4, 2002 | Jan. 7, 2002 | 4 of 12 |

 Individual Phone Charges for 818-209-3555    (continued)

**Voice Call Detail**

| | Date | Time | Phone Number | Call Destination | Rate/ Type | Minutes | Airtime Charges | Long Distance Charges | Other Charges | Total Charges |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | Wed. Dec. 05 | 9:31 AM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 2 | Wed. Dec. 05 | 2:18 PM | 818-907-7427 | Van Nuys, CA | | 2.0 | included | 0.00 | 0.00 | 0.00 |
| 3 | Wed. Dec. 05 | 2:21 PM | 818-907-7427 | Van Nuys, CA | | 3.0 | included | 0.00 | 0.00 | 0.00 |
| 4 | Wed. Dec. 05 | 3:39 PM | 323-270-5115 | Montebello, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 5 | Wed. Dec. 05 | 3:50 PM | Incoming | | | 2.0 | included | 0.00 | 0.00 | 0.00 |
| 6 | Wed. Dec. 05 | 3:52 PM | 323-270-5115 | Montebello, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 7 | Wed. Dec. 05 | 3:59 PM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 8 | Wed. Dec. 05 | 4:06 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 9 | Wed. Dec. 05 | 4:07 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 10 | Wed. Dec. 05 | 6:01 PM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 11 | Wed. Dec. 05 | 6:48 PM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 12 | Wed. Dec. 05 | 6:50 PM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 13 | Wed. Dec. 05 | 7:32 PM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 14 | Wed. Dec. 05 | 7:36 PM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 15 | Wed. Dec. 05 | 7:52 PM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 16 | Wed. Dec. 05 | 7:54 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 17 | Wed. Dec. 05 | 7:57 PM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 18 | Wed. Dec. 05 | 9:36 PM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 19 | Wed. Dec. 05 | 10:53 PM | 818-990-0634 | Van Nuys, CA | | 2.0 | included | 0.00 | 0.00 | 0.00 |
| 20 | Thu. Dec. 06 | 10:12 AM | 310-993-6748 | Beverlyhls, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 21 | Thu. Dec. 06 | 10:15 AM | 818-765-5559 | No.Hollywd, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 22 | Thu. Dec. 06 | 10:41 AM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 23 | Thu. Dec. 06 | 11:13 AM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 24 | Thu. Dec. 06 | 3:32 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 25 | Thu. Dec. 06 | 4:29 PM | 310-993-6748 | Beverlyhls, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 26 | Thu. Dec. 06 | 6:03 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 27 | Thu. Dec. 06 | 10:52 PM | 818-990-0634 | Van Nuys, CA | | 5.0 | included | 0.00 | 0.00 | 0.00 |
| 28 | Fri. Dec. 07 | 8:59 AM | 818-784-6284 | Van Nuys, CA | | 2.0 | included | 0.00 | 0.00 | 0.00 |
| 29 | Fri. Dec. 07 | 11:26 AM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 30 | Fri. Dec. 07 | 11:35 AM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 31 | Fri. Dec. 07 | 11:39 AM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 32 | Fri. Dec. 07 | 3:01 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 33 | Fri. Dec. 07 | 3:16 PM | 818-907-7427 | Van Nuys, CA | | 2.0 | included | 0.00 | 0.00 | 0.00 |
| 34 | Fri. Dec. 07 | 6:34 PM | 310-748-6274 | Gardena, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 35 | Fri. Dec. 07 | 9:18 PM | 310-748-6274 | Gardena, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 36 | Fri. Dec. 07 | 11:29 PM | 818-990-0634 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 37 | Sat. Dec. 08 | 10:10 AM | 818-907-7427 | Van Nuys, CA | | 13.0 | included | 0.00 | 0.00 | 0.00 |
| 38 | Sat. Dec. 08 | 12:12 PM | Incoming | | | 10.0 | included | 0.00 | 0.00 | 0.00 |
| 39 | Sat. Dec. 08 | 3:02 PM | 818-907-7427 | Van Nuys, CA | | 10.0 | included | 0.00 | 0.00 | 0.00 |
| 40 | Sat. Dec. 08 | 4:02 PM | Incoming | | | 2.0 | included | 0.00 | 0.00 | 0.00 |
| 41 | Sat. Dec. 08 | 4:12 PM | Incoming | | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 42 | Sat. Dec. 08 | 4:19 PM | 323-428-1630 | Lsan Da 14, CA | | 5.0 | included | 0.00 | 0.00 | 0.00 |
| 43 | Sat. Dec. 08 | 6:06 PM | 323-428-1630 | Lsan Da 14, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 44 | Sat. Dec. 08 | 6:07 PM | 310-993-6748 | Beverlyhls, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |
| 45 | Sat. Dec. 08 | 7:04 PM | 818-907-7427 | Van Nuys, CA | | 1.0 | included | 0.00 | 0.00 | 0.00 |

*Handwritten margin note (left):* ALTMANIS DID NOT CALL TO KADAMOVAS IT 10:15 AM ! BUT HE DID CALL TO SOMEBODY ELSE !

*Handwritten note (bottom):* CALL #20 - THU DEC 06  10:12 AM  ALTMANIS MAKE CALL TO MIKHEL CELLUR PHONE BUT THIS CALL NOT EXIST ON THE GOVERNMENT COLOUR EXHIBIT CHART. - MAP

12886

*Handwritten (bottom left):* 5 OF 5.



# Exhibit 2

**IN THE UNITED STATES COURT OF APPEAL**

**FOR THE NINTH CIRCUIT.**

RECEIVED
MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

JUN 0 4 2010

FILED
DOCKETED  DATE  INI

UNITED STATES OF AMERICA,
    PLAINTIFF - APPELLEE,

V.

JURIJUS KADAMOVAS,
    DEFENDANT - APPELLANT.

U.S.C.A. No. 07-99009
D.C. No. CR 02-220-DT

MOTION TO NEFARIOUS ACTS
BY THE GOVERNMENT AND PRISON
OFFICIALS IN RELATION J. KADAMOVAS
LEGAL, DISCOVERY MATERIALS AND
TRIAL TRANSCRIPTS.

I am JURIJUS KADAMOVAS (KADAMOVAS) RESPECTFULLY SUBMIT THE FOLOWING MEMORANDUM ABOUT NEFARIOUS ACTS BY THE GOVERNMEN AND TERRE HAUT PRISON OFFICIALS IN RELATION KADAMOVAS LEGAL, DISCOVERY MATERIALS AND TRIAL TRANSCRIPTS, AND ASKING THIS COURT AUTHORITY TO ISSUE THE ORDER REQUESTED BY KADAMOVAS EVEN IF IT IS NOT CONSTITUTIONALLY REQUIRED.

### BACKGROUND FROM PRELIMINARY DECLARATION.

1) I WAS BORN AND EDUCATED IN LITHUANIA. MY NATIVE LANGUAGE IS RUSSIAN.

2) I AM ONLY ABLE TO SPEAK BASIC CONVERSATIONAL ENGLISH (I AM NOT FLUENT AND I AM NOT ABLE TO FULLY READ AND UNDERSTAND DOCUMENTS WRITTEN IN ENGLISH.

3) I DID NOT RECEIVE SUFFICIENT OPPORTUNITY TO WORK ON THE CASE AND BECOME FAMILIAR WITH THE DISCOVERY BEFORE THE TRIAL. THIS FACT NEGATIVELY AFFECTED MY DEFENSE.

4) IT IS IMPORTANT FOR MY DEFENSE PREPARATION THAT I AM PERMITTED TO READ, UNDERSTAND, AND HAVE A WORKING KNOWLEDGE OF ALL THE INFORMATION RELEVANT TO MY CASE. IN ORDER FOR ME TO ASSIST MY APPEAL I NEED TO READ THE REPORTS IN THE CASE AND THE DISCOVERY INFORMATION IN MY NATIVE LANGUAGE. I MUST BE ABLE TO COMPARE ONE DOCUMENT WIT ANOTHER AND DOCUMENTS IN ENGLISH WITH MATERIALS IN RUSSIAN. I AM UNABLE TO REMEMBER EVERYTHING THAT IS READ TO ME OR THAT I DISCUSS WITH MY CONSEL. WITHOUT ACCESS TO COMPLETE DOCUMENTS AND THE SOFTWARE THAT IS NECESSARY TO WORK WITH THE DOCUMENTS, IT IS IMPOSSIBLE FOR ME TO EFFECTIVELY ASSIST IN MY APPEAL PREPARATION

5) My consel was advised that other high security inmates in MDC ware allowed 24 hours per day laptop computer access in their cells to accommodate their trial preparation.

6) It took half of a year, a large number of complaints, and my counsel's motions for me to finally receive permission to access the case information, discovery and laptop wich necessary software in to my cell.

7) As a pre-trial inmate I was allowed to have a laptop computer with all necessary software power cord and discovery materials 14 hour daily (See Exhibit A page 1,2,3.) because of my special curcumstances. Now my circumstances are unique because I did not have sufficien opportunity to work on my appel.

8) When I was allowed by Judge Tavriziah to have a laptop computer in my cell I finded many misstatements in the prosecution's exhibits.

9) As a result of working on the case wich laptop computer, I found about 47 "mistakes" in the exhibits of the opposing party which showed to jury. The Government changed the facts in the evidence, that negatively affected my defense.

10) At sentencing day, I was describing some of the misstatements that I found by that time and facts showing how I was prevented from accessing to the discovery information but was asked to finish by the judge.

11) That time I have no access for a printer and all my foundings, Government "mistakes" I saved on CD's, very few was on paper.

   Misappropriation of privileged information by the Government.

12) On March 7, 2003 during the search of my cell my notes regarding Altmani's past crimes were seized. I was preparing them for my attorneys and investigators.

13) On March 14, 2003 the FBI received Altmanis's confession to the some crimes wich were described in my notes that wer seized one week earlier.

14) I believe that the Government misappriated my notes regarding Altmanis's past crimes and used them to forced Altmanis to confess to the crimes which he previously concealed. As a result of this misappropriation, I was deprived of the opportunity to defeat Altmanis's credibility in front of FBI and the court.

15) Confidential, attorney-client privileged correspondence to, and from my attorneys was unreasonably and excessively delayed or never received

16) My notes were also misappropriated by the Marshal of the Court when during the trial he removed and copied them without my consent. My defense consel objected to that behavior by the Marshal and the judge sustained the objection.

        2

17) My current discovery information is in disorder which prevents me from effective work on my defense. On May 23, 2007, I received 10 boxes of legal material in Terre Haute.

18) When I was not allowed by the prison to receive that electronic stored Discovery CD's/DVD's material, I asked that it be sended back to my attorney but I received the response that the materials would be in a safe place.

19) The prison officials stored electronicly discovery in the Special Confinement Unit and spot-checked it for contraband.

20) Later I received a document that 187 CD/DVD discs were confiscated by the prison as contraband. Despite the fact this correspondence was identified as Special Mail, and acording to the rules of the Federal Bureau of Prisons and Attorney-Client privilege could not be read or even opened without the presence of the inmate, the above said special mail was opened by the prison employees without my presence

21) After my materials were spot-checked for contraband, I did not find some CD's with my works either in the boxes, nor were they mentioned among the confiscated materials.

22) On May 19 2009 my paralegals Christina Larson Gits and Olga Matrosova arrive in Terre Haut for visiting and make inventory my CD's/DVD's. By Case Manager Mr. English was not to allowed to do so.

23) Some day in Dec. 2009 I received mail from my attorney Barbara O'Connor, include E-male betuin Barbara O'Connor and Mary Ellen Doucette-Lunstrom who is attorney for Terre Haute. (See Exhibit B-page 1) It say... Case Manager English who "Scanned the discovery several months back for contraband and he did not have an issue of opening any of the discovery.

24) Mr. English sended confiscated CD's/DVD's to my attorney Mr. B. Coleman (See Exhibit "B" page #2) Subject: Confiscated Electronic Media, Kadamovas, Jurijus Reg. No. 21050-112. 6. 19 Compact Disc unable to view.

25) It obviously appears that Mr. English some how destroer information on thous CD's/DVD's, which was work product. (See Exhibit "B"-page #6.) and contained information Attorney-Client priv.

26) When I was working on my laptop computer additionally for 47 Government's "Mistakes" I find out that big amount of my discovery materials are different from those that my counsels have, It contain same number but diferend image. (See Exhibits "C" pages 7,8,9,10)

3.

27) I AM NOT ALLOWED TO HAVE MY DISCOVERY MATERIALS STORED ON CD'S. ALL OTHER INMATES ARE ALLOWED TO HAVE THE CD'S WITH DISCOVERY AND/OR COURT TRANSCRIPTS.

28) MY CD's/DVD', WAS STORED IN ONE OF THE EMPTY CELL IN "C"-RANGE WITH MY ELECTRONIC TRANSLATOR. TERRE HAUTE OFFICIALS ASURED ME THAT NO OTHER INMATES WOULD HAVE ACCESS TO THIS CELL. THEY FAILS, ANOTHER INMATE HAD MY TRANSLATION IN HIS POSSION AND IT WAS DAMAGED. MANY OTHER INMATES HAD ACCESS TO THE CELL

29) ON APR. 5. 10 I WAS ESCORTED IN TO THE OFFICE OF UNIT MANAGER MR. SHOEMAKER. HE READED TO ME COURT ORDER, AND I AM NOT EXACTLY UNDERSTAND HIM. I ASKED HIM TO EXPLAIN OR BETTER TRANSLATE IN TO THE RUSSIAN. HE TEL ME, THAT I AM NOT IN MOSCOW.

30) BUT I AM TRULY NOT UNDERSTAND THIS COURT ORDER. IT DON'T EXPLAIN ABOUT THE SOFTWARE WITHOOT I CAN OPEN MY FILES, TRANSLATE DOCUMENTS... STEALING TRANSLATOR WAS REPLACED THAT SAME DAY BUT IT CANNOT TO HELP TRANSLAIT BIG AMOUNT OF PAPERS, AND HIS SCANER DON'T SCAN FROM COMPUTER MONITOR-SCREAN, IT HAVE NO MEMORY FOR SAVE TRANSLATION IF I WILL BE LEAD IN BY HAND.

31) THAT IS THE FIRST REASON WHY I ASKED TO SEND THIS TRANSLATOR BACK TO MY ATTORNEY IN OCT 23 2008. ACTUALY I WAS ASKING THIS ELECTRONIC TRANSLATOR FOR LEARN ENGLISH LANGUAGE AND IN SECOND PLACE TO TRANSLATE DOCUMENTS AND MAKE MY PETITIONS AND REQUESTS ON BETTER ENGLISH. THIS TRANSLATOR HAVE VERY GOOD TUTER FOR RUSSIAN SPEAKING STUDENTS, WHAT I DESPARETLY NEED. (SEE EXHIBITS "D" PAGES #11 TO 18) ALSO I SENDED TO YOU MY LETTER TO THE WARDEN DATE: MAY 11. 2010 I STIL GET NO RESPONSE. (EXHIBIT "D" PAGES 19-21)

32) TERRE HAUTE AND B.O.P. OFFICIALS NEVER WILL TELL YOU TRUE STORY WHY, AND HOW THEY ALLOWED TO HAVE THIS TRANSLATOR. SINS I ARRIVE IN TERRE HAUTE I WAS ASKING TO HELP FOR LEARN ENGLISH LANGUAGE I WAS STRAGLE TO WRITE REQUESTS AND UNDERSTAND RESPONSES. I WAS ANDER SAM RESTRICTIONS AND WAS NOT ALLOWED TO CONTAKT ANY ONE. (EXHIBITS "E" WILL SHOW ALL REMEDYS APPEALS.) SOME DRY I ASKED, WHAT IS THE BOP POLICY REGARDING GRIEVANCES, DOES ALL UANDATED TO BE IN ENGLISH ONLY? AND SOME INMATE START HELPING TO CONTINUE THIS QUESTION IN ALL LEVELS OF APPEALS. FINALY ON 11/5/08 I GET RESPONSE FROM REGIONAL DIRECTOR MR. MICHAEL K. NALLEY YOU MAY WRITE YOUR ADMINISTRATIVE REMEDIES IN YOUR NATIVE LANGUAGE (SEE EXHIBIT "E" PAGE #23) THEN THEY TRICK ME WICH TRANSLATOR LIKE YOU CAN TO SEE FROM EXHIBITS "D", AND ON 12/19/08 AMENDED RESPONSE 11/5/08. SEE EXHIBIT "E" PAGES. STILL REMAIND THE STRENGE WHY THE SIGNATURE MR. MICHAEL K NALLEY ON RESPONSE BY 11/5/08 ID# 507543-R1 LOOK DIFERENTLY THEN ON RESPONSE 12/19/08 ID# 507543-R1

33) Also, in all story with my attorney motion, to allow computer and court order I don't understand. Before this order I had use less computer in cell neer by with access to the toilet and water, without limited working time.

34) It appare to me that now I get absolutly use less computer with limited time, just 20-hour a week, without access to the toilet..

35) But iuen in this not understandable condishians, I was try to get my electronicly stored discovery for try to working on my appels, and for this reason I was asked my unit manager Mr. Shoemaker to inventory my electronic discovery materials that in that moment was stored in "C" range C-312. I get no responses, on my Cop Out 4/8/10, my BP-8, 4/15/10.

36) On Apr. 22.10 I was allowed to count my CD's/DVD's stored in C-312 in front of Corection Officer Mr. Hart and discover short on quantity. (See Exhibits "F" pages)

37) On May 22, 2010 inmate C. Vialva #91909-080 was working as SCU C.D. orderly at approximately 1:00 pm He walked down C-Lower range to pick-up CD's. He discovered that two (2) CD's cases issued to inmate Battle, contained the wrong CD's. Upon further reveiw he also discovered that two (2) cases actually contained legal CD's, one of them was marked, "Mikhel Discovery", and the other "Kadamovas Legal". (See Exhibit "G" page #38)

38) Since this day I can't start working on my appeal, it simply inpasible becaus the Government and BOP officials sabatage all my trying's. They cover up "mistakes" and destroy the case evidances which proof my innocence and reveal how they set me up.

39) Also I cannot understand why the other inmates allowed to have computer in his cell, I am not. I am saw my self like inmate Fulks #16617-074 had computer in hes cell "C" range #302 on Jan. 31.10, on Feb. 11.10 and Feb. 20.10.

40) On May. 20.10 I supposedly had legal visit with my paralegal Christina Larson Gits and Attorney Margaret O'Donald. By my Unit Manager Mr. Shoemaker I was not allowed to fetch-bring in to the visit photo album, with was contained no contraband. It was alot s of photos with my art works, and photos from discovery which I would like to show to Attorney. (See Exhibit "H" page #39)

41) If I cannot to bring in to the legal visits my legal works on CD's/DVD's for show on the computer, which don't contain the software for open files. If I cannot to printing out pages necessary for discuss with Attorneys. If I can't to... if I can't to...

41) Then the Government don't have to spend a million dollars for create elusion that my appeal going fairly. Even my attorney will be try to doing good work, they never will be know all possibilitys and "mistakes" in my trile transkripts. I belive se that trile transcripts, provided be Government with three year delay, will be different from actuality, like I have different then my trile attorney discovery materials.

42) I had ask my paralegal, to print out some issue, that my trial attorney remember also, and she was not be able to faind this issue in transcripts. During the trile I maked many note and remember some things which paralegal cannot to find now.

## Conclusion.

For the foregoing reasons, this Court should grant Kadamovas's motion and allow him

1) To withdraw presently appointed counsels and for an order allowing Kadamovas to continue and file his "Direct Appeal" proceedings Pro-Se.

2) Discontinue nefarious acts by the Government and BOP prison officials in relation Kadamovas legal, discovery materials and trial transcripts.

3) Order to Unit Manager Mr. Shoemaker to inventory my electronic discovery materials stored on CD's / DVD's.

4) After inventory allow to have my legal CD's DVD's inclusively those was send out to Attorney Mr. B. Coleman, in my cell

5) Computer resorces to allow compare, transcate, sorting, make note, print and scann documents. Computer equipment and software are necessary for effective work on the Discovery which is in different electronic format. In Kadamovas cell, for 14 hour daily.

6) Grant Kadamovas to learn English language with reasonable translator "Ectaco Partner ER 850" for Russian speaking student.

I am so sorry for my English language, on this time I have no any working translator or dictionary.

Dated: May. 25, 2010

Respectfully Submitted

_Kadamovas J._

Juridus Kadamovas #21050-112
USP Terre Haute, P.O. Box 33
Terre Haute, IN. 47808-0033

6.

## CERTIFICATE OF SERVICE.

THE UNDERSIGNED JURIJUS KADAMOVAS DOES CERTIFY THAT HE MAILED A TRUE AND CORRECT COPY OF THE FOREGOING MOTION VIA THE US MAIL, FIRST CLASS POSTAGE PREPAID ON THIS 26TH DAY OF MAY, 2010 TO:

CLERK, U.S. COURT OF APPEALS
FOR THE NINTH CIRCUIT
P.O. BOX 193939
SAN FRANCISCO, CA, 94119-3939

JURIJUS KADAMOVAS
DECLARANT

11 DAYS

EXHIBITS "A"

EXHIBIT

P-Send

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | | CASE NUMBER |
|---|---|---|
| | PLAINTIFF | CR.02-220-B-DT |
| v. | | |
| 2) Jurlius Kadamovas | | |
| | DEFENDANT. | **ABSTRACT OF COURT PROCEEDING** |

**TO:    UNITED STATES MARSHAL AND/OR WARDEN, METROPOLITAN DETENTION CENTER:**

You are hereby notified that the Honorable Dickran Tevrizian,
☒ United States District Judge   ☐ United States Magistrate Judge, has this date ☒ ordered   ☐ recommended that the above-named federal prisoner be:

☐ Allowed to make ☐ _____ social ☐ _____ legal telephone call(s) at prisoner's own expense;
　☐ forthwith　　　　　　☐ as soon as possible　　　　☐ as requested, at suitable times

☐ Allowed social visits　　　　☐ Dressed in civilian clothing for court appearances

☐ Housed or designated to ☐ MDCLA ☐ Other _____

☐ Provided with a medical examination and/or medical treatment for_____
A report regarding this examination/treatment is to be submitted to the court on or before_____

☐ Provided with a psychiatric/psychological examination. A report regarding this examination/treatment is to be submitted to the court on or before_____

☐ Provided with dental treatment.  A report regarding this examination/treatment is to be submitted to the court on or before_____

☒ Other _Shall be provided 14 hour daily access to his laptop computer, power cord and discovery materials between and including the dates of 11-17-06 to 11-28-06. These materials and items shall be provided to him in his cell_

CLERK U.S. DISTRICT COURT

Dated:  11 76-06 _____　　　　By: _____
　　　　　　　　　　　　　　　　　　　　　　　Deputy Clerk

---

### RETURN TO CLERK'S OFFICE
☒ Western Division-Los Angeles　　　☐ Southern Division-Santa Ana　　　☐ Eastern Division-Riverside

This abstract was received on _____

☐ The aforementioned order(s) were or will be complied with on: _____

☐ The aforementioned order(s) were not complied with for the following reasons: _____

_____
_____
_____
_____

| Name (Print) | Title | Signature |
|---|---|---|

cc: ☒ MDC, ☒ Cell block

#1

18 days

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | | |
|---|---|---|
| | PLAINTIFF | CASE NUMBER |
| v. | | CR. 02. 220-13-DT |
| 2) Jullus Kadamovas | | |
| | DEFENDANT. | ABSTRACT OF COURT PROCEEDING |

TO:    UNITED STATES MARSHAL AND/OR WARDEN, METROPOLITAN DETENTION CENTER:

☑ You are hereby notified that the Honorable __Dickran Tevrizian__

☑ United States District Judge    ☐ United States Magistrate Judge, has this date ☑ ordered    ☐ recommended that the above-named federal prisoner be:

☐ Allowed to make ☐ _____ social ☐ _____ legal telephone call(s) at prisoner's own expense;
    ☐ forthwith                    ☐ as soon as possible              ☐ as requested, at suitable times

☐ Allowed social visits              ☐ Dressed in civilian clothing for court appearances

☐ Housed or designated to ☐ MDCLA ☐ Other _____

☐ Provided with a medical examination and/or medical treatment for_____
A report regarding this examination/treatment is to be submitted to the court on or before_____

☐ Provided with a psychiatric/psychological examination. A report regarding this examination/treatment is to be submitted to the court on or before_____

☐ Provided with dental treatment. A report regarding this examination/treatment is to be submitted to the court on or before_____

☑ Other Shall be provided 14 hour daily access to his laptop computer, power cord and discovery materials between and including the dates of 12-16-06 to 1-3.07. These materials and items shall be provided to him in his cell.

CLERK U.S. DISTRICT COURT

Dated: __12·14-06__                    By: __Alex Sorreill__
                                                          Deputy Clerk

═══════════════════════════════════════════════════════════

## RETURN TO CLERK'S OFFICE

☐ Western Division-Los Angeles        ☐ Southern Division-Santa Ana        ☐ Eastern Division-Riverside

This abstract was received on _____

☐ The aforementioned order(s) were or will be complied with on: _____

☐ The aforementioned order(s) were not complied with for the following reasons: _____

_____

_____

_____

| Name (Print) | Title | Signature |
|---|---|---|

cc: ☒ MDC, ☒ Cell block

#2

Case 2:19-cv-00540-JPH-MJD   Document 4-1   Filed 02/05/20   Page 71 of 108 PageID #: 205

8 DAYS

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | CASE NUMBER |
|---|---|
| PLAINTIFF | CR-02-720-B-DT |
| v. | |
| 2) Iulius Kadamovas | |
| DEFENDANT. | **ABSTRACT OF COURT PROCEEDING** |

**TO:   UNITED STATES MARSHAL AND/OR WARDEN, METROPOLITAN DETENTION CENTER:**

You are hereby notified that the Honorable _Dizleven Teurizian_,

☑ United States District Judge   ☐ United States Magistrate Judge, has this date ☑ ordered   ☐ recommended that the above-named federal prisoner be:

☐ Allowed to make ☐ _____ social ☐ _____ legal telephone call(s) at prisoner's own expense;
    ☐ forthwith      ☐ as soon as possible      ☐ as requested, at suitable times

☐ Allowed social visits      ☐ Dressed in civilian clothing for court appearances

☐ Housed or designated to ☐ MDCLA ☐ Other _____

☐ Provided with a medical examination and/or medical treatment for_____
A report regarding this examination/treatment is to be submitted to the court on or before_____

☐ Provided with a psychiatric/psychological examination. A report regarding this examination/treatment is to be submitted to the court on or before_____

☐ Provided with dental treatment. A report regarding this examination/treatment is to be submitted to the court on or before_____

☑ Other _shall be provided daily access, after court/evening until 10:00 pm and on the weekends to his laptop computer, power cord and discovery materials between and including the dates of 1-4-07 thru 1-8-07. These materials and items shall be provided to him in his cell_

Dated: _1-3-07_

         CLERK U.S. DISTRICT COURT

By: _____
         Deputy Clerk

---

**RETURN TO CLERK'S OFFICE**

☑ Western Division-Los Angeles    ☐ Southern Division-Santa Ana    ☐ Eastern Division-Riverside

This abstract was received on _____

☐ The aforementioned order(s) were or will be complied with on: _____

☐ The aforementioned order(s) were not complied with for the following reasons: _____
_____
_____
_____

| Name (Print) | Title | Signature |
|---|---|---|
| | | |

cc: ☒ MDC, ☒ Cell block

# 3

## Barbara E. O'Connor

**From:** Mary Ellen Doucette-Lunstrum [mdoucette-lunstrum@bop.gov]
**Sent:** Tuesday, November 25, 2008 7:56 AM
**To:** Barbara E. O'Connor
**Subject:** Re: Thank You and Status

*EXHIBIT*

Hi Barbara,

I sent an e-mail message to Susan Dewitt asking her when would be a good time to call her. She must be busy because I have not received a reply.

I am going to make a point of calling her today and if she is not in, I will leave a message.

One issue to note is that I spoke with Case Manager English who "scanned" the discovery several months back for contraband and he did not have an issue of opening any of the discovery. He also advised that all the "home movies" have been provided to Kadamovos.

Next time you are here, we can make arrangements for the attorneys and unit staff to review the items which were deemed to be contraband.

I will still contact AUSA Dewitt about the programs and will get back with you after I speak with her. I am scheduled to be out of the institution starting 11/21 and will return on 12/2.

Hope to get back with you later today.

Mary Ellen

Mary Ellen Doucette-Lunstrum
Supervisory Attorney Advisor
Federal Correctional Complex
4200 Bureau Road North
Terre Haute, Indiana 47802
(812) 238-3556

>>> "Barbara E. O'Connor" <barbara@kirbyoconnor.com> 11/24/2008 3:12 PM
>>> >>>
Mary Ellen,

Thank you for meeting with us last week and for your assistance with Mr. Kadamovas's request to use the Ectaco translator. We all appreciated you taking the time and, along with Mr. Julian, trying to resolve the problem.

I'm wondering if you've had a chance to talk to Susan DeWitt about the software issues and the computer?

Let me know when you can and, again, thanks.


Barbara
O'Connor & Kirby, P.C.
174 Battery St., 3d fl.
Burlington, VT 05401
802.863.0112
802.865.5980 (f)

This message may contain attorney-client privileged information. Please notify the sender if you received this message in error and delete it immediately.

1

# 4

Federal Bureau of Prisons

United States Penitentiary
Terre Haute, Indiana

Date: May 19, 2009

Reply To
Attn Of: B. English, Case Manager

Subject: **Confiscated Electronic Media**
Kadamovas, Jurijus
Reg. No. 21050-112

1. 30 Music Cassettes
2. 10 Compact Disc containing software
3. 3 Compact Disc with documents password protected
4. 1 Martial Arts training video
5. 18 Music Compact Disc
6. 19 Compact Disc unable to view
7. 61 Movie DVDs
8. 2 Pornographic movie DVDs
9. 1 Sony Walkman EX190
10. 1 earbuds

#5

Case 2:19-cv-00540-JPH-MJD Document 4-1 Filed 02/05/20 Page 74 of 108 PageID #: 208

#6

3 of 19 compact Discs

Mr. English unable to view.



#6

Case 2:18-cv-07059-PH 06/04/2010 Page 14 of 46 ID: 7373190 DktEntry: 154

EXHIBITS 4-14

B        19^98   4HUM359
DMV POINT COUNT 2

VC
19498   2JUA534 ?
^

19493   4H2G776

DMV POINT COUNT i

63652

11.-0!   ii-26-OI

DfiV POINT COUNT 0
VO

#7

```
. NOT .                                                                          P.03
    CRT = 363           * CLETS DATABASE RESPONSE *           DATE = 12/31/01
    CLETS LINE = FBD9   ****************************           TIME = 14.05.23
                             PAGE 01 OF 02

                         ** MESSAGE TEXT **

    MSGID:    3801
    *FBD05891.JD
    DATE:12-31-01*TIME 14:05*

    DMV RECORD FOR LAW ENFORCEMENT USE ONLY

    DL/NO:B8364476*B/D 01-27-1982*NAME:▓▓▓▓▓▓▓▓▓▓
    RES/ADDR  AS OF 04-18-98 5146 E MADISON AVE FRESNO 93727*
    OTH/ADDR AS OF 04-13-01:8064 WILKINSON AV N HOLLYWOOD *
    AKA:POGOSYAN GAYK*

    IDENTIFYING INFORMATION

    SEX.MALE*HAIR BLACK*EYES:BLK*HT 5-07*WT 182*

    LIC/ISS.08-07-98*EXPIRES:01-27-02*CLASS.C NON-COMMERCIAL*
    ENDORSEMENTS:NONE*
    ORIGINAL DL ISSUE DATE 08-07-98*

    LATEST APP


    DL TYPE:ORIGINAL*ISS/DATE: 08-07-98*OFFICE  #50*BATES:MAC*



    LICENSE STATUS:
      VALID*

    DEPARTMENTAL ACTIONS.
    NONE

    CONVICTIONS
    VIOL/DT   CONV/DT  SEC/VIOL    DKT/NO         DISP    COURT   VEH/LIC

    07-07 00  08-24-00  21755 VC   4897964         B      19498   4HUM859
    DMV POINT COUNT 1


    07-10-00  09-20-00  22348B VC  ML16164         L      17468   4HUZ745
    DMV POINT COUNT 2


    05-08-01  10-11-01  22350 VC   L381250         B      19498   2JUA534
    DMV POINT COUNT 1


    -10-01   11-26-01  5200  VC   V208339         B      19498   4HZG976
    DMV POINT COUNT 0
```

See attached

63652

#8

```
1 46
S4 4
387
00IS^.QO
001 '.»2. 00
2,00
3,00
00'. i'3'.OO
0 0 1 ^ !!> , 0 0
.00145.00
00141.00
00130,00
00 I 30 ,00
420'.
03/18/9?
07/29/96
07/05/9S
004-1
2843
0020
08/29/01
ob/;
C2
0022
0062
END
```

**63664**

#9

```
DEC-31-2001  15:06
   CRT - 363         * CLETS DATABASE RESPONSE *        DATE = 12/31/01
   CLETS MNE - FSDO  *********************************  TIME = 14.50.52
                          PAGE 01 OF 01

                       ** MESSAGE TEXT **


   MSGID     6312
   4FRD06312.TV
   DATE: 12/31/01 TIME: 14.51
   REG VALID FROM: 08/31/01 TO 08/31/02
   LIC#:2809960 YRMD:85 MAKE:DODG BTM  PK VIN  1B7KD3413FS703935
   R/O  KALAMKERYAN KARAPET GARY, 6229 AUCKLAND AVE CITY:N HOLLYWOOD
   C.C.:19 ZIP#:91606
   SOLD:00/00/85 RCLD:08/29/01 OCID 08/17/88 LOCP ?

   TYPE:31 POWR G AXLE 2 WGHT:04800 VEH :32 BODY:P CLAS:CV
   REG STATUS:
   06/08/2001    RENEWAL NOTICE EXTRACTED
   08/31/01 SMOG DUE 08/31/03



   CLEARANCE INFORMATION RECORDS
   OFFICE   WORK DATE    TECH/ID    SEQ #    VALUE    FICHE DATE    TTC
    145     06/29/94      84        2486    00156.00  06/30/94     POT
    146     08/16/95      99        1589    00152.00  08/17/95     POT
    144     08/04/96      55        4201    00152.00  08/06/96     POT
    387     08/18/97      11        0078    00152.00  08/20/97     H05
    515     07/29/98      22        0041    00153.00  07/31/98     H05
    144     07/05/98      49        2843    00153.00  PRIOR SUSPENSE
    515     08/17/99      AL        0020    00145.00  08/19/99     H05
    315     08/13/99      N4        0041    00145.00  PRIOR SUSPENSE
    515     08/08/00      46        0055    00141.00  08/10/00     H05
    315     08/29/01      C2        0023    00130.00  08/31/01     H05
    515     08/15/01      B7        0062    00130.00  PRIOR SUSPENSE


   END
```

63664

#10

*Cop Out*

10 OCT 08

FROM: J. KADAMOVAS

    #21050-112 C-305

To: MR. JULIAN RYHEID, ENGLISH                    EXHIBIT

ON AUGUST 12 2008 YOU RECEIVED REQUEST ABOUT ECTACO
ELECTRONIC TRANSLATOR ER 850
IN REQUEST VERY CLEARE :4 FOR USE IN HIS CELL. EXHIBIT A-1 1 OF 3
REVIEW THE WEBSITE, WWW ECTACO. COM, IF YOU HAVE ANY QUESTIONS
REGARDING THE DEVICE, ITS USE OR ITS APPROPRIATENESS.
PLEASE LET US KNOW IF YOU HAVE ANY QUESTIONS OR REQUIRE ANY
FURTHER INFORMATION.
WEBSITE WWW ECTACO. COM EXHIBIT A-1 2 OF 3 AND 3 OF 3
CONTAIN INFORMATION WHICH **NO DOUBT** THAT ECTACO PARTHER
ER-850 HAVE A MEDIA PLAYER WITH MP-3 SUPPORT A VOICE
RECORDER... IT CONTAINS ADVANCED SPEECH RECOGNITION MODULES
THAT UNDERSTAND AND TRANSLATE WHAT YOU SAY...
ON SEP 29 08 MR JULIAN TOLD ME THAT HE WAS HAVE NO IDEA
BOUT VOICE RECORDER... AND THAT WHY I CAN'T HAVE IT IN MY CELL
SINCE 17 DEC 08 AND ABOUT 6 MONTH I WAS HAVE IN
MY CELL :- PERSONAL PORTABLE RECORDER AND CASSETTE PLAYER
        BUILT - IN MICROPHONE FOR RECORDING VOICE
        RCA-RP 3503 FROM EDUCATION DEP AND IT
AS NO PROBLEM AT ALL.
I AM SHURE THAT YOU JUST DON'T WANT TO GIVE ME
POSSOBILITY PARTICIPATE IN MY DEFENSE ON APPEAL AND
CONTINUE COLD WAR AGAINST ME!
F I WRONG, JUST PROVIDE ME ELECTRONIC TRANSLATOR ER 850
WHICH YOU BY AGREE RECEIVED FROM MY ATTORNEY ON SEPTEMB
AND STILL MOOKING ME AND LOOKING UNREASONABLE POINT TO
OT GIVE TO ME.                                    #11

# Barbara E. O'Connor

**From:** Barbara E. O'Connor [barbara@kirbyoconnor.com]
**Sent:** Tuesday, August 12, 2008 6:29 PM
**To:** 'Benglish@bop.gov'; 'Bruce Ryherd'
**Cc:** 'Benjamin L. Coleman'; 'Christina Larson Gits'
**Subject:** Jurijus Kadamovas

Hello Counselors English and Ryherd,

I am writing to request that you permit us to provide Mr. Kadamovas with a translation device, specifically the Ectaco Electronic Translator ER 850 for use in his cell as he reviews the voluminous transcripts and documents in this case.

This device has a much more expanded vocabulary than the Lingo translation machine you have provided to Mr. Kadamovas and should allow him to review the transcripts and discovery in this case much more efficiently. Indeed, the Lingo translator is useful only to translate individual words verbatim which, for a non-native English speaker, simply does not allow for adequate translation of lengthy documents. The vocabulary is limited and Mr. Kadamovas requires translation of a much larger number of words in order to review legal materials, including legal terminology, as well as help with understanding phrases.

We would provide this translator at no cost to the Bureau of Prisons and ask that you review the website, www.ectaco.com, if you have any questions regarding the device, its use or its appropriateness.

It was clear during our recent visit that Mr. Kadamovas's spoken English has improved quite a bit since his arrest, although I am sure you would agree that an interpreter is extremely helpful. However, reading and writing require different skills and are much more difficult. In order for him to read and review the discovery and transcripts so that he can participate in his defense on appeal, additional assistance is required. Since his trial counsel are not appointed for appeal, it is particularly important for us to ensure that Mr. Kadamovas understands the documents presented at trial, can participate in his defense and that he can read all the transcripts to ensure there is no error.

I hope you will permit us to provide this device to Mr. Kadamovas. Please let us know if you have any questions or require any further information.

Thank you for your cooperation.

*Barbara O'Connor*
O'Connor & Kirby, P.C.
174 Battery St., 3d fl.
Burlington, VT 05401
802.863.0112
802.865.5980 (f)

This message may contain attorney-client privileged information. Please notify the sender if you received this message in error and delete it immediately.

8/12/2008

#12

*Exhibit A-1 2 of 3*



## ECTACO iTRAVL NTL-9C - Talking 2-way Multilingual Language Communicator and Electronic Dictionary



The amazing ECTACO iTRAVL NTL-9C now allows travelers to communicate thoroughly in a multitude of languages without the assistance of a human translator. iTRAVL NTL are the lastest versions of iTRAVL TL-9 and iTRAVL TL-6. With its user-friendly and accurate 2-way translation system that provides instant translation between English and Chinese, French, German, Italian, Polish, Portuguese, Russian Spanish and vice versa it is absolutely inexhaustible. The unique iTRAVL NTL-9C also boasts an extensive multilingual Travel Voice PhraseBook that translates and speaks tens of thousands of phrases using native-speaker voice narration and a 1,600,000 word audio-visual dictionary that includes general vocabulary, idioms, medical, technical, legal, and business terms, as well as slang and useful expressions - so there's nothing you won't be able to say! Also included are additional travel resources like the renowned Fodor's Travel Guide, CIA World Factbook, and our very special Language Teacher - an audio-visual language learning system that has been incorporated into iTRAVL to let anyone learn to speak another language independently and effectively in the time it takes to travel to your destination!

## ECTACO Partner English <-> Russian ER850 Deluxe



The remarkable ECTACO Partner ER850 Deluxe: English <-> Russian Talking Electronic Dictionary, Audio PhraseBook and Handheld Scanner is one of the most sophisticated translation and travel communication handhelds ever invented. Completely customizable and expandable, it contains advanced speech recognition modules that understand and translate what you say. Combining authentic native-speaker voice narration in the PhraseBook and state-of-the-art TTS (text-to-speech) voice synthesis in the Dictionary, Partner 850 series devices offer unbeatable assistance in every kind of communication and translation task that you can imagine. And with an included Handheld Scanner you can even grab entire printed text wherever you find it ? in a book or newspaper, on a prescription, even from a poster in the subway ? scan it, instantly upload it and get a translation into your chosen language immediately using sophisticated Full Text Translation modules. With a fully expandable vocabulary that includes hundreds-of-thousands of words pre-loaded in both general and specialized dictionaries, the Partner contains the most extensive lexical database ever assembled! And with an Audio PhraseBook designed for the frequent traveler, you now have access to 14,000 pre-recorded phrases for commonly encountered situations that can be spoken aloud instantly. In addition, this incredibly stylish device also features such indispensable extras as exam preparation guides, a media player with MP3 support, a voice recorder, metric conversions and size equivalents, plus a world time clock, a daily alarm, a calculator and much, much more.

All Russian-language dictionaries

## ECTACO Partner English <-> Spanish ES850



The remarkable ECTACO Partner ES850 - English <-> Spanish Talking Electronic Dictionary and Audio PhraseBook is one of the most sophisticated translation and travel communication handhelds ever invented. Completely customizable and expandable, it contains advanced speech recognition modules that understand

*Exhibit A-1 3 of 3*

and translate what you say. Combined with authentic native-speaker voice narration in the PhraseBook and state-of-the-art TTS (text-to-speech) voice synthesis in the Dictionary, Partner 850 series devices offer unbeatable assistance in every kind of communication and translation task that you can imagine. With a fully expandable vocabulary that includes hundreds-of-thousands of words pre-loaded in both general and specialized dictionaries, the Partner contains the most extensive lexical database ever assembled! And with an Audio PhraseBook designed for the frequent traveler, you now have access to 14,000 pre-recorded phrases for commonly encountered situations that can be spoken aloud instantly. In addition, this incredibly stylish device also features such indispensable extras as exam preparation guides, a media player with MP3 support, a voice recorder, metric conversions and size equivalents, plus a world time clock, a daily alarm, a calculator and much, much more.

All Spanish-language dictionaries

### ECTACO iTRAVL NTL-13AS Talking 2-way Multilingual Language Communicator and Electronic Dictionary



With an amazing 13 languages, the NTL-13AS provides everything you need to navigate some of the world's most complex languages effortlessly. Able to translate and speak for you, the NTL-13AS is packed with a full range of the most useful communication tools ever invented for English and Spanish, French, German, Italian, Portuguese, Chinese, Japanese, Korean, Thai, Hindi, Tagalog, Vietnamese, and Indonesian - all accessed via one of the world's most sophisticated and intuitive user interfaces. Style, comfort, ease of use, and complete confidence are just a few of the things you can count on the NTL-13AS to deliver time and time again.

By simply speaking into the ITRAVL, your phrases are instantly translated and spoken aloud using a sophisticated combination of speech recognition modules, real human voice narration and speech synthesis. Including the Fodor's Travel Guide among its indispensable features, the NTL-13AS contains detailed maps with destination advice and addresses to help you find your way while reducing the effort necessary to access the information you depend on most while traveling - and all in less space than even a single foreign language pocket dictionary takes up! Helping you before, during and after your trip, the NTL-13AS also includes a built-in speech enabled Language Teacher and language-learning games to let you improve your speech and accent no matter where you go.

### ECTACO Partner XL-1500 Multilingual Talking Dictionary



The Partner XL-1500 Multilingual Talking Dictionary is the most sophisticated device from our award-winning Partner range. A revolutionary multilingual translation solution, it features a unique combination of language pairs and voice output capabilities and is the only handheld dictionary in the world to contain synthesized TTS (text-to-speech) functionality in English, Arabic, Chinese (Mandarin), Dutch, French, German, Greek, Hebrew, Italian, Japanese, Korean, Polish, Portuguese, Russian, Spanish in the same device.

The XL1500 lets you travel just about anywhere you need to go and be understood when you get there. By speaking translations aloud it will act as your own personal language assistant and interpreter and with an astonishing vocabulary containing of over 3,367,000 words, you will never again be at a loss for words. A 14-topic phrasebook that speaks 31,000 phrases in 15 languages is accessed via an intelligent, user-friendly

KADAMOVAS, Jurijus
Reg. No. 21050-112
Unit : SCU C-305

---

### Inmate Request to Staff Member Response

This is in response to your correspondence receipted on October 22, 2008, wherein you request staff to provide you with the ER 850 electronic translator sent by your attorney.

You're Unit Team explained the conditions of use to you on October 22, 2008. You refused to sign the agreement on that date and requested a legal call with your attorney. The legal call was accommodated by Unit Staff on October 22, 2008. The conditions of use are as follows:

You are authorized to utilize a ECTACO Partner ER850 English - Russian Electronic Translator. This machine is provided by your attorney, Ms. Barbra O'Conner for use in the appeal of your current conviction. The ER850 Translator will be issued to you for use in the Unit Law Library only. No other inmates may come into contact with this machine. Due to the technical nature of the translator you will not be permitted to retain the machine in your cell. You may request to use the translator by including your intent with your written cop-out to the Officer in Charge.

Additionally, the agreement between institutional staff and Ms. O'Conner is that the Office of O'Conner and Kirby, P.C. will be responsible for warranty and maintenance issues, as well as all expenses which may incur as a result of your use of this machine. It is understood by all parties that the translator will be returned to Ms. O'Conner upon the conclusion of your appeal process.

Should you refuse accept the terms and conditions of use for the ECTACO Partner ER850 English - Russian Electronic Translator, it will be returned to your attorney.

I trust this addresses your issue.

Date  22 oct 08

S. Julian, Unit Manager

#15

BP-S148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98

**U.S. DEPARTMENT OF JUSTICE** **FEDERAL BUREAU OF PRISONS**

| TO: (Name and Title of Staff Member) [illegible] | DATE: Oct 27 08 |
|---|---|
| FROM: [illegible] | REGISTER NO.: [illegible] |
| WORK ASSIGNMENT: | UNIT: SCU C-305 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting. Continue on back, if necessary. Your failure to be specific may result in no action being taken. If necessary, you will be interviewed in order to successfully respond to your request.)

... октября 08 и 27 октября вы пытаетесь сказать меня что-бы я подписал какой-то документ написанный на английском языке который я не могу понять в точности. Я прошу вас сделать перевод этого документа на русский язык, после чего я смогу его прочесть и принять решение в том подписывать согласие или нет. А так-же я прошу разъяснить как, по каким дням сколько часов я могу работать в библиотеке с эл переводчиком. Могу ли я иметь своё Discovery и компьютер в то-же самое время так как Discovery на CD's и DVD's. Будут ли установлены программы для того что-бы я мог открывать свои файлы Discovery.
Спасибо за ваше время

(Do not write below this line)

DISPOSITION:

ON THISE COP OUT ON RUSSIAN
I AM ASKING MAKE
TRANSLATION IF THEY LIKE
TO I SIGNED ANYTHING
ALSO I AM ASKING FOR
EXPLAIN ALL RULS WITH
ECTACO AND LIBRARY AND
MY DISCOVERY.

Signa

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86 and BP-S148.070 APR 94

#16



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*

Terre Haute, Indiana 47808

October 22, 2008

MEMORANDUM FOR:   KADAMOVIS, Jurijus
Reg. No: 21050-112

FROM:   S. Julian, Unit Manager

SUBJECT:   English - Russian Translator

You are authorized to utilize a ECTACO Partner ER850 English - Russian Electronic Translator. This machine is provided by your attorney, Ms. Barbra O'Conner for use in the appeal of your current conviction. The ER850 Translater will be issued to you for use in the Unit Law Library only. No other inmates may come into contact with this machine. Due to the technical nature of the translator you will not be permitted to retain the machine in your cell. You may request to use the translator by including your intent with your written cop-out to the Officer in Charge.

Additionally, the agreement between institutional staff and Ms. O'Conner is that the Office of O'Conner and Kirby, P.C. will be responsible for warranty and maintenance issues, as well as all expenses which may incur as a result of your use of this machine. It is understood by all parties that the translator will be returned to Ms. O'Conner upon the conclusion of your appeal process.

I accept the terms and conditions of use for the ECTACO Partner ER850 English - Russian Electronic Translator.

---

KADAMOVIS, Jurijus   DATE
Reg. No.: 21050-112

Memorandum issued by:

---

S. Julian, Unit Manager   DATE

#17

<u>Consent to Have Counsel Relieved and New Counsel Appointed</u>

I, JURIJUS KADAMOVAS, hereby request that my present attorneys, Richard P. Lasting, and Sonia E. Chahin, each be relieved of his/her current appointment to represent me in this matter, and I request that new counsel be appointed to represent me on appeal.

DATED: _12 MAR 07_                    _____
                                      JURIJUS KADAMOVAS

I, _____, am a Federal Court interpreter, proficient in both the Russian and English languages.  I hereby certify that I have translated the foregoing document for JURIJUS KADAMOVAS from the English language into the Russian language.

                                      Fe _____
DATED: _____

_I_ CAN SIGN SOMETHING
AFTER COURT
INTREPRETER AND
TRANSLATE LIKE
THISE PAGE.

#18

DATE: MAY 11TH, 2010
TO: WARDEN H.J. MARBERRY
FROM: JURIJUS KADAMOVAS
     #21050-112

RE: TRANSLATION DEVICE


    Dear Warden Marberry!

I am writing this letter in hopes of bringing an important matter to your attention that I
have been having. You see, Mr. Shoemaker my Unit Manager has a new Tranlator device that was
replaced by the BOP after your staff allowed another inmate to gain unauthorized access to
it; which in turned was damaged by the inmate. I have seen this translator and was advised
that since this device has a recording function, I would not be allowed to keep it on my person

I feel like I need to address the whole issue with you so you can see my point of veiw, from
the very begining I was asking that this translator and its previous succesor was to be soley
used for me to learn English; not to translate my legal work and/or discovery material. It
was your staff that all of a sudden out of their queistionable wisdom stated on their own
that I was going to use it for legal work, and that I said thats what I was going to do. Even
if I was to use this machine for that purpose, I have well over a 100,000 pages of discovery
and another 50,000 pages in trial transcripts; the machine has very limited memeroy and can
at best scan only one line of text at a time. This would take 25 years to accomplish and you
and I both know my appeal process will not even take a quarter of that after the new laws
that were passed.
Now, on the other hand, if your staff would have listen and realized that it has the capabiliti
for me to learn English, maybe we would not be going through this issue currently. Due to
its design and function, its only ment to teach English and not translate legal material,
and their is no legitimate security concern when it comes to me learning English. Now, let
me also be perfectly clear, the recording function is differnt and separate from the scaning
function, for me to learn English I do not need the recording function; I repeat, I do not
need the recording function. Sure, it would be nice and easier for me to learn to read, write,
and speak English faster, but since your staff want to use this as a bogus claim of security,

#19

*you should know that I have it under good authority that the company that produces this product has the ability to dis-engage this recording function permitaly alleviating your staff of their concerns towards their bogus claim.*

*If money is a concern when it comes to shipping and cost of disabling this recording function, I assure you my attorneys would be more than willing to pay for this to happen if it ment me finally learning English. It should also be noted that your education department, Mr. Markle and Ms. Quiones have not been up here to schdule more English tutoring sessions like they claim they were, or how Mr. Bilingsly was doing for me before he was removed from making his daily rounds up here in the SCU. This device have function specifically designed to teach how to read and write in English which I desparetly need to learn for obvious reasons.*

*Now, if your staff goad you into denying this request, then at least be open to allowing me other translators by this company and/or another to have and keep on my person so that I can start to learn English. When the first machine was purchase, it came with a lesser model that I was allowed to keep on my person; but this machine has since ceased working. It was only able to translate one word at a time, and only gave definition, it did not show how in relation it worked with other words in the sentance.*

*Please, I stress with you how important it is for me to get this situation under control. I must be allowed to learn English to properly file my appeal, this is not a joke and/or a prank, my life is at stake here if I can't learn English. Please take this request seriously and please do not pass it off on to one of your flunkies cause I have seen their abilities and decision making first hand and it is not the best. This requires you and only you to handle this regardless of what other naysayers may have to say that are employed by you.*

*Thank you for your time to this matter,*

*Jurijus Kadamovas*
*#21050-112/SCU*

2.

#20

Con Out                                          19 APR 10

FROM: J. KAPANOVAS
        # 21050-112
TO: Mr. SHOEMAKER
   I am WOULD LIKE TO REMAIND TO YOU ABOOT
ECTACO ELECTRONIC TRANSLATOR.
IF IT POSSEBLE THAT I CAN HAVET IT IN MY
CELL PLEASE.
IF FOR SOME REASON I CAN NOT TO HAVE IT IN
MY CELL, PLEASE GIVE TO ME THE REASON,
MAYBE I CAN SOLVE THE PROBLEM OR IF IT
NOT, JUST SEND BACK TO MY ATTORNEY AND
TELL ME PLEASE WHAT KINDOU OTHER MODEL I CAN
HAVE.
   YOU CAN GO ON WWW.ECTACO.COM AND SEE
ALL AVAILABLE MODELS AND SPECIFICS.
      THANK YOU.

                                              # 21

U.S. Department of Justice

Federal Bureau of Prisons

**Central Office Administrative Remedy Appeal**

Type or use ball-point pen. If attachments are needed, submit four copies. One copy each of the completed BP-DIR-9 and BP-DIR-10, including any attachments must be submitted with this appeal.

From: __Kadamovas Jurijus__    __21050-112__    __SCU__    __Terre Haute__
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A—REASON FOR APPEAL** Я не удовлетворён ответом регионального директора на мою жалобу ID№507543-R1.

Пытаясь писать свои жалобы на английском языке я получаю ответы которые не соответствуют моей жалобе из чего я делаю выводы о том что электронное устройство для перевода не имеет достаточного словарного запаса слов и не имеет функции перевода предложений в контексте. Гораздо более лучше я могу излагать свои жалобы на русском языке. И тому что мне не позволяют учить английский язык и не предоставляют материалов для изучения языка для русско говорящего студента. Regional Director пишет что я могу писать жалобы на моём родном языке, но временные рамки будут расширены. Он не предоставил палоси и своих "расширенных рамок времени." Жало на мои жалобы которые я пишу на английском языке я не могу получить своевременный ответ. Многие жалобы остаются без ответа вовсе. 29 окт 08 я написал Cop Out и BP-8 жалобы на русском языке которые дважды об были возвращены мне с объяснением что я должен писать свои прошения на английском языке. 28 oct 08 Ms Quinones из департамента образования отказала взять мою жалобу "Cop Out" потому что она была на русском языке. Позвольте учить английский язык в реальных условиях, а пока принимайте и отвечайте на мои жалобы по русски.

DATE: 24 NOV 08    SIGNATURE OF REQUESTER    EXHIBIT

**Part B—RESPONSE**

BP-11

English помог спешить 28 NOV 08

Жалобы на английском только

GENERAL COUNSEL    CASE NUMBER: 507543-A1

DATE

ORIGINAL: RETURN TO INMATE

**Part C—RECEIPT**

CASE NUMBER: _____

Return to: _____
LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

#22

DATE    SIGNATURE OF RECIPIENT OF CENTRAL OFFICE APPEAL    BP-231(13) APRIL 1982

Printed on Recycled Paper

Case: 07-99009    06/04/2010    Page: 30 of 46    ID: 7373190    DktEntry: 154

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

**Administrative Remedy Number:** 507543-R1

This is in response to your Regional Administrative Remedy Appeal received in this office on October 6, 2008, in which you allege you are being denied access to the courts because you are not receiving assistance in preparing administrative remedy documents. You allege you are not proficient in English and request to file administrative appeals in your native language.

We have reviewed your appeal and the Warden's response dated September 22, 2008. As indicated in that response, as well as in Administrative Remedy 501079-R1, staff have provided assistance to you in the past and remain available to assist you in the future. Additionally, you may seek assistance from family members, attorneys or other inmates as needed. You may write your administrative remedies in your native language; however, this may impact the time frame required to respond. Accordingly, you are encouraged to seek assistance as needed and continue to submit your documents in English. There is no evidence that staff are hindering your access to the courts in any way.

Based on the above, this response to your Regional Administrative Remedy Appeal is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

11/5/08
Date

Michael K. Nalley, Regional Director

#23

U.S. Department of Justice

Federal Bureau of Prisons

Type or use ball-point pen. If attachments are needed, submit four copies. One copy of the completed BP-229(13) including any attachments must be submitted with this appeal.

From: __Kadamovas  Jurijus__    __#21050-112__    __SCU__    __USP/TH__
          LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A - REASON FOR APPEAL** On 8/06/08 I sought redress through Informal Resolution for the denial by Special Security Unit ("SCU") administrative personnel, Case Worker Bruce Ryherd, Case Manager Brain English and Unit Manager Julian denying me assistance with both interpreting BOP Policy and Regulation and as well in assistant me with preparing and filing of administrative remedies in the past year and a half.  In response Mr. English contents that I am proficient in English and that I do not require what 28 U.S.C. § 542.16 mandates, and that is inter alia, assistance for preparing and filing administrative remedies for those such as myself who are illiterate in English. Id. §(b).  A copy of that Policy is attached hereto and marked as Special Exhibit (A).  The Informal Resolution and Response are as well attached hereto and incorporated herein for the Regional Director's consideration and response.  Thereafter I timely filed an administrative remedy regarding the claim by Case Manager English contentions that I am proficent in English and that I do not warrant what the applicable BOP Policy mandates. A copy of that BP-9 and Response are as well incorporated herein and attached hereto for the Regional Director's consideration and response.  That response was received by me September 25th, 2008.  See Special Exhibit (B) hereto attached.  This appeal timely follows.

Contrary to the nebulous response by the Warden that administrative should be written in English, but is not mandated under policy is merely an evasive response to the core issue, and that was enunicated and delineated through the attached BP-9.  Which is,

__October 1st., 2008__    XXX __[signature]__
          DATE                                      SIGNATURE OF REQUESTER

**Part B - RESPONSE**

BP-10    2Oct08

Wamo661 HA Procuon Jc861UB
Proqoucudaxt on English

_____    _____
          DATE                                      REGIONAL DIRECTOR

If dissatisfied with this response, you may appeal to the General Counsel. Your appeal must be received in the General Counsel's Office within 30 calendar days of the date of this response.

ORIGINAL: RETURN TO INMATE                    CASE NUMBER: _____

**Part C - RECEIPT**                                              CASE NUMBER: _____

Return to: _____
               LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____

                                                                                                                    #24

_____    _____
          DATE                                      SIGNATURE, RECIPIENT OF REGIONAL APPEAL

USP LVN    ⊕ PRINTED ON RECYCLED PAPER    BP-230(13)
                                                                                        JUNE 2002

Jurijus Kadamovas #21050-112
October 1st., 2008

BP - 10 Continued
Denial Access/Courts

since my transfer to USP/TH and placement on SCU that applicable SCU personnel, as well as Warden Marberry has and continues to deny me assistance with preparing and filing administrative remedies. In fact Mr. Ryherd and English has discouraged my filing of administrative remedies and at times told me that I did not need to continue the administrative processes because certain issues grieved had been resolved. Because I do not read English and have a extreme low level of comprehension of such language I have not been able to understand or interpret BOP Policies and Regulations. Yet Mr. English to justify their violation of applicable BOP Policy and law claims in a total spurious manner that I am 'Proficient' in English and can file my own administrative remedies. Nothing is further from the truth as is clarified through the attached BP-9. In contrast with asserting that I can have other inmates help me with preparing and filing administrative remedies Mr. Ryherd, English and Julian have and continue to do everything in their power to frustrate and thrawt such assitance by the one SCU Inmate who has assisted me, i.e. Wesley I. Purkey #14679-045 and who is aiding me with preparing litigation in redress of the ongoing constitutional proscription being visited me by the applicable SCU administrative officials and Warden Marberry.

Resolution: Because no possible remedy is possible at this level that the BOP does not provide monetary damages for the constitutional violations being committed against me, and as well as Mr. English, Mr. Ryherd and Mr. Julian clarifying that I am not entitled to assistance under the applicable policy based on my alleged 'proficiency' in English. Thank You for your attention to this matter....

End of Extra Page BP - 10

#25

Case 2:19-cv-00540-JPH-MJD  Document 4-1  Filed 02/05/20  Page 94 of 108  PageID #: 228
Case: 07-35009  06/04/2010  Page: 33 of 46  ID: 7373190  DktEntry: 154

Special Exhibit (A)/BP-10

Remedy No.: 501079-F1                                          FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted on July 16, 2008, in which you state unit staff are not providing you with assistance in drafting, preparing and filing administrative remedies pursuant to 28 C.F.R. § 542.16. As relief you request the unit staff perform their duties and assist you with filing and drafting administrative remedies.

A review of your request indicates since your arrival at FCC Terre Haute in April 2007 you have filed approximately thirty-three (33) Administrative Remedy requests. A review of the remedies you have filed indicates you are either preparing the requests yourself or obtaining assistance from some other source. In fact, members of your unit team have assisted you previously in filing and preparing Requests for Administrative Remedies.

Bureau of Prisons' Program Statement 1330.16, Administrative Remedy Program states the following concerning assistance from staff:

### ASSISTANCE §542.16

a. An inmate may obtain assistance from another inmate or from institution staff in preparing a Request or an Appeal. An inmate may also obtain assistance from outside sources, such as family members or attorneys. However, no person may submit a Request or Appeal on the inmate's behalf, and obtaining assistance will not be considered a valid reason for exceeding a time limit for submission unless the delay was caused by staff.

b. Wardens shall ensure that assistance is available for inmates who are illiterate, disabled, or who are not functionally literate in English. Such assistance includes provision of reasonable accommodation in order for an inmate with a disability to prepare and process a Request or an Appeal.

As referenced above, you may obtain assistance in utilizing the Administrative Remedy process from other inmates, institution staff and outside sources, such as family members or attorneys.

Based upon the above, I find no evidence to substantiate your claim of staff not providing you with assistance in filing Requests for Administrative Remedies.

Therefore, your request for Administrative Remedy is for informational purposes only.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Gateway Complex, Tower II, 8th Floor, 4th & State Ave., Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

8/5/08
_____
Date

H. J. Marberry
Complex Warden

#26

Special Exhibit (B)/BP-10

JURIJUS KADAMOVAS, 21050-112
TERRE HAUTE USP    UNT: SCU    QTR: X01-411L
4700 BUREAU ROAD SOUTH
TERRE HAUTE,  IN 47802

*JK* RECEIVED SEP 25 08 AT ≈ 12:30

#27

Remedy No.: 507543-F1                                    FCC Terre Haute, IN

## PART B - RESPONSE

This is in response to your Administrative Remedy receipted on September 8, 2008, in which you request clarification concerning a requirement for administrative remedies to be written in English.

A review of your request indicates Unit Staff provided you with an explanation concerning this issue. There is no specific requirement mandating administrative remedies be written in English. Program Statement 1330.16, Administrative Remedy Program, states inmates have the responsibility to use this Program in good faith and in an honest and straightforward manner. Therefore, it is preferred you continue to make an effort to write your administrative remedies in English. Additionally, you can continue to seek the assistance of your Unit Team and other inmates when filing administrative remedies.

Therefore, your request for Administrative Remedy is for informational purposes.

If you are dissatisfied with this response, you may appeal to the Regional Director, Federal Bureau of Prisons, Gateway Complex, Tower II, 8th Floor, 4th & State Ave., Kansas City, Kansas 66101. Your appeal must be received within 20 calendar days of the date of this response.

9/22/08
Date

H. J. Marberry
Complex Warden

#28

U.S. DEPARTMENT OF JUSTICE

Federal Bureau of Prisons

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: **Kadamovas Jurilui**     #21050-112    SCU    USP/TH
     LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST** On August 6th, 2008 I sought redress for Mr. Julian, Unit Manager, Mr. English, Case Manager and Mr. Ryherd, Case Worker/Special Confinement Unit ("SCU") mandating that I prepare, draft and file all my grievance in English. Because of my significant language barrier and cultural barrier as well, as I am a native of Russia and illiterate in English. Whereas' all of the above SCU Administrative Officials have and continue to refuse to aid me with preparing, drafting and filing grievances at the facility level or appeals it is impossible for me to competently and comprehensively articulates issues being presented through applicable administrative procedures. As now, I am sometimes able to gain—aid from another prisoner, Wesley I. Purkey #14679-045 with filing administrative remedies and as well as through him understanding what the particular response states. Although I do not comprehend the applicable BOP Policies goerning the filing—of administrative remedies. The above SCU administrative officials have all told me that it is not their jobs or responsibility to aid me with drafting grievance and/or administrative appeals and to go get Purkey to help me. In response with my request to draft, pepare and file administrative grievances in my native language which I am fluent in Mr. English contends that - filing grievances in other than the English language is not necessarily prohibited, inter alia, but it is preferred inmates make an effort to write administrative remedies in English. Without clarification he goes on to say that if the English language is not utilized in such filings the process may may become extremely protracted in response time and etc. Moreover' Mr. English spuriously contends that I am PROFICIENT IN ENGLISH, and speciously makes this claim finding conclusionary support in asserting that this is based on my communications with both staff and inmates alike. This administrative remedy follows Mr. English's pertinacious charade which has absolutely no indicia of credibility

Spetenber 2nd., 2008      Continued Next Page    XXX    *[signature]*
DATE                                                        SIGNATURE OF REQUESTER

**Part B- RESPONSE**

DATE                                                WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

**ORIGINAL: RETURN TO INMATE**          CASE NUMBER: SO 7543-F

CASE NUMBER: _____

**Part C- RECEIPT**

Return to: _____
     LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT: _____ #25

DATE                                      RECIPIENT'S SIGNATURE (STAFF MEMBER)    BP-229(13)

USP LVN

Juriluj Kadamovas #21050-112                          EP - 9 Continued
September 2nd., 2008                                   Denial Access To The Courts'

what-so-ever and perpetates' this ruse to disguise these administrative officials violation of BOP Policy,
and as well as my constitutional rights of access to the courts.

    Under applicable BOP Administrative Policy Unit Administrative Officials, including Mr. Julian,
English and Ryherd are to assist inmates with preparing and filing administrative grievances who are not
capable of doing so for themselves, for whatever reason might exist. In this case I am illiterate in
English, have on numerous occasions requested and been denied assistance by all of the SCU administrative
personnel in preparing and filing administrative remedies, including this one which Mr. Ryherd refused to
assist me with August 29th, 2008. Because I am not able to read the administrative policies, let alone
interpret them in English I am not able to comprehensively articulate issues for redress through the administra-
tive channels. This particular issue has been and is being address through the applicable administrative
processes and will not be presented here beyond the mentioning of such for clarification at the impetus
behind the charade Mr. English is perpetating and why. The facade Mr. English depictures through his untenable
and tenuous claim that I am proficient in English is simply a glaring effort to disguise and conceal his and
his co-workers ongoing flagrant violations of law in denying me access to the courts which exhaustion of administra-
tive remedies is predicated on and arcilliary to. Here the applicable SCU administrative officials have and
continue to deny me what BOP Policy and applicable law mandates, and that is aid with helping prepare, draft
and file administrative remedies. This is the driving force behind Mr. English's charadj and facade that I
am proficient in English, and in fact Mr. English's claims asserted defeats this pretentious claim and here
is why:

    First Mr. English that I have been provided different language books and other translation devises
to assis me in communicating in English. Of course Mr. English choose to cull the applicable facts which I
will succinctly clarify. But' for the sake of argument if I was PROFICIENT IN ENGLISH as Mr. English claims,
then why am I being provided these various language textbooks and other translating devices? Hrad as all get-
out to reconcile that with any logic, but of course Mr. English's claim of proficient is predicated on a
self serving reasons dipping with motivation to misrepresent and so he does. Secondly' I do have a couple
of different language books and a small Russian/English dictionary, and perhaps Mr. English could utilize
such in interpreting my grievances written in my native language, as he makes this same untenable claim
that I am proficient in English because I have access to these very difficult textbooks to study without
any guidance or help. Further' the very Russian/English Dictionary that has been provided to me does not
even have the word PROFICIENT in it, and if Mr. English would like to verify this fact he is more than welcome
to come to my cell and see for himself. Lastly' Mr. English's claim that I am proficient in English and
can be verified through my communications with staff and inmates alike is truly ridiculous, but many, many
claims presented by this unit administrative officials are - but are always self serving. Perhaps the U.S.
District for the Eastern District L.A. Calf. provided almost a half of a million dollars during my trial and
the Nint Circuit Court of Appeals contine to afford funding for an interpreter just for the heck of it - kinda
like any capital defended can obtain funding of this magnitude for a alnguage interpreter without any legitimate
verification of necessity. Mr. English's charade and facade is truly transparent in the face of the indubitable
facts dissipating such which is totally void of a scintilla of indicia of credibility. Which is vividly seen
in the contradicting statements made in his untenable response, whereas he ends his response claiming that I
am proficient in English, but' even so, inter alia, I may seek out the assistance of my Unit Team and other
inmates when filing my administrative remedy requests or submitting other correspondence. As perspicuously
enunicated above that he and the other Unit Team Member have and continue to deny me assistance in filing
grievances, what other correspondence I can as well seek his and the Unit team assistance with he failed
to identify such, but in reality that claim is just more of teh same mumble jumble......

Resolution: This addresses the facade and ruse set forth by Case manager English that I am proficient in
English, and as well request specific clarification whether I am allowed to file administrative remedies, and
'other correspondence' in my native language, and if so then will such administrative processes be processed
under the prolungation of the applicable BOP grievance procedures. Thank You.

<u>End of Extra Page EP - 9</u>

#30

Attachment 1
Page 1 (front)
THX 1330.13I

## FEDERAL CORRECTIONAL COMPLEX

### Terre Haute, Indiana

### INFORMAL RESOLUTION FORM

Bureau of Prisons Program Statement 1330.13, Administrative Remedy Program, states "Inmates shall informally present their complaints to staff, and staff attempt to informally resolve any issue before an inmate files a request for Administrative Remedy."

In keeping with the spirit and intent of Bureau of Prisons Program Statement 1330.13, the following form shall be utilized by staff in attempting to informally resolve an inmate's complaint.

ONLY ONE (1) COMPLAINT SHALL BE PLACED ON EACH FORM
== ===================================================================

INMATE'S NAME: _J. KAVAMOVAS_ REG. NO.: _21050-112_ UNIT: _SCU_

DATE/TIME COMPLAINT RECEIVED FROM INMATE: _AUG 6. 2008_

NATURE OF COMPLAINT: _WHAT IS THE POLICY REGARDING GRIEVANCES: BP-8,9,10,11 DOES ALL MANDATED TO BE IN ENGLISH ONLY? PLEASE AFFORD POLICY IF ONE DESIGNATES SUCH ENGLISH ONLY!_

ACTION TAKEN TO INFORMALLY RESOLVE COMPLAINT: _See response attached_ _8-25-08_

THE APPLICABLE PROGRAM STATEMENT USED IN THIS INFORMAL RESOLUTION ATTEMPT: _____

INFORMAL RESOLUTION WAS ACCOMPLISHED: _____

DATE _____

INMATE'S SIGNATURE: _____

SIGNATURE INDICATES INMATE'S ACCEPTANCE OF RESOLUTION

#31



**U.S. Department of Justice**

Federal Bureau of Prisons

*Federal Correctional Complex*
*Terre Haute, Indiana*

Date:    August 25, 2008

Reply To
Attn Of:    B. English, Case Manager

Subject:    Informal Resolution

Currently, there is no specific requirement mandating that administrative remedies be written in English. However, it is preferred inmates make an effort to write administrative remedies in English. By doing so, it will not be necessary to obtain a translation of your request, which may delay the processing of your request.

Based upon your written correspondence and communication with staff and inmates, it appears you are proficient in English. Moreover, it is my understanding that you have been provided with various language textbooks and other translation devices to assist you in communicating in English. Finally, you may seek out the assistance of your Unit Team and other inmates when filing your administrative remedy requests or submitting other correspondence.

#3

```
JURIJUS KADAMOVAS, 21050-112
TERRE HAUTE USP     UNT: SCU     QTR: X03-305L
4700 BUREAU ROAD SOUTH
TERRE HAUTE,  IN 47802
```

Изменение — жалобы на Английском.

# Изменили

получил Jan 12.09

В Jan 8.09 я получил ответ на Remedy 507596-R1 от Michael K. Nalley, Regional Director, о медицинской жалобе по колени, которая была на Русском языке !!!

Здесь дата на Remedy 507543-R1  12/19/08

А на 507596-R1  12/22/08

Получается что 19 дек 08 он запрещает писать жалобы на Русском, а 22 дек 08 сам дает ответ на мою жалобу на Русском !! ! Где логика? Да и подписи разные ) ! !

Я думаю что в Terre Haute просто подделали ответ Регионального директора. Но при более большом разбирательстве он явно встанет на сторону Terre Haute.

#33

**U.S. Department of Justice**
**Federal Bureau of Prisons**
**North Central Regional Office**

**Regional Administrative Remedy Appeal**
**Part B - Response**

---

**Administrative Remedy Number:**    507543-R1 (Amended)

---

This is in response to your Regional Administrative Remedy Appeal received in this office on October 6, 2008, in which you allege you are being denied access to the courts because you are not receiving assistance in preparing administrative remedy documents. You allege you are not proficient in English and request to file administrative appeals in your native language.

We have reviewed your appeal and the Warden's response dated September 22, 2008. Since our previous response, we have received additional information regarding your ability to communicate in English. Specifically, you have filed numerous administrative remedies in English, you have demonstrated and documented the ability to communicate with staff and inmates in English, you have been provided a hand-held Russian/English translator, and you have two attorneys with whom you have no problems communicating. As indicated in the previous response, as well as in Administrative Remedy 501079-R1, staff have provided assistance to you in the past and remain available to assist you in the future. Additionally, you may seek assistance from family members, attorneys or other inmates as needed. Accordingly, you are considered proficient in English and any correspondence with the Bureau of Prisons you submit in Russian will not be honored.

Based on the above information, your Regional Administrative Remedy Appeal is denied.

If you are dissatisfied with this response, you may appeal to the Office of General Counsel, Federal Bureau of Prisons, 320 First Street, NW, Washington, DC 20534. Your appeal must be received in the Office of General Counsel within 30 days from the date of this response.

12/19/08
Date

Michael K. Nalley, Regional Director

_T___ 1 To Inmate
1/12/09
5 July u/m

#34

**U.S. DEPARTMENT OF JUSTICE**

Federal Bureau of Prisons

**REQUEST FOR ADMINISTRATIVE REMEDY**

*Type or use ball–point pen. If attachments are needed, submit four copies. Additional instructions on reverse.*

From: J. KAVALIOVAS     21050-112    SCU    TERRE HAUTE

       LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

**Part A- INMATE REQUEST** On 4.8.10 submited a Cop Out to Mr. Shoemaker (Unit Manag-er attachment SE #1) He has failed to grant me a response. On 4.15.10 submited a BP-8 to Mr Shoemaker unit Manager (See attachments SE #2) He also failed to grant me a response.

I want him to inventory my electronic discovery materials that are presently being housed in cell C-312.

On Apr 22.10 I was alowed to count my CD's DVD, stored in C-312 in front of colection oficer Mr. Hart during inventory I discovered shortfall in quantity.

On Apr 24, 2010 I was moved from cell #C-312 in to cell #C-308 across coralvod in front of cell # C-312 wich my discovery materials, when I have observe how other inmate in 5:50pu was moving from cell #C-311 in to cell #C-312, inmate Bartle #11451-086 opened boxes with my discovery and cearl-over, then put boxes in to the table when I was not be able to see what he doing, after about 5-five minuts he get two boxes out of the cell #310 in to the corudor, then I asked coerection Oficer Mr. Item why it happen? He tell to me that they tell him move inmate from cell #311 to 312 and he don't know that then was my discovery. He put the boxes in cell #315.

You need things to my discovery other inmates 1) Have Inventory 2) keep in safe place!

26 APR 2010

DATE        SIGNATURE

**Part B- RESPONSE**

Инвентарисация CD,

EXHIBITS

DATE             WARDEN OR REGIONAL DIRECTOR

*If dissatisfied with this response, you may appeal to the Regional Director. Your appeal must be received in the Regional Office within 20 calendar days of the date of this response.*

ORIGINAL- RETURN TO INMATE         CASE NUMBER:

                                          CASE NUMBER:

**Part C- RECEIPT**

Return to:

       LAST NAME, FIRST, MIDDLE INITIAL    REG. NO.    UNIT    INSTITUTION

SUBJECT:

#35

*S.E. #2*

Attachment 1
THX-1330.13J

## FEDERAL CORRECTIONAL COMPLEX
## TERRE HAUTE, INDIANA
## INFORMAL RESOLUTION FORM

Inmate Name: Kadamovas, J.                    Reg. No. 21050-112
Unit: _____
        SCU/C-317

**NOTICE TO INMATE:** You are advised normally prior to filing a Request for Administrative Remedy, BP-2999(13), you must attempt to informally resolve your complaint through your Correctional Counselor. Please follow the steps listed below:

1.    **State your complaint:** On 4-8-10 I submitted a Cop-Out to Mr. Shoemaker/Unit Mang., attachment lable S.E. #1) He has failed to grant me a response in a timely manner, I want to inventory my electronic discovery materials that are currently being housed in cell C-312 y range before I start and/or even attempt to use this new computer they have for me to do aw work on, why he can not respond to this simply request is rediculous.

(If more space is needed, you may use up to one letter size (8 ½ x 11) continuation page. You must also submit one copy of supporting exhibits. (Exhibits will not be returned with the response to the BP-229(13) responses.))

2.    **State what actions you have made to informally resolve your complaint:** Submitted Cop-Out, no more time for talk, time for action.

_____
_____

3.    **State what resolution you expect:** I want him present during the inventory of my tronic discovery materials and repremanded for him not providing me with a response to my Cop- in a timely manner.

Inmate's Signature: _____        Date: 4-15-10

Correctional Counselor's Comments (Steps to Resolve): _____
_____

Counselor' Signature: _____    Date:
Unit Manager's Review: _____    Date:
Informally Resolved: _____    Date:

| | BP-8 ISSUED | BP-8 RETURNED | BP-9 ISSUED | BP-9 RETURNED |
|---|---|---|---|---|
| DATE | | | | |
| TIME | | | | |
| COUNSELOR | | | | |

#36

BP-A148.055 **INMATE REQUEST TO STAFF** CDFRM
SEP 98
U.S. DEPARTMENT OF JUSTICE                          FEDERAL BUREAU OF PRISONS

| TO: (Name and Title of Staff Member) MR. SHOEMAKER /Unit Mang. | DATE: 4-8-10 |
|---|---|
| FROM: KADAMOVAS, J. | REGISTER NO.: 21050-112 |
| WORK ASSIGNMENT: | UNIT: SCU/C-317 |

SUBJECT: (Briefly state your question or concern and the solution you are requesting.
Continue on back, if necessary. Your failure to be specific may result in no action being
taken. If necessary, you will be interviewed in order to successfully respond to your
request.

Before I start to use the new computer you have
for me to use, I want a complete inventory
of my Electronic Discovery Material being housed
currently in cell C-312 on my range, and
I want you and I present so that I
don't get blamed for lost and/or destroyed
items that are part of my Electronic Discovery
Material.

(Do not write below this line)

DISPOSITION:

The inventory was done yesterday 4/22/10.

| Signature Staff Member | Date 4/23/10 |
|---|---|

Record Copy - File; Copy - Inmate
(This form may be replicated via WP)

This form replaces BP-148.070 dated Oct 86
and BP-S148.070 APR 94

FILE IN SECTION 6 UNLESS APPROPRIATE FOR PRIVACY FOLDER

**SECTION 6**

#37

On May 22, 2010 I, inmate C. Vialva Reg# 91909-080 was working as the CD orderly at approximately 1:00PM. I walked down C-lower range to pick up CDs. The first CDs I retrieved came from inmate Battle. As part of my normal routine I count the CDs and then check to make sure all the CDs are in their proper cases. While doing so I discovered that 2 out of the 5 CD cases issued to Battle contained the wrong CDs. Upon further review I also discovered that 2 cases actually contained legal CDs. One of them was marked "Mikheil Discovery", and the other "Karamovas legal". I immediately notified officer Hart and explained to him what I found and where I found them. I also asked him to retrieve the proper CDs for the Etta James and Richard Pryor cases and he did. Officer Hart and I asked Karamovas if the legal CDs were his and he replied "yes" then told officer Hart to give the CDs to counselor Edwards.

#91909-080

#38



IDENTICAL IMAGE, DIFFERENT ADDRES. ON TOP MY ADDRES
FOR THE DIFFERENT SET UP? LOWER ALTMANIS ADDRES



EXHIBIT

H-39

**FILED**

JUN 21 2010

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 07-99009 |
| Plaintiff-Appellee, | D.C. No. 2:02-cr-00220-DT |
| v. | Central District of California |
| JURIJUS KADAMOVAS, | Los Angeles |
| Defendant-Appellant. | ORDER |

Before: Peter L. Shaw, Appellate Commissioner

On June 4, 2010 the Court received Appellant's pro se motion, dated May 25, 2010, which raises additional issues concerning Appellant's laptop computer, the translation device, and alleged interference with and neglect of Appellant's legal materials by prison staff members.

Because Appellant is represented by counsel, Appellant may not communicate with the Court directly, but only through his counsel of record.

Pursuant to this Court's June 3, 2010 order, Appellant's counsel has a status report due July 1, 2010 in this Court. On its own motion, the Court extends the due date of the status report to July 22, 2010 so that Appellant's counsel may also address in the status report the concerns raised in Appellant's June 4, 2010 pro se motion.