# Exhibit 1

Nos. 07-99008 & 07-99009

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

*v.*

IOURI MIKHEL & JURIJUS KADAMOVAS,
*Defendants-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT*
*FOR THE CENTRAL DISTRICT OF CALIFORNIA*
*DISTRICT COURT NO. CR 02-220-DT*

## GOVERNMENT'S  SUPPLEMENTAL
## ANSWERING BRIEF

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

MICHAEL ANTHONY BROWN
Assistant United States Attorney
Criminal Appeals Section

1000 United States Courthouse
312 North Spring Street
Los Angeles, CA 90012
Telephone: (213) 894-8230
Email: Anthony.Brown@usdoj.gov

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

# TABLE OF CONTENTS

| DESCRIPTION | PAGE |
|---|---|
| I  INTRODUCTION | 1 |
| II  BACKGROUND | 2 |
| III  ARGUMENT | 3 |
| IV  CONCLUSION | 11 |

## TABLE OF AUTHORITIES

**DESCRIPTION**                                          **PAGE(S)**

**Cases**

*Carpenter v. United States,*
    No. 16-402 ....................................................................................2

*Cerezo v. Mukasey,*
    512 F.3d 1163 (9th Cir. 2008) ........................................................3

*Puckett v. United States,*
    556 U.S. 129 (2009) ........................................................................5

*Rakas v. Illinois,*
    439 U.S. 128 (1978) ........................................................................4

*Smith v. Marsh,*
    194 F.3d 1045 (9th Cir. 1999) ........................................................3

*United States v. Mondragon-Hernandez,*
    546 Fed. Appx. 693 (9th Cir. 2013) ................................................5

*United States v. Murillo,*
    288 F.3d 1126 (9th Cir. 2002) ........................................................3

**Statutes**

18 U.S.C. § 2703(d) ................................................................................2

**Federal Rules**

Fed. R. Crim. P. 12(b)(3) ........................................................................3

Fed. R. Crim. P. 12(c)(3) ........................................................................3

Fed. R. Crim. P. 52(b) ............................................................................5

ii

Nos. 07-99008 & 07-99009

# IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

IOURI MIKHEL & JURIJUS KADAMOVAS,

*Defendants-Appellants.*

*APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE CENTRAL DISTRICT OF CALIFORNIA DISTRICT COURT NO. CR 02-220-DT*

## GOVERNMENT'S SUPPLEMENTAL ANSWERING BRIEF

## I

## INTRODUCTION

After briefing in this ten-year-old consolidated appeal was already completed, Defendants-Appellants Iouri Mikhel and Jurijus Kadamovas ("defendants") moved this Court to file a supplemental brief raising a claim they could have raised in any of their three opening briefs but

never did, namely, that historical cell cite location data introduced in their trial was obtained in violation of the Fourth Amendment, requiring reversal of their convictions and sentences. For the reasons given below, the Court should reject this claim.

## II

## BACKGROUND

This term, in *Carpenter v. United States*, No. 16-402, the Supreme Court will determine whether obtaining historical cell cite location records with a court order issued under the Stored Communications Act, 18 U.S.C. § 2703(d), which requires only "reasonable grounds" for believing that the records are "relevant and material to an ongoing investigation," violates the Fourth Amendment. In their supplemental brief, defendants argue that, if the Supreme Court rules against the government in *Carpenter*, the historical cell cite location evidence admitted at their trial—originally obtained with a § 2703(d) order (ASER 11-15)[1]—would have been seized in violation of the Fourth

---

[1] "ASB" refers to Appellants' Supplemental Brief (ECF No. 224), and "ASER" refers to Appellants' Supplemental Excerpts of Record (ECF No. 227).

2

Amendment and, thus, erroneously admitted. (ASB 2-3.) Defendants contend that their sentences and convictions will have to be reversed as a result. (ASB 3.)

## III

## ARGUMENT

As an initial matter, this Court should not even reach the merits of defendants' claim. Because defendants did not raise it in any of their three opening briefs, the claim is waived. *See, e.g., Cerezo v. Mukasey*, 512 F.3d 1163, 1165 n.5 (9th Cir. 2008) (issue raised for the first time in a supplemental brief was waived); *Smith v. Marsh*, 194 F.3d 1045, 1052 (9th Cir. 1999) ("[O]n appeal, arguments not raised by a party in its opening brief are deemed waived.").

The claim is also waived because defendants did not move to suppress the evidence in the district court and do not now offer any satisfying explanation for their more-than-ten-year delay in raising it. *See United States v. Murillo*, 288 F.3d 1126, 1135 (9th Cir. 2002); Fed. R. Crim. P. 12(b)(3), (c)(3) (suppression motions must be made before trial; untimely motions may be considered if a defendant shows good cause). To the extent that defendants, by mentioning that the

3

government recently produced a copy of its application for the § 2703(d) order, are suggesting that they just learned how the government acquired their historical cell site location data, they are wrong.  The § 2703(d) order, which bears Bates numbers indicating it was disclosed in pretrial discovery (SER 11-15), demonstrates that the basis for a suppression motion was reasonably available to defendants before trial and could have been raised in a timely fashion.

To the extent that defendants are challenging the seizure of historical cell cite location data for cell phones belonging to their codefendants and victims, which was also authorized by the § 2703(d) order, the claim should be rejected because defendants lack Fourth Amendment standing to raise such a claim.  *See Rakas v. Illinois,* 439 U.S. 128, 134 (1978) ("A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed.").

Even if the Supreme Court ruled in *Carpenter* that the Fourth Amendment requires a search warrant based on probable cause to obtain historical cell site location data, such a ruling would not mean

4

the district court plainly erred by admitting the cell site location data

for defendants' phones at trial.[2]  Because the evidence was obtained

pursuant to an otherwise valid § 2703(d) order, it was admissible under

the good faith exception to the exclusionary rule first announced in

*United States v. Leon*, 468 U.S. 897 (1984), which applies to "an officer

acting in objectively reasonable reliance on a statute" authorizing

warrantless search that is later determined to be unconstitutional.

*See Illinois v. Krull*, 480 U.S. 340, 349 (1987); *see also United States v.*

*Davis*, 785 F.3d 498, 518 n.20 (11th Cir. 2015) (en banc) (holding that,

under *Leon*, the denial of defendant's motion to suppress cell site

location records did not constitute reversible error because the officers,

who obtained the records with a § 2703(d) order, acted in good faith);

---

[2] Because defendants never raised their claim in the district court, any review of the its merits must be for plain error.  Fed. R. Crim. P. 52(b); *United States v. Mondragon-Hernandez*, 546 Fed. Appx. 693, 694 (9th Cir. 2013).  To prevail under plain-error review, defendants must show (1) there was error, (2) the error was clear and obvious, and (3) the error affected defendants' substantial rights.  *Puckett v. United States*, 556 U.S. 129, 135 (2009).  Even if the defendants make this showing, the Court still has the discretion to remedy the error—"discretion which ought to be exercised only if the error seriously affects the fairness, integrity or public reputation of judicial proceedings."  *Id.*  "Meeting all four prongs is difficult, as it should be."  *Id.* (internal quotation marks omitted).

*United States v. Dorsey*, 2015 WL 847395, at \*8 (C.D. Cal. Feb. 23, 2015) (collecting cases applying *Krull* to the collection of historical cell site location records via § 2703(d) order).

Furthermore, any error in admitting the evidence at trial did not affect the guilt- or penalty-phase verdicts. Not including the cell site data, the government presented overwhelming evidence of defendants' guilt and of the aggravating factors supporting defendants' death sentences, including:

- The testimony of cooperating codefendant Ainar Altmanis, who said that he helped defendants abduct all five of their victims; helped defendants kill Muscatel, Umansky, and Kharabadze; and accompanied defendants on the trip in late January 2002 when they killed Safiev and Kharabadze and then disposed of their bodies. (GER 1304-99, 1402-49, 1456-62, 1482-1514, 1519-70, 1584-1629, 1637-1717.)

- The testimony of Kadamovas's wife and cooperating codefendant, Natalya Solovyeva, who described how she was recruited by Kadamovas to help abduct Kharabadze and Safiev; recounted that, when Muscatel was killed, Kadamovas disappeared on an overnight trip, returned from this trip with blood and dirt on his shoes and clothes, and later confided in her that he and Mikhel "threw out the body of the American" during the trip; and said that Kadamovas took a second overnight trip around the time of Pekler's disappearance, after which she found Pekler's passport inside Kadamovas's van. (GAB 52-54 (discussing testimony).)

- The testimony of cooperating codefendant Aleksejus Markovskis, who described how he helped abduct

6

Kharabadze and Safiev and later cleaned the Weslin Residence and the two cars used to transport Kharabadze and Safiev to the New Melones Reservoir. (GER 2879-2992.)

4) • The testimony of Vladimir Paniouchkine, who, at Kadamovas's request, tried to drain Kharabadze's and Safiev's bank accounts with credit and debit cards supplied by Kadamovas and, when he learned that the two had been murdered, turned the bank cards and the victims' driver's licenses over to the police. (GER 3321-51.)

5) • The testimony of a deputy from the Tuolumne County Sheriff's Department, who stopped Altmanis outside Sonora, California, on January 25, 2002, the same night defendants killed Kharabadze and Safiev and dumped their bodies in the nearby New Melones Reservoir. (GER 3469-80.)

6) • The testimony of Pekler's office assistant, who identified Kadamovas as "Volodia," Pekler's last business appointment before her disappearance. (GER 2037, 2051, 7467.)

7) • Handcuffs and other kidnapping tools seized at Mikhel's residence, including plastic flex ties, firearms, stun guns, and sedatives. (GER 376-415, 458-76.)

8) • Colored duct tape wrapped around Muscatel's head and the boot cover found inside his mouth, which matched items defendants bought at a Woodland Hills, California, Home Depot the morning they abducted Muscatel. (GER 530-31, 1788A-1788C, 5319A-5319B; 7461-62, 7466.)

9) • The shoeprint from Kadamovas's size 7.5 Adidas sneaker in Muscatel's blood on Parrotts Ferry Bridge. (GER 715, 1894-1938, 7465-65, 7504-13.)

10) • An envelope, with defendants' and codefendant Petro Krylov's fingerprints on it, containing the phone number for the pre-paid cell phone used during Umansky's abduction. (GER 849-51, 3871-77, 3900-01, 4139-47, 7412, 7432.)

7

11) • ATM surveillance camera footage of Mikhel using one of Umansky's bank cards to check his account balance and make a cash withdrawal, and of Altmanis's car in the background. (GER 1532-36, 2282-2301, 7404, 7475-79.)

12) • ATM surveillance camera footage of Mikhel using Safiev's and Kharabadze's bank cards to withdraw money from their bank accounts. (GER 2775-93, 2844-68, 7490-7501.)

13) • Video footage of Kadamovas purchasing a pre-paid cellular telephone used in the abduction of Kharabadze and Safiev. (GER 2303-16, 4147-57, 7433, 7484-89.)

14) • Cell phones belonging to Safiev and Kharabadze found at Mikhel's residence. (GER 4238, 4242.)

15) • Handcuffs seized at Mikhel's house, with the Safiev's and Karabadhze's DNA, and Kadamovas's fingerprints, on them. (GER 3742-47, 3894-95.)

16) • Audio recordings, seized from Kadamovas's house, of Safiev talking both to Kadamovas and to people whom Kadamovas had directed Safiev to call. (GER 3190-96.)

17) • Video monitors that had been stripped from Umansky's car and were found concealed in a couch at Altmanis's house. (GER 760-67, 1521-22, 1585-86.)

18) • A piece of paper, found in Mikhel's house, identifying the foreign bank account where Umansky's ransom was wired. (GER 471-72, 7405.)

19) • Documents found at Design Water World, defendants' business front where Safiev and Kharabadze were abducted, for accounts used to launder the Umansky, Safiev, and Kharabadze ransom money. (GER 1013-26.)

20) • A computer at Design Water World that contained, among other information, evidence that defendants had researched

8

Umansky's auto accessory business before abducting him. (GER 2069-80.)

21) • Papers found at Design Water World, some in Mikhel's handwriting, containing the telephone number for Konstantin Tezhik, victim Safiev's business associate; Tezhik's email address; and the script of a ransom call that Mikhel placed to Tezhik. (GER 1249-52, 3217-22, 3217-22, 3954-55, 7400-01, 7416-17.)

22) • A map found at codefendant Krylov's house with Kharabadze's home address written and marked on it, and with Kadamovas's fingerprints on it. (GER 741-47, 756-57, 2747-57, 3900-01, 7420-22.)

23) • A receipt and bank records found at Mikhel's house showing that two days after Muscatel's disappearance, Mikhel bought gas in Gorman, California, while en route from Los Angeles to the New Melones Reservoir. (GER 3457-67.)

24) • Wiretapped telephone calls between Mikhel and Kadamovas, Mikhel and codefendant Krylov, and Mikhel and an unindicted coconspirator in Russia, during which the parties discussed efforts to collect additional ransom money from Tezhik and plans for dividing up the ransom money already collected. (GER 3400-38.)

25) • The detailed tracing of the ransom money paid by Umansky's family and Tezhik. (*See* GAB 57-58.)

As this bulleted outline shows, the historical cell site location data was not by any means the only, or even the most convincing, evidence of defendants' guilt. The data—which showed that defendants were responsible for dumping the victims' bodies in the Northern California reservoir where they were later found—helped illustrate the full scope

9

of defendants' involvement in the hostage-taking offenses. But it was not crucial to proving the essential elements of those offenses. Nor was it crucial to proving, at the penalty phase, that defendants "engaged in the most aggravated conduct and were more culpable than other participants." (JSOB 3.) That was already well-established by evidence that defendants recruited their codefendants, devised the plans for abducting their victims, held the victims hostage in their own houses, killed the victims with their bare hands, and took the lion's share of the ransom money.

Finally, given the overwhelming evidence of defendants' guilt and of the alleged aggravating factors supporting their death sentences, as well as the inexplicable delay in raising their challenge, the Court should not exercise its discretion to remedy any error that may have occurred in admitting the evidence at trial.

10

## IV

## CONCLUSION

For the reasons given above, the Court should reject defendants' untimely and unexcused Fourth Amendment challenge to the admission of their historical cell site data evidence at trial, and affirm defendants' convictions and death sentences.

DATED: November 20, 2017  Respectfully submitted,

SANDRA R. BROWN
Acting United States Attorney

LAWRENCE S. MIDDLETON
Assistant United States Attorney
Chief, Criminal Division

*/s/ Michael Anthony Brown*

MICHAEL ANTHONY BROWN
Assistant United States Attorney
Criminal Appeals Section

Attorneys for Plaintiff-Appellee
UNITED STATES OF AMERICA

11

9th Circuit Case Number(s) 07-99008 & 07-99009

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)

Nov 20, 2017

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Michael Anthony Brown

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date)

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)