# Exhibit 6

Nos. 07-99008, 07-99009

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JURIJUS KADAMOVAS,

Defendant-Appellant.

---

Appeal from the United States District Court
for the Central District of California
Honorable Dickran Tevrizian, District Judge Presiding

## APPELLANT'S PRO SE SUPPLEMENTAL BRIEF

JURIJUS KADAMOVAS
Register No. 21050-112
USP Terre Haute
P.O. Box 33
Terre Haute, IN 47808

Defendant-Appellant

I am the appellant in this direct appeal from my convictions and death sentence imposed in 2007 in the United States District Court for the Central District of California.

I am a Lithuanian citizen. My native language is Russian. When I was arrested in 2002, I knew only a few words in English. I depended upon official interpreters to understand court proceedings and to communicate with my legal team.

My trial was not conducted in a fair manner. I could speak no English and almost all the evidence and discovery was never translated for me, nor was I allowed access to the discovery. I could not work with my investigators or help challenge the evidence. The judge sought to become the United States Attorney during my trial. The prosecutors misstated the facts and made unfair arguments, and my attorneys, particularly one appointed close in time to the trial, did not have sufficient time to prepare. I have sought access to the complete discovery in this case since prior to my trial, starting more than 10 years ago. I have filed many grievances with the Bureau of Prisons regarding the conditions of my confinement and the poor handling of my case materials. Indeed, I went on two hunger strikes while awaiting trial, and two here in Terre Haute on death row as part of my struggle to simply obtain and understand the discovery in my case.

Before my trial, when efforts to have discovery translated from English to

1

Russian proved too costly, my attorneys sought to obtain permission for me to review my discovery on a laptop computer equipped with Russian translation software. Jail officials, however, hindered my access and ability to meaningfully work with my computer and discovery. It was not until Day 43 of my trial, after months of repeated requests for the court to intervene, that my trial judge finally ordered that I could work on my case with my laptop computer, translation software and discovery in my cell.   By then, however, my attorneys were too busy to work with me about what I was finding in my discovery that was helpful to my case.

When I was finally able during trial to work on my case, I started to find information that not only helped my defense but which also pointed out mistakes and errors the government was making with the evidence and its arguments. Some of the errors I discovered included:

a. I discovered and alerted my lawyers that the government was incorrectly presenting evidence and arguing that a telephone call was made on December 14, 2001 from my home telephone number allegedly to unindicted co-conspirator Vladimir Sobolov in Russia, when the telephone call at issue was placed from my cellular telephone. After the government presented this incorrect evidence, my attorney advised government lawyers of the mistake, but, nevertheless, the government repeated the same incorrect information in their closing argument, which required my attorney to bring the mistake to the judge's attention and which caused the government lawyer to have to tell the jury about the mistake. The prosecutor downplayed the mistake when he told the jury: "But in any event, there is just one thing to correct. And one of the charts that was shown to you yesterday showed phone calls that were made -- represented phone calls were made from

2

a residential phone belonging to Defendant Kadamovas prior to sending the Umansky ransom note. In fact, that was from his cell phone." I later then learned, upon further reviewing discovery, that the call at issue was not only not made from my home telephone but that it was not even made to Sobolov but rather to Vladmir Tsukanov, a man whom I do not even know.

b.   I also soon thereafter tried to point out another government error that was made during my trial, but the judge would not listen and told me to tell my attorney, who then did nothing about the government's error. As a consequence, I could only tell the judge at my sentencing on March 12, 2007 that the government was wrong when it presented evidence and exhibits that, at 10:15 a.m. on December 6, 2001 (the time frame of victim Rita Pekler's disappearance), a telephone call from co-defendant Ainar Altmanis's cellular telephone was made to my cellular telephone (which according to government argument allegedly proved that my cellphone was in the Bakersfield, California area), when my review of Altmanis's cellular telephone bill shows that the call made at 10:15 a.m. was not to my cellular telephone, but rather to a completely different telephone number. Similarly, my cellular telephone bill shows that my cell phone did not receive a telephone call from anyone, let alone Altmanis's telephone at 10:15 a.m. on December 6, 2001.  Even at my sentencing, the judge stopped me from addressing other errors I had found.   He told me I was "just wandering and complaining."

These two government errors that I brought to the attention of the court during my trial only scratched the surface of what I actually found and what I could have found had I had earlier access to my discovery. Just these two errors made the jury believe that I had placed or received these telephone calls to and from persons involved in the crimes. Who knows what other government errors there were, that went unchallenged, and, therefore, led the jury to accept the government's versions as true. For example, I discovered two photos of the same two weights on a single

3

page provided in discovery. The upper image notes the address 3534 Weslin, and the bottom photo notes the address 4320 Mammoth #103. I believe this is proof that the government worked on several different versions of their case against me, and is evidence I could have found had I had earlier access to my discovery.

A comparison of my actual telephone records from discovery to the government's alleged evidence of my telephone calls shows that the government's exhibits were completely different from my actual telephone records: comparing one page from GTX 702A, Bates Stamp 17861 and the corresponding page from my original phone records, Bates Stamp 79203. The government exhibit of my telephone records for February 3-4, 2002 provides completely different information than my original records from Cingular Wireless Company. Examples like these could have harmed the government's case, and I should have been allowed to become meaningfully involved in my defense.

Once I got to death row, the government destroyed my case files and discovery (that were on DVDs and CDs with my notes) and comments about my findings which were attorney client privileged so that I would be unable to prove to counter the evidence used to convict me.

My inability to assist in my defense continued on appeal, as follows:

      a.     After my conviction, all my files, including discovery as well as all my personal and confidential notes were confiscated when

4

my trial lawyer sent them to USP Terre Haute where I have been since April 2007. Not only were my files confiscated but prison officials reviewed the contents outside my presence and without my permission and then claimed months later that 19 of the CDs of materials would not open. This made no sense to me because when I had last worked on my laptop computer in the MDC in Los Angeles, I had been able to open every CD and had made digital notes based upon my review of the discovery and other documents. My request to be present and watch the CDs being opened and to make an inventory was denied by BOP officials. A letter to my attorney confirms that my electronic media was confiscated and as such could not viewed in the prison visiting room and that 19 Compact Discs were unable to be viewed. E-mail communication between my attorney and a prison attorney in which the prison attorney informed my counsel that "Case Manager English scanned the discovery several months back for contraband and he did not have an issue opening any of the discovery." This proves that my files were erased or otherwise destroyed.

b.  My Motion to Nefarious Acts by the Government and Prison Officials in relation J. Kadamovas Legal, Discovery Materials and Trial transcripts which I sent out to the U.S. Court of Appeals for the Ninth Circuit, which was received but never formally filed in the Court record, explains in detail the problems I had been experiencing with access to my discovery, both at trial and after I arrived at USP Terre Haute.

c.  All my requests for meaningful access in my cell (as I had in Los Angeles) to a functioning computer with translation software and my discovery have been denied. In 2009, the master commissioner denied my pro se motion supplemented by my attorney's request for appointment of a Russian speaking attorney [Dkt. Nos. 97-98; 104; 112]. The master commissioner also denied my requests to have my trial transcripts translated from English to Russian and to delay the filing of my appeal until the transcripts were translated. [Dkt. No. 189].

5

d.   Not only was I not allowed meaningful access to my discovery and the ability to work on my case, but prison officials did not keep my materials safe so that in 2010, my digital case materials were found in the cells of other prisoners who had been locked in the cell where my case materials were stored. My request at this point to do a full inventory of my case files was only partially allowed. I was allowed to count the disks and learned that 22 were missing, and 3 of the 22 missing disks contained attorney/client privileged materials. Three disks probably contained dozens of gigabytes of important information, so this was no small loss. I was not, however allowed to make an inventory by checking them with a computer.

e.   Then, in 2012, I was notified that my paper legal files were too big and that they had to be mailed out or they would be destroyed. Having no choice, I mailed three boxes to my attorney. During this process some of the boxes with my legal paper work were lost and never made it to my attorney. Rather than admitting that the BOP policies were the issue, the BOP took no responsibility for the loss of my legal materials.

f.   I resorted to two hunger strikes, one in 2010 and a second in 2011 to protest the conditions of my confinement, including my access to my discovery, the deliberate destruction of my legal materials and my inability to work on my appeal. I was so humiliated and desperate that I felt at the time I had no option but to drop my appeals to bring attention to my plight. In April 2017, for similar reasons, I submitted my Notification of Intent to Withdraw Appeals. [Dkt. No. 339].

g.   Documentation recounts events when BOP supervisor of education Diana Quinones submitted a false declaration to the Court of Appeals in support of efforts to prevent me from having computer with necessary software in my cell so that I could meaningfully work on my appeal, and my efforts to address this issue with former Complex Warden J.F. Caraway. Part of Warden's response to me states: "You allege the supervisor of education submitted a declaration to the Court of Appeals that

6

contained false information. According to the Supervisor of Education, she does not recall ever submitting a declaration to the Court of Appeals," and he then denied me the opportunity to show proof of this issue. To me it is still not clear whether Mrs. Quinones simply lied in her declaration or whether some other BOP officials submitted documentation to make it look like her declaration.

If I can meaningfully participate in the proceedings I will continue to find things that would disprove the evidence against me. The 21st century is a digital world. Lawyers file motions and court orders electronically. In the pre-digital discovery age, death row prisoners could spend any or all waking hours working on their cases in their cells. All they needed was a pen, a notepad, and the hard copy versions of their discovery and transcripts. My discovery was provided by prosecutor digitally on CDs and DVDs. If case-related materials are provided in an electronic format, then the government should be obligated to provide prisoners with a meaningful ability to work on their cases in the same or relatively similar fashion they could with hard copies of their case materials, and must have the same attorney client privilege protection. I believe prisoners should have the same possibility to conduct side-by-side phone and bank records, and photo array reviews. Prisoners should have a possibility to sort files, the ability to highlight and make notes on documents and then save them, have the ability to search all documents at once, to review video and edit clips, and the capability to listen to audio files. Additionally,

7

there should be translation software for non-English speaking prisoners and all other technical capabilities necessary to meaningfully work on their cases and to communicate with counsel in a confidential manner, as required by the Privacy Act of 1976 and protection by the attorney-client privilege and the work product doctrine. *See also* Rule 53 of the United Nations Standard Minimum Rules for the Treatment of Prisoners (the Nelson Mandela Rules) which provides: "Prisoners shall have access to, or be allowed to keep in their possession without access by the prison administration, documents relating to their legal proceedings."

The application of the death penalty, any miscarriage of justice or failure of the judicial system represents an irreparable loss of human life. I assert that the United States government has violated my rights under the International Covenant on Civil and Political Rights, specifically Part II Article 2, Part III Article 7, 14, 17, and 26, as well as the American Convention on Human Rights, "Pact of San Jose, Costa Rica" (B-32) specifically Article 8, Right To a Fair Trial, Article 12, Freedom of Conscience and Religion, and Article 25, Right to Judicial Protection. I pray that the U.S. courts will protect my rights under domestic United States law and that international courts will enforce these provisions of international law.

Respectfully submitted,

*s/Jurijus Kadamovas*, Defendant-Appellant

8

## CERTIFICATE OF SERVICE

I hereby certify that, on June 16, 2017, I electronically filed the foregoing

Appellant's Pro Se Supplemental Brief with the Clerk of the Court for the United

States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF

system.

I certify that all participants in the case are registered CM/ECF users and

that service will be accomplished by the appellate CM/ECF system.


Dated: June 16, 2017                    *s/Benjamin L. Coleman*
                                        BENJAMIN L. COLEMAN